**CAROLINE HUNT TRUST
ESTATE, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 95–531C.**

United States Court of Federal Claims.

April 29, 2005.

Rosemary Stewart, Spriggs & Hollingsworth, Washington, D.C., for plaintiff. Monica A. Freas, of counsel.

Kenneth M. Dintzer, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Scott D. Austin, Arlene Pianko Groner, John J. Hoffman, Elizabeth M. Hosford, and Jane M.E. Peterson, of counsel.

## OPINION

MEROW, Senior Judge.

### Factual background

The Caroline Hunt Trust Estate ("CHTE") seeks to recover its required contributions under a 1988 agreement with the government wherein its subsidiary Southwest Savings Association ("SSA"), acquired via merger, four troubled thrifts. Federal assistance included a $307.5 million credit to the regulatory capital level required of the vastly larger postmerger SSA. CHTE asserts the enactment of the Financial Institution Reform, Recovery, and Enforcement Act of 1989, Pub.L. 101–73, 103 Stat. 183 (Aug. 9, 1989) ("FIRREA") and its implementing regulations, which eliminated the $307.5 million capital credit, materially breached that agreement. CHTE seeks damages equal to the value of its contributions.

### The Caroline Hunt Trust Estate

CHTE is an irrevocable trust created in 1935 with diversified holdings in real estate, oil and gas, and other investments. Caroline Hunt is the sole beneficiary. Since 1982, and during all times relevant here, Donald Crisp ("Crisp") was the trustee who administered the Trust with a three-person advisory board of which he was a member.

In 1972, CHTE acquired majority ownership of SSA, a Texas chartered, federally regulated savings and loan association. Between 1980 and 1990, CHTE held more than 90% of SSA's stock. For approximately three years during this period, the president of SSA, Todd Miller ("Miller"), owned 4% of the shares, but Crisp held the voting proxy for those shares. The remaining shares were held by family members of Caroline Hunt, or their trusts. CHTE also controlled SSA's Board of Directors. From 1986 to June 1990, Miller was president, chief executive officer, and a director of SSA. No dividends were paid by SSA to CHTE since at least 1982 when Crisp became the trustee.

Prior to August 9, 1989 and the enactment of the FIRREA, the Federal Home Loan Bank Board ("FHLBB") was responsible for regulating all savings and loan associations, also referred to as thrifts. Thrift savings accounts were insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). 12 U.S.C. § 1461 *et seq.* (1988). These entities were independent agencies of the United States, although the FHLBB served as the operating head of the FSLIC, and the FSLIC conducted its operations as a division or office within the FHLBB. The FHLBB and FSLIC were abolished by FIRREA. The Office of Thrift Supervision ("OTS") succeeded these agencies as the federal regulator for open savings and loans associations and their holding companies. The Federal Deposit Insurance Corporation ("FDIC") replaced FSLIC as insurer. The Resolution Trust Corporation ("RTC") succeeded FSLIC as the federal receiver for closed associations. At 1995 year-end, the RTC was replaced by the FDIC as the receiver for all closed thrifts. 12 U.S.C. § 1441a(m)(1)-(2).

Before FIRREA, SSA was regulated by the Texas Savings and Loan Department as well as the FHLBB and FSLIC. After FIRREA, but prior to June 1990, SSA was regulated principally by OTS. SSA was required to obtain and file annual financial statements audited by an independent accounting firm and did so. During times relevant here, SSA, along with other federally regulated thrifts, filed quarterly Thrift Financial Reports ("TFRs").

As the principal shareholder of a FSLIC-insured institution, CHTE was a savings and loan holding company under the Savings and Loan Holding Company Act as it existed in 1988 (12 U.S.C. § 1730a et seq.) (the "Holding Company Act"). Jt. Stip. ¶ 3. CHTE was a diversified unitary savings and loan holding company, meaning its holdings included other investments in addition to SSA. If CHTE had owned more than one thrift, it would have been classified as a multiple rather than a unitary savings and loan holding company. Multiple holding companies were subject to more restrictions and filings, 12 U.S.C. § 1730a(e)(3) (1982 & Supp. V 1987), although under Section 408(m) of the National Housing Act and the Holding Company Act, FHLBB could have waived certain restrictions. CHTE made periodic filings required by the Holding Company Act and the FHLBB.

Under the Holding Company Act and regulations, CHTE was required to obtain the approval of the FHLBB before CHTE and/or SSA could acquire other thrifts. 12 U.S.C. § 1730a(e)(1);[1] 12 C.F.R. § 584.4 (1988).[2] On June 2, 1983, "in order to facilitate regulatory approval of the proposed acquisition of Landmark Savings Association of Ennis, Texas ('Landmark'), by [SSA]," Crisp, on behalf of CHTE, with the approval of Tom Hunt, another member of the Trust's advisory board, wrote to Joseph E. Settle, Principal Supervisory Agent of the FHLBank of Little Rock, Arkansas, that, "[t]he Trust will cause [SSA] to meet the minimum statutory reserve and net worth requirements applicable to institutions insured for twenty years or more, as set out in 12 C.F.R. § 563.13, and where necessary, will infuse additional equity capital, in a form satisfactory to the Supervisory Agent, sufficient to effect compliance with such requirements." DX 5. The Trust also agreed not to receive cash dividends in excess of 50% of SSA's net income. Id. On June 3, 1983, the FHLBB approved the Trust's application to acquire control of Landmark and to merge it into SSA.[3]

Subsequently, in 1986, CHTE sought federal approval to merge New Federal, a subsidiary of SSA, into Pioneer Savings Association of Waco, Texas, and liquidate the combination into SSA. At that time, an H-(e)3 Application under Section 408(e)(1)(A)(ii) of the National Housing Act

---

1. 12 U.S.C. § 1730a(e) (1988) stated in relevant part:

    (1) It shall be unlawful for–
    (A) Any savings and loan holding company directly or indirectly, or through one or more subsidiaries or through one or more transactions–
    (i) to acquire, except with the prior written approval of the Corporation [defined in Section 1725 as FSLIC], the control of an insured institution or a savings and loan holding company, or to retain the control of such an institution or holding company acquired or retained in violation of this section as heretofore or hereafter in effect;
    (ii) to acquire, except with the prior written approval of the Corporation, by the process of merger, consolidation, or purchase of assets, another insured or uninsured institution or a savings and loan holding company, or all or substantially all of the assets of any such institution or holding company. . . .

2. Acquisition of control of an insured institution required prior approval of the FSLIC. 12 C.F.R. § 574.3(a)(1988). Control was defined as acquisition of 25% or more of the stock of the institution or power to elect a majority of the Board of Directors. 12 C.F.R. § 574.4(a). 12 C.F.R. § 574.6(a)(3) mandated an Application "[b]y a savings and loan holding company for approval of acquisitions by merger, consolidation, or purchase of assets of an insured or uninsured institution."

3. The Trust's Application to acquire control of Landmark was made under H–490, presumably the predecessor to H-(e)3. DX 6. As part of the transaction, CHTE pledged savings accounts totaling $542,968 to eliminate any deficit in SSA's net worth. DX 291 at FCR 2964. Under similar terms, CHTE also pledged savings accounts totaling $899,180 in connection with a November 3, 1982 acquisition/merger of Ellis County Savings Association of Waxahachie, Texas. DX 291 at FCR 2966.

was required for a savings and loan holding company to acquire one or more thrifts by merger into its existing subsidiary. In its H-(e)3 Application, CHTE was the "Applicant."[4] On May 23, 1986, FHLBB Resolution No. 86–532 approved the Trust's Application on the condition that the Trust again stipulate to maintain SSA's regulatory capital at a certain level and limit dividends paid by SSA to CHTE. Subsequently, in a July 25, 1986 letter to the FHLBB's Principal Supervisory Agent, CHTE wrote that, as long as it controlled SSA, the Trust would cause SSA's net worth to be maintained at a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, and if necessary, infuse equity capital in a form satisfactory to the Supervisory Agent to meet those requirements. DX 24. The Trust also wrote that, absent prior approval from the Supervisory Agent, SSA would limit dividends to 50% of net income under parameters specified in the letter. *Id.* While referred to in testimony, exhibits and argument by various terms, including net worth maintenance agreements or obligations, these two letters are primarily described in this opinion as regulatory capital maintenance letters. While there was testimony that regulators required bilateral agreements in other transactions with other acquirers and other thrifts, the regulatory capital maintenance letters here were signed only by CHTE, not SSA, and were on CHTE letterhead. Neither of the letters were signed by the government nor any other party. The value of the release of any obligations of the Trust thereunder is an issue in this case.

On several occasions prior to the 1988 acquisitions that are the subject of this litigation, CHTE infused capital into SSA. CHTE contributed an office building, a bank branch, and stock in a life insurance company[5]. The government contends these contributions were not meaningful. The value of these contributions is not material to the court's findings. Also prior to the 1988 transactions at issue here, CHTE acquired subordinated debentures—promissory notes of SSA issued March 23, 1983 for $1.3 million;[6] August 31, 1984 for $5 million; June 28, 1985 for $15 million; and July 25, 1985 for $5 million. These notes are referred to collectively herein as the subordinated notes, subordinated debentures, or subdebt. In the event SSA was liquidated, the notes would be paid last, ahead only of stockholders, thus they were "subordinated." PX 3; Tr.2079 (Dr. McConnell). As of May 18, 1988, the outstanding balance owed to CHTE on the subordinated notes was $23,780,462.06. DX 210. SSA made all payments on these notes to CHTE. Pl. Facts 381 and Gov't Resp. The subdebt was included in SSA's regulatory capital. Tr. 177 (Miller). The value of CHTE's contribution of the subordinated notes to the equity of postmerger SSA is also an issue in this case.

### The thrift crisis and the government bailout

Much, if not most, of SSA's loan portfolio was secured by real property in the Dallas, Texas area. In 1987, the thrift industry in Texas was in crisis. Falling oil prices and the Tax Reform Act of 1986[7] undermined the

---

4. The 1986 H-(e)3 Application included a footnote/disclaimer stating that the legal advisors to the Trust opined that CHTE was not a savings and loan holding company as that term was defined in 12 U.S.C. § 1730a, and the filing of the Application should not be construed to be inconsistent with that opinion. DX530. The FHLBB disregarded this disclaimer. Tr. 1262–63 (Herrick). *See also* Tr. 1418–19 (Leibold) (the disclaimer had no significance). Counsel for FHLBB considered the disclaimer to be "an ineffective and futile effort to try to stake out a position that had been rejected." Tr. 2764 (Julie Williams, FHLBB Deputy General Counsel). This same disclaimer was contained in CHTE's H-(e)3 Application filed in connection with the May, 1988 acquisitions, the subject of this litigation. DX 138.

5. In 1984, CHTE contributed the stock of States General Life Insurance Company, which added $8,657,000 to SSA's capital, a value established by an independent appraisal, accepted by regulators. PX 170 at Pl. 006062; Tr. 178 (Miller). That company lost approximately $500,000 in 1987 and $1 million in 1988. Its premium income declined significantly during this period. Tr. 4478–79 (Bankhead).

6. This Note is the sum of 17 individual promissory notes.

7. The Tax Reform Act of 1986 eliminated tax benefits associated with real estate investments, particularly in multi-family residential and apartment buildings, which led to a decline in real estate values.

Texas economy in general, and the Dallas real estate market specifically. An oversupply of real estate depressed prices and lenders lost money on foreclosures. Texas thrifts paid higher interest rates on their savings deposits during the 1980s due to these economic conditions and increased competition— the "Texas premium." Most Texas thrifts with assets above $500 million that originated commercial loans in the 1980s did not survive this crisis.

These unprecedented market conditions put intense financial pressure on thrifts in the Dallas district, and by October 1987, no one could accurately predict when the Texas real estate market and the thrift industry would rebound. The pressure on government regulators as insurers of the thrift deposits was also intense. While the FHLBB faced some 20 failed institutions in 1987, in 1988 it faced nearly 300 possible failures in Texas. The deteriorating financial condition of the thrift industry overwhelmed FSLIC's resources. *Home Sav. of Am. v. United States*, 399 F.3d 1341, 1345 (Fed.Cir.2005) ("[A]lthough legally committed to compensating depositors whose savings were lost, [FSLIC] lacked sufficient funds to bail out all the failing thrifts."). By 1988, FSLIC was estimated to be insolvent by over $50 billion. *United States v. Winstar*, 518 U.S. 839, 847, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). All the insolvent thrifts simply could not be liquidated, so FSLIC sought private investors, both because it did not have the funds to pay depositors the deficits, and because it wanted to avoid public panic if all the troubled thrifts were liquidated. Pl. Facts No. 20 and Gov't Resp.; *Fifth Third Bank of Western Ohio v. United States*, 402 F.3d 1221, 1224 (Fed.Cir. 2005) (noting that to deal with this crisis, the FHLBB sought out healthy financial institutions and outside investors to acquire troubled thrifts).

In this financial and regulatory environment, the government offered cash, notes, and agreements to forbear from enforcing regulatory requirements as incentive for private investment. Much of the pre-FIRREA assistance inflated a troubled thrift's regulatory capital cushion through the accounting gimmick of supervisory goodwill, allowing the negative net worth of an acquired thrift to "count" as regulatory capital. *First Commerce Corp. v. United States*, 335 F.3d 1373, 1376 n. 1 (Fed.Cir.2003). As a result, a thrift with negative net worth was an attractive acquisition. The FHLBB also offered "capital credits," described by the Supreme Court as "an express commitment to include those credits in the calculation of regulatory capital." *Winstar*, 518 U.S. at 867, 116 S.Ct. 2432. Capital credits, like supervisory goodwill, cushioned depleting asset bases. Also, asset coverage (agreement to reimburse thrift for loss on the sale of an asset), yield maintenance (guaranteed return on the sale of certain assets), tax benefits, equity splits, and various other forbearances were negotiated through the FHLBB's Office of Regulatory Policy Oversight and Supervision ("OR-POS").

In this environment, CHTE's subsidiary SSA, which itself had a regulatory capital deficit of over $60 million, acquired four deeply insolvent Texas thrifts. Under the auspice and approval of CHTE's May 18, 1988 H-(e)3 Application, the four thrifts were placed into federal receivership and their assets and certain liabilities conveyed to SSA. FSLIC's financial assistance and incentive for CHTE's subsidiary SSA assuming these additional liabilities included a $307.5 million capital credit ("the capital credit"). Less than two years later, FIRREA caused the elimination of this credit.

Shortly following FIRREA, SSA was placed into federal receivership and liquidated. CHTE claims the passage of FIRREA and attendant elimination of the $307.5 million capital credit was a material breach of its contract with the government. As damages, CHTE seeks $23,979,700, the total value of the subordinated notes and the value of SSA, both contributions required under its contract with the government. After extensive pre-trial proceedings, a four-week trial, briefings and argument, supplemental filings were allowed to address recent Federal Circuit *Winstar* cases. Based on the testimony of numerous witnesses recorded in some 5,000 pages of trial transcript, arguments of counsel, the voluminous briefs submitted, together with some 574 exhibits, and over 600

findings proposed by the parties, the court reaches the following conclusions.

### Contract liability

Prior to the 1988 acquisitions at issue, SSA itself had a serious regulatory capital deficiency. In September 1987, SSA's regulatory capital deficit was $21,921,000; by December 31, 1987, it was $43,794,000; and by March 31, 1988, it was $60,884,000. DX 629A. Regulators were well aware of deficiencies prior to approving the acquisitions.

If SSA had not been able to acquire federal assistance, it had a "Plan B"—a "hunkerdown" survival strategy to attempt to return to regulatory capital compliance. Branches could have been closed; operating costs could have been trimmed. Tr. 498–99 (Miller); Tr. 1036–37 (Crisp); Tr. 1273–74 (Herrick). CHTE could have acquired some of SSA's troubled loans ·or provided noncash collateral. Tr. 499–500 (Miller). While the government argues that this amorphous Plan B would not have saved SSA from its ultimate (albeit post-May 1988) demise, the court's conclusions do not depend on conjecture over this hypothesis.

### SSA management was well-regarded

In 1987 and early 1988, in the FHLBB's Management Consignment Program ("MCP"), the government entered into contracts with thrifts considered to be well-managed to handle the day-to-day operations of other failing institutions. SSA's management was well-regarded, and was twice requested to participate in the MCP program. On the third urgent appeal, after Miller received authorization from Crisp, as he did before making major decisions, SSA accepted the government's plea and assisted in the management of a troubled thrift in Texarkana, Texas. · Tr. 181–82 (Miller). SSA's management reportedly performed well under the circumstances.[8] DX 125; Tr. 184 (Miller).

From 1985 to 1988, Miller was a director of FHLB–Dallas, having been elected by his thrift industry peers. During part of his tenure, he was the Vice Chairman. Tr. 166–69 (Miller).

### Negotiations commence

Before any negotiations began concerning these acquisitions, Crisp instructed Miller that any deal with the government to acquire troubled thrifts must include sufficient time for the economy and real estate values to improve, a release of the regulatory capital maintenance letters, and adequate financial assistance to carry SSA through until the economy recovered. Miller was authorized to grant the government equity in SSA in return for its assistance. Pl. Facts No. 91. On August 21, 1987, following their meeting, David Bradley of FHLB–Dallas sent SSA Executive Vice–President H. Martin Hearne ("Hearne"), a list of Texas thrifts in need of assistance. DX 46. On October 16, 1987, Miller proposed that, with federal assistance, SSA acquire three[9] troubled Texas thrifts. DX 65.

Crisp had been advised that there was a question whether the regulatory capital maintenance letters were enforceable. Pl. Facts No. 126 and Gov't Resp. Nonetheless, Crisp instructed Miller to condition any acquisition proposal on a release of these letters because, while the Trust was willing to risk its investment in SSA to do a deal, given the unknowns of troubled thrifts to be acquired, it would not be prudent for the Trust to extend that risk. Crisp testified: "in the very beginning of the negotiations, Mr. Miller and others made it very clear that the [release] was a condition." Tr. 978 (Crisp). Regardless of whether made by SSA or CHTE (or both), the request for release was on behalf of the Trust—the only signatory on the letters.[10] Tr. 3056–57 (former FHLBB

---

8. In a May 11, 1988 FHLB–Dallas memorandum, SSA management was cited as performing well in its management of the Texarkana, Texas thrift. The memo noted that SSA had incurred recent operating losses and was over $60 million below its minimum net worth requirement, but the losses did not appear to be the result of any management deficiencies. DX 125 at WSJ026 1671.

9. While the initial proposal was to acquire three, the number evolved to twelve and then fifteen; four thrifts were ultimately acquired. DX 81; DX 84.

10. The government strenuously objected to a finding that Crisp requested the Trust's release from any obligation under the regulatory capital maintenance letters, citing contrary deposition testimony in earlier litigation involving the RTC.

Chairman Danny Wall); PX 234B. A release was a condition from the very beginning and was raised in almost every subsequent meeting with the government.[11] Tr. 1250–51 (Herrick). Indeed, the government admits that a release was a condition of each acquisition proposal. Gov't Resp. to Pl. Facts No. 193. A release was a constant and a "deal-breaker" for CHTE. Gov't Resp. to Pl. Facts No. 129.

In the midst of these negotiations, during the Fall of 1987, FHLBB consultant Bud Gravette ("Gravette") formulated clusters of thrifts—combinations of troubled institutions proposed for acquisition. Previously, single troubled thrifts were generally touted as targets. This cluster approach evolved into FHLBB's "Southwest Plan" adopted February 3, 1988, in Resolution No. 88–68. This Resolution announced that the FHLBB was "engaged in the development of a plan for solving the multi-billion dollar problem of thrift institutions" in the Southwest.[12] PX 28. The Southwest Plan's goal was to consolidate troubled Texas thrifts under well-qualified management. Jt. Stip.¶ 7; Pl. Facts Nos. 24 and 27 and Gov't Resp. Unlike earlier efforts to deal with failing thrifts on a case-by-case basis, the Southwest Plan consolidated groups of failed thrifts for acquisition by entities with well-qualified management teams. FSLIC had not previously transferred a group of thrifts to one acquirer. Tr. 3488–90 (former FHLBB Supervisory Agent David Bradley). FHLBB/FSLIC solicitation material for the Southwest Plan outlined available government assistance, including capital loss coverage, yield maintenance, and a FSLIC note in the amount of the negative net worth of an acquired institution. Regulatory forbearances and specific accounting treatments could be requested, but were not automatically granted, and FSLIC could require an equity share in the resulting thrift. DX 88 at 900547–48.

FSLIC sent potential acquirers "invitations for investment," and "solicited people to indicate interest if they wanted to participate." Tr. 1842, 1846–47 (FSLIC Executive Director Stuart Root). If more than one invitee expressed an interest, offers were compared in a matrix. Tr. 1848 (Root). Gravette reported positively on SSA's management team. Miller was highly regarded by Gravette, Joe Selby, Executive Vice President and Director of FHLB–Dallas ("Selby"), and George Barclay, FHLB–Dallas President ("Barclay"). Id.

### FHLBB Resolutions

The FHLBB resolutions of May 18, 1988, contain the terms of the acquisitions as finally negotiated and approved. The FHLBB had the final authority to approve the acqui-

---

Gov't Resp. to Pl. Facts No. 91; Tr. 1088–91, 1093, 1094, 1097. There Crisp testified he was not involved in any efforts to extricate the Trust, and that all his negotiations with the government were on SSA's behalf. Complaints of inconsistency in prior litigation, however, cut both ways. In the RTC litigation, the government sued the Trust, alleging the Trust and the other individual shareholders were negligent and breached their fiduciary duty to SSA, dominated SSA's Board of Directors, controlled SSA, conspired to conceal SSA's true financial status in order to participate in the Southwest Plan, and were accordingly, responsible for its ultimate demise. Allegations of intimate involvement by CHTE are inconsistent with the government's position in this case. In any event however, Crisp's credibility in this regard is not critical to the court's findings. In the context of the subject transactions, a release would benefit only CHTE, regardless of the source of the request.

11. Release of CHTE's regulatory capital maintenance letters was in SSA's October 16, 1987 proposal to FHLB–Dallas (DX 65 at HB 024234);

the October 29, 1987 proposal (FX 17 at HB 024253); the November 24, 1987 proposal (DX 73 at HB 005654) and the January 15, 1988 proposal (DX 81 at HB 005729); as well as SSA's February 11, 1988 proposal to FSLIC and FHLBB (DX 84 at HB 005988) and SSA's March 7, 1988 proposal to FSLIC (DX 92 at WOT131 0305). The government never told Miller that a release could not be arranged. Pl. Facts No. 129 and Gov't Resp.

12. The Resolution stated: "[t]he Board has placed a major priority on resolving thrift problems in Texas in recognition of the fact that thrift troubles in that state constitute a major fraction of all thrift problems nationwide." PX 28, p. 1.

The Resolution also identified benefits the government intended to achieve by consolidating "insolvent institutions together with some combination of healthy institutions and capital infusions to produce viable thrifts," including reducing operating expenses, using capable management teams, reducing the percentage of higher cost deposits, and attracting capital to a market that had too many inefficiencies. Id.

sition of the troubled thrifts, and only the FHLBB could release the Trust from any obligations under the regulatory capital maintenance letters. Gov't Facts No. 38 and Pl. Resp.

Extensive negotiations discussed *infra* culminated before the FHLBB on May 18, 1988. The Board was presented with voluminous analyses and recommendation packages from three subagencies. First, the ORPOS package (from the so-called regulatory arm of the FHLBB), explained that SSA proposed to acquire four insolvent thrifts, Briercroft Savings Association of Austin, Texas ("Briercroft"); City Savings and Loan Association of San Angelo, Texas ("City Savings"); Lamar Savings Association of Austin, Texas ("Lamar"); and Stockton Savings Association of Dallas, Texas ("Stockton"). DX 139. These four insolvent thrifts would first be placed into FSLIC receivership and the package included the resolutions to do so. FSLIC would then convey the assets and liabilities of these thrifts to SSA.

CHTE was described as the holder of approximately 94% of SSA's stock. SSA's management's satisfactory performance in the MCP program was noted; its management was "experienced and capable," with "good organizational strengths," with a "rating of 1 for the Management MACRO factor." [13] DX 139 at WOB023 0494. The package also explained that while the Trust could have acquired each of the four failing thrifts directly, for business reasons the Trust chose to have its subsidiary, SSA, acquire them. [14] For perspective, SSA had approximately $1.4 billion in assets immediately before the May 18, 1988 transactions, and $6.8 billion in assets thereafter—a nearly fivefold increase. Jt. Stip.¶ 12.

The Board was informed that SSA itself was a troubled thrift, and its viability depended both upon the financial assistance in the proposal and time for the economy to recover. [15] The package included a FHLB–New York financial analysis memorandum that warned SSA's capital level was less than half of its requirement; its financial condition had seriously deteriorated over the preceding five quarters; reserves had not increased with additional nonperforming assets; "the association is over-stating its capital position;" and loss allowances appeared inadequate. DX 139 at WOB023 1069–71. SSA was in regulatory capital failure and its premerger prospects for survival were weak. *Id.*

SSA's then most recent audited financial statement for the fiscal year ending September 30, 1987 and its March 1988 TFR, were attached. *Id.* Attach. G & H. An FHLBB examination report of October 27, 1987, and an April 29, 1988 letter from SSA's assigned Supervisory Agent to SSA's Board of Directors (the "Supervisory Letter") summarized areas of concern and criticized SSA's $43 million regulatory capital deficiency. A detailed business plan to cure that deficiency was requested. *Id.* Attach. I & J. The regulators also questioned almost $200 million of SSA's assets, and asked that a prudent loan loss reserve be established in conjunction with independent auditors. Sporadic attendance by certain members of the Board of Directors was also noted. *Id.*

The package also included a May 4, 1988 letter from ORPOS that outlined areas of supervisory concern, and Miller's May 10, 1988 response. *Id.* Attach. J. A May 5,

---

13. MACRO was a regulatory acronym used to identify areas of review of a thrift's financial condition. Ratings ranged from a high of "1" to a low of "5." Tr. 1883 (Root); Tr. 3194–95 (Jardieu). MACRO components were: **M**anagement, **A**sset quality, **C**apital adequacy, **R**isk management, and **O**perations.

14. Crisp testified: "[w]ell, that, mechanically, is exactly what would happen. They would be merged into Southwest Savings. We felt that was the most efficient and effective way to do the merger. Certainly the most efficient in terms of cost. And we only had one management, so we

only needed one association. I don't recall that ever really being a matter of debate or discussion. I think everyone agreed that that was a desirable way to do it." Tr. 1002.

15. "In summary, the financial viability of [SSA] is dependent upon FSLIC assistance provided in conjunction with the 'Southwest Plan' **and** a turnaround in economic conditions in the association's market." DX 139 at WOB023 0493 (emphasis supplied). SSA's 1.9% regulatory capital was disclosed on the first page of the executive summary.

1988 memo from SSA's Supervisory Agent and Regulatory Analyst reported favorably on SSA as an acquirer, and noted management was strong and very capable. Its regulatory capital deficit was also described, as was the need for additional general reserves. *Id.* Attach. E.

Discussing this data and concerns raised therein, the ORPOS executive summary to the package attributed SSA's declining capital primarily to adverse economic conditions and concluded the pre-merger SSA's viability was dependent on FSLIC assistance. Adequacy of SSA's loan loss reserves was highlighted. The SSA Board was requested to revisit this issue with the concurrence of its independent auditors. ORPOS planned to followup. Change in the composition of the five member SSA Board of Directors was recommended due to sporadic attendance. The size of the Board was recommended to be increased by two members, experienced and not affiliated with either SSA or CHTE. *Id.* Attach. J, p. WOB023 0495. Two other conditions were endorsed—SSA should obtain prior regulatory approval of any senior management change (particularly a departure of Todd Miller which would elicit supervisory concerns) and submit a business plan for the newly enlarged thrift within ninety days. DX 139, p. WOB023 0496. The ORPOS summary concluded that supervisory concerns were not sufficient to warrant objection to the acquisitions, particularly since the planned FSLIC assistance would add to SSA's regulatory capital. The ORPOS package deferred SSA's postacquisition financial viability to FSLIC. *Id.* at WOB023 0498.

The ORPOS executive summary pointed out that massive government assistance was necessary to resolve the acquisition of four supervisory cases with an aggregate negative regulatory capital of approximately $924.2 million. *Id.* at WOB023 0499. The ORPOS summary also described the government forbearances to be extended. The FHLBB would agree to forbear for ten years from any supervisory or enforcement action against the postmerger SSA for failure to meet regulatory capital requirements *"provided that* SWS [regulators' acronym for SSA] regulatory capital does not fall below 3.0% to [sic] total liabilities." *Id.* at WOB023 0502 (emphasis in original). The release of CHTE from its regulatory capital maintenance letters, acknowledged as a "deal-killer," would be granted "in return for the association's conversion of its subordinated debt to the Trust for common stock." *Id.* at WOB023 0494, 0499. The substitution of permanent regulatory capital in the form of common stock would be exchanged for the Trust's subordinated debentures which would increase the permanent capital by approximately $27 million. *Id.* at. WOB023 0500. "[I]n the opinion of this Office, [this] adequately compensates for the loss of the net worth maintenance agreement as a source of capital." *Id.*

"[I]n order to facilitate the subject transaction," there was no objection to a limited waiver of the requirement that transactions between CHTE and SSA be approved by the regulators.[16] SSA was allowed to lease office space in a building owned by CHTE, provided that the lease was on market terms, both the Trust and SSA kept adequate records of the transactions to the satisfaction of the Supervisory Agent, and the amount paid by SSA to the Trust did not exceed $750,000 in any twelve-month period (the "transactions with affiliates" forbearance). *Id.* at WOB023 0502–03. Also, no supervisory objection was taken to the preapproval of certain future debts of the Trust ("debt preapproval").[17] *Id.* at WOB023 0507. These provisions were included in the draft forbearance letter in the ORPOS package. *Id.* at WOB023 1271–72.

The proposed government assistance package included a promissory note from FSLIC, the details of which were not the focus of the ORPOS package which concentrated on the regulatory rather than the financial and legal

---

**16.** 12 C.F.R. § 584.3 (1988) required preapproval of leases between a savings and loan holding company's subsidiary and an affiliate.

**17.** Under 12 C.F.R. § 584.6 (1988), no savings and loan holding company was permitted to issue, sell, renew, or guarantee any debt security, or assume debt without prior approval. These restrictions did not apply to a diversified savings and loan holding company such as CHTE, but the forbearance was extended in the event the Trust's status changed.

aspects of the acquisitions. Indeed, the Assistance Agreement, which the government argues is the "contract," to which CHTE is not a named party, was neither an attachment nor included in the ORPOS package. *Id.* at WOB023 0510. The ORPOS summary did explain, however, that the portion of the FSLIC note necessary to increase SSA's capital to 5% would be credited to SSA's regulatory capital (the "capital credit").

> The portion of the FSLIC promissory note(s) issued to SWS, pursuant to the Assistance Agreement, will be a credit to SWS' regulatory capital to the extent that such note(s) increases SWS' regulatory capital to a level equal to five percent of liabilities at the time of acquisition.

*Id.* at WOB023 0506–07. As subsequently computed, the regulatory capital credit was $307.5 million. Pl. Facts 154 and Gov't Resp. In other words, upon closing, the post-merger SSA would have $307.5 million credited toward its regulatory capital requirement. CHTE alleges the government's subsequent elimination of this $307.5 million regulatory capital credit was a substantial and material breach of contract.

Included as an attachment in the ORPOS package was CHTE's H-(e)3 Application, with CHTE listed as the "Applicant." DX 139, Attach. K, WOB023 1247–69. CHTE's H-(e)3 Application, signed by Crisp, requested approval for CHTE to acquire up to 15 Texas thrifts via merger into SSA. CHTE was permitted to file a short-form application because information on the Trust was already on file. Tr. 1259–60 (Herrick); Tr. 2794–95 (Williams). The Application listed the geographic location and deposit size of the branch offices of all fifteen targeted thrifts, and contained a FHLBB form for the purchase of the assets of each target and merger into SSA, described as the "resulting institution." DX 139 at WOB023 1251–69.

The FSLIC package was from Stuart Root, Executive Director of FSLIC ("Root") (who testified at trial) and General Counsel Jordan Luke. DX 140. The report's Executive Summary explained that a March 1, 1988 Request for Proposals was disseminated by the government, to which SSA responded with a proposal dated March 30, 1988. SSA was subsequently determined suitable. An extensive analysis of potential acquirers was reportedly performed, but none of the other proposals equaled that of SSA. DX 140 at Pl. 000324–26. FSLIC would be appointed receiver for the insolvent four thrifts. FSLIC would then provide financial assistance for SSA to acquire substantially all their assets as well as assume their liabilities. The memorandum discloses the various forms of financial assistance to be granted by FSLIC, including a ten-year, interest-bearing FSLIC promissory note in an amount equal to the difference between liabilities assumed and tangible assets acquired, with general and specific loss reserves reversed. *Id.* at Pl. 000331. SSA's existing regulatory capital of 1.9% as of March 31, 1988 was acknowledged. *Id.* at Pl. 000322.

Referencing the opinion of FHLBB's Corporate and Securities Division ("CASD"), the third subagency package, FSLIC recommended approval of the structure of the acquisitions contained in CHTE's H-(e)3 Application. *Id.* at Pl. 000330. FSLIC did not object to the appointment of a receiver for the four insolvent institutions, the granting of the requested forbearances, the entering of the Assistance Agreement (a draft of which was included in this, but not in the ORPOS package), or the transfer of the assets to SSA. Further details of the financial assistance are contained in the package, including a reference to the release of the regulatory capital maintenance letters "in return for" CHTE's contribution of $25 million in subordinated debt. *Id.* at Pl. 000333. More than thirty FHLBB resolutions were part of the package.

The CASD opinion was signed by Julie Williams, Deputy General Counsel ("Williams"). DX 140 at WSJ069 0818–39. Williams' May 17, 1988 legal opinion, addressed to FSLIC Office of General Counsel, described the transaction sequence under the facts and regulatory environment, as an H-(e)3 Application by CHTE to acquire control, with FSLIC assistance, of the four insolvent thrifts, by merger into CHTE's wholly owned subsidiary, SSA. The header and subject line of the opinion is the "Savings and Loan Holding Company Application H-(e)3 filed by

The Caroline Hunt Trust Estate Dallas, Texas FHLBB No. ___ to acquire control with FSLIC financial assistance of [City Savings, Lamar Savings, Briercroft Savings, and Stockton Savings] by merger into the Acquiror's wholly-owned subsidiary." *Id.* at WSJ069 0818 (omission in original). The first sentence of the twenty-one page legal opinion, under *"FACTS,"* states: "The Caroline Hunt Trust Estate (the 'Acquiror' and 'Trust'), proposes to acquire control of substantially all the assets and certain liabilities of [the four insolvent thrifts] (collectively the 'Target Institutions') through the following steps: . . . ." *Id.* at WSJ069 0819 (parentheticals in original). The sequential transactional steps were delineated as: (1) the appointment of FSLIC as receiver for the targeted institutions; and (2) the transfer of the assets and certain of the liabilities from FSLIC to SSA pursuant to the Assistance Agreement.

The legal opinion describes CHTE's proposal including FSLIC financial assistance in the form of yield maintenance and capital loss coverage, primarily on the acquired thrifts' assets and liabilities.[18] SSA's preacquisition assets were not so covered. In short, FSLIC would guarantee certain rates of return and cover certain losses on assets from the acquired thrifts, but did not extend that guarantee to SSA's existing portfolio. FSLIC would issue two promissory notes—a "Net Worth Deficit Note" for the amount of the net worth deficit of the acquired thrifts plus certain net operating losses, and a second promissory note, the Regulatory Capital Note:

> to assure that Southwest has adequate regulatory capital after the consummation of the acquisition so that it is able to attract depositors and other investors, the FSLIC will contribute additional capital to Southwest by executing a second promissory note (the "Regulatory Capital Note") payable on the same terms and bearing interest at the same rate provided in the Net Worth Deficit Note.

*Id.* at WSJ069 0819.

The Regulatory Capital Note would be credited toward SSA's capital requirements.

The promissory note(s) issued to and made to the order of Southwest, pursuant to the Assistance Agreement, will be a credit to Southwest's regulatory capital to the extent that such credit increases Southwest's ratio of regulatory capital to total liabilities to ___% at the Effective Date, for purposes of determining compliance with Section 563.13 of the Insurance Regulations, or any successor regulation.

*Id.* at WSJ069 0836 (omission in original).

"In consideration of the issuance by FSLIC of the Regulatory Capital Note," SSA would also issue common stock warrants and two series of preferred stock, one to FSLIC and one to CHTE. As a result, FSLIC would have the right to acquire 50% of SSA's outstanding common stock (exercisable from May 1988 until May 2003), and the right to 90% of SSA's value at the end of ten years, up to a maximum of $54 million, with CHTE allowed to retain the remaining 10% up to a maximum of $6 million. *Id.* at WSJ069 0820. For a period of up to ten years, FSLIC would forbear from taking enforcement action against SSA under 12 C.F.R. § 563.13, provided that SSA's regulatory capital did not fall below 3% of total liabilities.

> The FSLIC will forbear, for a period not to exceed ten years . . . from exercising its authority to take action under Section 563.13 *Regulatory Capital Requirement* of the Rules and Regulations for the Federal Savings and Loan Insurance Corporation ("Insurance Regulations") for any failure of Southwest to meet the Regulatory Capital Requirement of Section 563.13 of the Insurance Regulations, *provided that,* Southwest's regulatory capital does not fall below 3.0% of total liabilities.

*Id.* at WSJ069 0835. The Trust's request for preapproval of debt was explained, and the legal opinion concurred that the Board had authority to grant the exemption. *Id.* at WSJ069 0828. Likewise, no legal objection was raised to the Trust's request for a limit-

18. Indeed, the legal opinion consistently reports transactions in terms of what FSLIC would do and what the Trust requested.

ed waiver of preapproval of transactions with affiliates. *Id.* at WSJ069 0830.[19]

"[T]he Trust requests that FSLIC release the Trust from the net worth maintenance provisions...." because of the substantial increase and uncertainties attendant the proposed mergers. DX 140 at WSJ069 0822–23. Counsel had no objection to the release.[20]

Girded with the foregoing packages, the FHLBB approved the transactions and issued implementing resolutions on May 18, 1988. DX 152–55. The voluminous resolutions included No. 88–364P (Briercroft), 88–372P (City Savings), 88–380P (Lamar Savings), and 88–388P (Stockton), which all recite the following: (1) FSLIC would be appointed as receiver for each respective thrift; (2) CHTE was the holder of 90% of the common stock of SSA, the Assuming Association; and (3) CHTE and SSA, defined as "the Applicants," had applied for approval to acquire control of the respective thrifts. DX 152, Pl. 000483, 000494, 000516, 000527, 000550, 000561, 000583, 000594.

Recitals included the Board's consideration of proposed FSLIC agreements, including the Assistance Agreement, "... pursuant to which the FSLIC in its corporate capacity will provide financial assistance and certain indemnifications to the Assuming Association **to facilitate the Acquisition** ...." DX. 152 at Pl. 000495, (emphasis supplied). Immediately following these "whereas clauses," under the subtitle "Holding Company Approval," the Resolutions determined in the "resolved clauses"[21] that (1) the acquisition of control by the "Applicants" (CHTE and SSA) would not be detrimental to FSLIC, (2) the "Applicants" were qualified to acquire the targeted thrifts, and (3) the acquisition would be consistent with the standards of the National Housing Act, 12 U.S.C. § 1730a(e)(2)(1982). The Resolutions authorized the execution of appropriate documents in the form proposed in the Board packages,[22] and granted the regulators the authority to decide which applicant, CHTE or SSA, would sign necessary documentation:

> RESOLVED FURTHER, That the Director, or Director, Financial Assistance Division, FSLIC, with the concurrence of the ORPOS and the OGC, shall determine which of the Applicants are necessary parties to such stipulations and other documents; ....

DX 152 at Pl. 000496, 000529, 000563, 000596.

The Resolutions preapproved certain future debts of CHTE, preapproved certain CHTE affiliated transactions,[23] authorized

---

19. The opinion noted that had the Trust acquired the targeted thrifts as separate entities, the transaction with affiliates rules may not have applied.

20. The legal opinion did not qualify its lack of objection to any corresponding or reciprocal contribution by the Trust.

21. As then FHLBB Chairman Danny Wall testified, to his lay understanding, "whereas" clauses set the stage as a predicate for action taken by the Board in the "resolved" clauses. Tr. 2982 (Wall).

22. The Resolutions authorized deviations from the forms presented in the Board package so long as they did not involve matters of policy, and were approved by the Office of General Counsel ("OGC").

23.
*Preapproval of Debt*
    RESOLVED FURTHER, That the Bank Board finds, for purposes of § 408(g) of the NHA [National Housing Act], 12 U.S.C. § 1730a(g)(1982), and § 584.6 of the Regulations for Savings and Loan Holding Companies ("Holding Company Regulations"), 12 C.F.R. § 584.6 (1987), that the Hunt Trust and any partnership or corporation controlled by the Hunt Trust, *other than* those that are "insured institutions" as defined in the NHA and the Holding Company Regulations ("Affiliates"), for a period not to exceed ten (10) years following the Acquisition, may issue, sell, renew, or guarantee debt securities and assume debt in the normal course of their respective business activities without prior written approval of the FSLIC; *provided* that for as long as the Hunt Trust fails to qualify as a "diversified savings and loan holding company," as defined in § 408(a)(1)(F) of the NHA, 12 U.S.C. § 1730a(a)(1)(F)(1982), the Hunt Trust and its Affiliates shall file with the Supervisory Agent a notice showing existing and proposed indebtedness, including with respect to all issues of commercial paper or other debt: amount, term, rate or any other information deemed material by the Hunt Trust or the Supervisory Agent, and also including the maximum level of such debt expected to be outstanding at any time during the year as well as the total amount expected to be outstanding at year-end; and

FSLIC to execute the Assistance Agreement, and granted the $307.5 million capital credit to be used to determine post-merger SSA's regulatory compliance under both existing and future regulations:

> [t]hat for regulatory accounting purposes, the promissory note(s) issued to and made to the order of the Assuming Association pursuant to the Assistance Agreement will be a credit to the Assuming Association's regulatory capital to the extent that such credit increases the Assuming Association's ratio of regulatory capital to liabilities to five percent (5%) at the Effective Date of the Acquisition, for purposes of determining compliance with § 563.13 of the Insurance Regulations, 12 C.F.R. § 563.13 (1987), or any successor rule or regulation; ....

DX 152 at Pl. 000503–04, 000536–37, 000570–01, 000603–04. A forbearance letter was authorized and subsequently issued. DX 152 at Pl. 000505, 000538, 000572, 000605; and DX 139 at WOB023 1270.

Resolution 88–393NP released CHTE from any obligation to maintain SSA's net worth, including under the regulatory capital maintenance letters.[24] DX 152 at Pl. 000614–15. *See also* PX 17 and 18. The Resolution recited that SSA required as a condition to

entering into the various Acquisition Agreements and the Assistance Agreement, that CHTE be released from any obligation to maintain SSA's net worth. It was likewise a condition of FSLIC[25] entering into the Assistance Agreement "that the $25 million of subordinated debt of the Assuming Association to the Hunt Trust be converted into equity capital." DX 152, Pl. 000614.

### Implementation

Pursuant to these and other FHLBB Resolutions, a myriad of agreements were signed. FSLIC was appointed receiver for the four insolvent thrifts and transferred ownership interests in the four thrifts to SSA. Jt. Stip.¶ 9. FSLIC and SSA signed the Assistance Agreement. DX 158; Jt. Stip. ¶ 8. The Assistance Agreement, to which CHTE is neither a signatory nor a named party, conditioned FSLIC's obligations thereunder in part on (1) the subdebt contribution and addition to SSA's equity capital, (2) SSA's issuance of preferred stock to FSLIC, and (3) issuance of warrants to FSLIC to acquire 387,247 shares of SSA's common stock. DX 158, ¶ s 2(b), 6, 8, and 9 at PCR001 0071–0072.

The subordinated notes were contributed by CHTE to SSA's equity capital. They were interlined with the notation "[c]ancelled

---

*Transactions with Affiliates*

> RESOLVED FURTHER, That the Bank Board finds, for purposes of §§ 563.41 and 563.43 of the Insurance Regulations, 12 C.F.R. §§ 563.41 and 563.43 (1987), and § 584.3 of the Holding Company Regulations, 12 C.F.R. § 584.3 (1987), that the Hunt Trust and its Affiliates may engage in transactions in the ordinary course of business with the Assuming Association, primarily in connection with the occupancy by the Assuming Association of an office building known as The Crescent, *provided* that all such transactions with the Assuming Association must be on terms approved by the board of directors of the Assuming Association and such transaction must be on market terms supported by appropriate valuations and, *provided*, further, that the aggregate consideration that may be paid by the Assuming Association to the Hunt Trust and its Affiliates may not exceed $750,000 in any 12–month period and, *provided*, further, that all parties to any such transaction shall maintain adequate records satisfactory to the Supervisory Agent regarding such transaction; ....

DX 152 at 000500–502, 000533–535, 000567–569, 000600–602.

24. The operative language was "the Bank Board finds that it is in the best interests of the FSLIC to release and forever discharge the Hunt Trust from all manner of actions, claims, sums of money, demands or other obligations whatsoever to contribute capital or funds to the Association including without limitation all such obligations (i) under that certain letter from the Hunt Trust to the Principal Supervisory Agent, Federal Home Loan Bank Board, Attention: Ms. Mary Beth Amoka, dated July 25, 1986, and (ii) under any stipulations or similar letters or agreements; ...." DX 152, Pl. 000614–15.

25. "It is a condition to the Corporation entering into the Assistance Agreement that the existing $25 million of subordinated debt of the Assuming Association to the Hunt Trust be converted into equity capital; ...." DX 152 at Pl. 000614. Although the Federal Savings and Loan Association was defined in the Resolution as "FSLIC," it is presumed that the reference to "Corporation" was intended to refer to FSLIC which, together with SSA, were the parties to the Assistance Agreement. The Assistance Agreement defined "Corporation" as the FSLIC.

May 18, 1988 as a contribution to equity capital of the Maker by Payee, Caroline Hunt Trust Estate." [26] PX 3. Minutes of a May 17, 1988 meeting of SSA's Board of Directors stated "[t]he debentures payable to the Caroline Hunt Trust Estate were discussed and following discussion, Mr. Crisp informed the Board that the Caroline Hunt Trust Estate would contribute the principal amount of the debentures in the amount of $23,780,462.06 to permanent capital pursuant to the various agreements with FSLIC." DX 498–000. The FHLB–Dallas subsequently acknowledged this was contributed capital. DX 210.

The government argues that while CHTE held the subdebt, only SSA could include the relinquishment of that debt to the thrift's equity. Gov't Resp. to PPF No. 152, citing Tr. 3467–68 (Bradley). In contrast, CHTE, consistent with its position that the Assistance Agreement was one of several documents in an overarching acquisition scheme, asserts that only the Trust could contribute its debt instruments, and as majority shareholder, commit that contribution to equity as required under its H-(e)3 approved by the FHLBB.

There is no dispute that CHTE owned almost $24 million in subdebt on which SSA's payments were current. Its relinquishment deleted a future obligation of SSA, and that amount was added to SSA's capital. The reduction of SSA's debt correspondingly increased the thrift's assets. The outstanding balance owed on the subordinated notes as of May 17, 1988 was $23,780,462.06. DX 133.

By Board resolution, SSA created a Series A Special Preference Stock which granted FSLIC the then vested right to 90% of the first $60 million of the postmerger SSA's earnings or value. Preferred stock certificates were issued. PX 7 & 9; Tr. 322 (Miller). Under a warrant agreement, SSA also granted FSLIC the right to purchase 387,247

shares of common stock—the right to acquire 50% of the stock of the postmerger SSA in ten years.[27] DX 148, 149; Jt. Stip. ¶ 11. Granted that right would not be realized for ten years, the anticipated time period necessary for economic recovery, it was nevertheless a vested interest. As a result, the Trust's 94% interest in SSA could be literally cut in half—diluted to accommodate the government's interest—a reduction possible only with, at minimum, the Trust's acquiescence, because SSA had no treasury stock. Tr. 1770–72 (Boone); Tr. 1399 (Leibold); Tr. 1012–13 (Crisp); Tr. 234–35, 634, 645, 660, 945 (Miller) (Neither the stock warrants nor the preferred stock could be issued without the Trust's approval.). Root acknowledged that to the extent FSLIC's shares went up, CHTE's ownership interest was diminished.[28] Tr.1904–06 (Root); Tr. 1340–41 and 1770–71 (Attorneys Boone and Herrick) (equity dilution required the consent of the Trust).

A ten-year partnership was formed. CHTE allowed the vehicle of SSA, including its highly regarded management, to acquire the four distressed thrifts, contributed over $23 million in promissory notes and relinquished a significant interest in the profits and equity of the postmerger SSA, all for the opportunity to be a 50% shareholder of a much larger merged institution. The government extended financial assistance including a $307.5 million regulatory capital credit, and avoided the cost of liquidating these four thrifts with the attendant negative publicity and reduction in public trust, not to mention the potential run on its insurance fund. At the end of ten years, the government would be 50% owner of a hopefully successful financial enterprise and have a preferential right to its profits.

FSLIC financial assistance included a ten-year, interest-bearing promissory note to SSA in an amount equal to the negative

**26.** Some of the twenty handwritten notes provided "cancelled May 18, 1988 as a contribution to equity capital of Maker by Payee" without specifying CHTE. There is no dispute, however, that CHTE was the payee of all the promissory notes and received all payments previously due thereunder. PX 3; DX 210.

**27.** SSA had a right to redeem the warrants commencing May 31, 1998, at a price defined in the Warrant Agreement. DX 148 at PCR001 0242.

**28.** While the government argues that its stock warrants were not exercisable until after 1998, long after SSA was seized, the right to acquire the stock vested on May 18, 1988.

capital of the four acquired thrifts. Tr. 796–97 (Miller); DX 158 at PCR001 0081–85. Initially, the amount of the note was calculated as approximately $483 million, but following an audit, the amount was increased to in excess of $700 million. DX 266 at FCR349 1182; Tr. 320–21, 797 (Miller). That portion of the note necessary to increase postmerger SSA's regulatory capital to 5% of liabilities, was credited to SSA's regulatory capital (the "capital credit"). DX 158 at PCR001 0083. Subsequently computed, the capital credit was $307.5 million. Gov't Resp. to Pl. Facts No. 154.

An FHLBB letter dated May 20, 1988, granted forbearances to both CHTE and SSA.[29] DX 163. The $307.5 million capital credit applied to SSA's regulatory capital "to the extent that such credit increases SWS' ratio of regulatory capital to total liabilities to 5.0% at the Effective Date, for purposes of determining compliance with Section 563.13 of the Insurance Regulations, or any successor regulation." DX 163 at WSJ069 0524. FSLIC also agreed to forbear for ten years from specified regulatory remedies if SSA failed to meet its minimum regulatory capital requirement, *provided that* SWS' regulatory capital did not fall below 3% of total liabilities." DX 163 at WSJ069 0522, (emphasis in original). The transactions with affiliates and debt preapproval forbearances were granted.

FSLIC agreed to pay SSA a guaranteed yield on "covered assets," *i.e.*, assets acquired in the transaction, with certain exceptions, including marketable securities and performing one-to-four family residential loans, which had their own form of assistance; and to reimburse SSA for capital losses upon the disposition of such assets. DX 158 at PCR001 0062–64, PCR001 0073, PCR001 0077. For the covered assets, FSLIC also committed to give SSA cash if the assets sold below their book value. The marketable securities SSA received as a part of the transaction were not covered, they were marked to market—to the then current market rather than book value. *Barron*

*Bancshares, Inc. v. United States,* 366 F.3d 1360, 1365 (Fed.Cir.2004). Tr. 794–99 (Miller). SSA's preexisting assets, referred to as noncovered or uncovered, received no assistance. Tr. 398, 794 (Miller). Gov't Facts Nos. 83 and 84 and Pl. Resp.

The cost of this government assistance was less than the cost to liquidate these thrifts. FSLIC rarely did a transaction where the cost of the transaction itself exceeded the liquidation cost. Pl. Facts No. 367 and Gov't Resp; Tr. 1866–67 (Root). Carrie Wagner ("Wagner"), then employed in the Analysis and Evaluation Division ("AED") of FSLIC, and the lead financial analyst in the SSA transactions, testified that SSA's acquisition of these troubled thrifts saved the government between $400 and $500 million in liquidation, depositor and other costs. Tr. 3162–65 (Wagner).

### CHTE was a disclosed principal

■ The government argues it did not have a contract with CHTE, particularly concerning the $307.5 million regulatory capital credit. In addition to the acknowledgments and recitations of CHTE's role in these acquisitions, as well as the structure of the foregoing transactions and history of prior dealings, all summarized above, negotiations, disclosures, and understandings of the participants, provide additional foundational support for the findings and conclusions herein.

CHTE argues that despite their titles, the source of their paycheck, or the heading of their stationery, many if not all of their negotiators either wore different hats on different occasions (SSA vice CHTE), or regardless of their hats, acted only on the behest of, or with the concurrence or acquiescence of, the Trust, a fact known to the government and expressly communicated by the negotiators. In a "get real" mode, CHTE also urges the court to look at the factual and legal reality of the transactions. CHTE, a 90% shareholder, with control of SSA's Board of Directors, called the shots. A major decision to more than quadruple SSA's assets and liabilities by taking on four insolvent thrifts was truly made by CHTE,

---

29. The record also contains what appears to be an identical forbearance letter dated August 2, 1988. DX 171. Two witnesses questioned about

this were unable to explain the reason for the second letter. Tr. 329 (Miller); Tr. 1296–97 (Herrick).

the holding company, a known and disclosed principal. CHTE also points out that under the Southwest Plan, FHLBB courted potential investors, rather than potential acquiring thrifts, to resolve the thrift crisis. Tr.1904–05 (Root) (investors were solicited to make proposals).

The government relies on documents to belie this schizophrenia. The deal that was allegedly breached according to CHTE's Complaint in this matter was in the Assistance Agreement, and only SSA signed that document. The sole benefit and integration clauses deny the existence of any other party, and the attorney negotiators, Herrick and Boone, both paid by SSA, expressly disclaimed any representation of the Trust in pre-merger correspondence to the Board. All this, the government urges, is evidence that the government did not enter into a contract with the Trust. Tr. 227 (Miller); Tr. 678 (FSLIC counsel and government negotiator Mike Duhl) (government said they didn't give a "flip" about the Trust). Moreover, the government argues that the Trust, which purposely and effectively insulated itself from any further obligations of SSA by obtaining a release of the net worth maintenance letters, should not be allowed now to change horses in midstream and assert contractual privity.

The Holding Company Act and regulations required CHTE to obtain federal approval for its subsidiary to acquire the troubled thrifts. In his summary of the May 19, 1988 recommendation package to the FHLBB concerning the proposed merger, Stuart Root, Executive Director of FSLIC ("Root"), described the structure of the proposal as CHTE's H-(e)3 Application:

## E. *Holding Company Application*

According to the opinion of the Corporate and Securities Division ("CASD"), attached as Exhibit L–2, the Application on Form H-(e)3 of the Caroline Hunt Trust and Southwest ("the Applicants") to acquire control of the Associations complies with the applicable standards of the Sav-

ings and Loan Holding Company Act, and CASD has no objection to the acquisitions. The Application, a copy of which is attached hereto as Exhibit L–12, requests approval of the structure of the Acquisition. We recommend that the Bank Board, as operating head of the FSLIC, approve the Applicants' H-e(3) application pursuant to § 408(e)(1)(B) and (2) of the NHA.

DX 140 at Pl. 000330.

The CASD opinion was that the transfer of the four thrifts into SSA could not be approved without CHTE's H-(e)3 Application being approved first. Tr. 2792–98 (Williams); Tr. 1418 (Leibold) ("[t]here wouldn't have been a deal without this application"); Tr. 1418 (Leibold). The government does not dispute that SSA's acquisition of the four thrifts could not have been accomplished without the approval of CHTE's H-(e)3 Application.

Moreover, by virtue of its prior H-(e)3 Applications, and the numerous references to CHTE's ownership in documents and FHLBB recommendation packages, government knowledge of CHTE's ownership of SSA is clear. The FHLBB knew the Trust held over 90% of SSA's stock and controlled the Board of Directors, the latter being a source of concern, prompting a recommendation that the Board be expanded with independent directors. DX 20; Tr. 1757 (Boone) (Trust controlled the Board of Directors); Tr. 3252–53 (Jardieu) (too many CHTE folks on the SSA Board of Directors which presented at least the appearance that they are more interested in the holding company's activities that those of the thrift); Tr. 3496 and 3516 (Bradley) (SSA's Board of Directors was not independent). *See also* DX 66 (SSA Board resolution of October 22, 1987 authorizing Miller to negotiate for FSLIC-assisted acquisitions—with Board members being Crisp, David Sands, and Miller). Moreover, an acquisition of this size with its Sisyphean [30] debt load could not have been approved without the express agreement of CHTE, the 90% shareholder.

---

**30.** In Greek mythology, Sisyphus, a cruel king, was punished in Hades, condemned eternally to roll a heavy stone up a hill.

Also, FSLIC was granted a substantial equity interest in the Trust's subsidiary—warrants to acquire 50% of SSA's common stock in ten years, and preferred stock in the lion's share of future profits. The Trust's ownership interest in SSA could not have been diluted without the Trust's agreement. Danny Wall, former FHLBB Chairman, testified that CHTE "as a control owner, the management of the institution could not have signed anything that its owner would not have agreed to . . . ." Tr. 3057 (Wall). *See also* Tr. 1473 (Leibold) (it was simply a fact of life that SSA was a recognized agent of a recognized principal); Tr. 1770–71 (Boone) (In the corporate world, a 90% shareholder's interest is not diluted without that shareholder's consent. That documents may recite that SSA is issuing stock, does not mean SSA did it on its own.).

.While CHTE was a disclosed principal, on the proverbial other side of the fence, government negotiators could talk—only the appropriate officials for the FHLBB, the other disclosed principal, could contract. Just as government negotiators represented Wall and the Bank Board, Crisp and Miller were taking their directions, and derived their authority, from the Trust, the decision-maker. Tr. 1772; 1246 (Herrick—negotiating with the FHLBB was like dealing with a Hydra). The FHLBB and CHTE made the decisions.

In addition to allowing the use of its subsidiary, CHTE provided material consideration for the acquisitions, subordinated notes and the stock warrants. *See* Tr. 1774 (Boone) (analogizing CHTE's ownership and contribution of the subordinated notes to someone who borrows money from a bank. The debtor cannot simply call up the bank and cancel the debt, only the creditor could do that.). In an admission of the Trust's contribution of the $23.5 million subdebt, then FHLBB Chairman Wall testified before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on September 14, 1990, that the conversion of CHTE's subdebt to equity "was done in order to eliminate an accruing interest obligation, to more clearly put it at risk as an equity investment and in an attempt to *even more inextricably lock in the Trust.*" PX 515 at 161, (emphasis supplied); Tr. 3059–61 (Wall). Also, Chairman Wall, when asked in a congressional hearing about minority or female participation in the Southwest Plan, testified that one acquisition was with a trust with a female beneficiary, a reference to CHTE. PX 512 at 32;Tr. 3090–92.

Consideration flowed directly to CHTE, specifically, the release of the regulatory capital maintenance letters as well as preapproval of CHTE's debt and transactions with affiliates restrictions.[31] That SSA, as well as the Trust benefited does not deny that benefits flowed directly from the government to the Trust and that the government's documents so stated. The government's release of CHTE's regulatory capital maintenance letters, CHTE's contribution of the subdebt and the equity split to the FSLIC, were material, substantial, and significant parts of these acquisitions.

With the foregoing background, negotiations further support the involvement of the Trust as a principal. Despite extensive discussions, by the end of 1987, no deal had been reached. Communication then commenced directly with FHLBB in Washington, DC. The negotiators, selected by Crisp on behalf of the Trust were Miller, Hearne, Dick Park (SSA's chief financial officer), Mike Boone (outside Dallas corporate counsel ("Boone")) and Mike Herrick (outside Washington regulatory counsel ("Herrick")). Tr. 211–12 (Miller); Tr. 1004 (Crisp). Crisp's

---

**31.** The forbearance letter provides:
For a period of ten years, in the event that the Trust fails to qualify as a diversified savings and loan holding company as a result of this transaction, the future indebtedness of the Trust or other Affiliates of [SSA] requiring approval under Section 408(g) of the NHA and/or Section 584.6 of the Insurance Regulations will be pre-approved by the FSLIC, *provided that* the Trust within 90 days of any calculation date when the Trust fails to qualify as a diversified savings and loan holding company will file with the Supervisory Agent a notice of its existing indebtedness and proposed indebtedness for the next twelve months. The Trust will be subject to such notice requirement as long as it is not a diversified savings and loan holding company. DX 163 at WSJ069 0524 (emphasis in original).

approach to negotiations was to form a very competent team of negotiators that, as a "good tactic," did not include himself—the decision-maker. Tr. 1004 (Crisp). This arrangement was confirmed by other witnesses. Tr. 1245–46 (Herrick) (negotiations were overseen by Crisp who had the overall decision-making authority) and 1773 (Boone) (government negotiators Mike Duhl ("Duhl") and John Rogers ("Rogers") took directions from Danny Wall and the Bank Board; Boone and the other "SSA" negotiators got their directions from Crisp). Negotiations were extensive. Miller testified there were approximately 25 government representatives at the first meeting in Washington at the office of Hopkins and Sutter, counsel for FSLIC. The government's negotiating team was lead by FSLIC counsel Duhl and Rogers of Hopkins & Sutter. Day-to-day negotiations were overseen by Crisp who had the overall decision-making authority for both the Trust and SSA. The SSA/CHTE negotiating team traveled several times to Washington, DC to negotiate with Rogers and Duhl and other government representatives.

In addition to the consideration provided to and from CHTE, the recitations in the documents, and the government's prior knowledge of CHTE's ownership and control of SSA, and having observed the testimony of the witnesses, the court finds that the "SSA" negotiators informed government regulators that they were negotiating acquisitions for the Trust, via the vehicle of SSA, its subsidiary thrift. Miller, lead negotiator for SSA, testified that his team was negotiating on behalf of both CHTE and SSA, and repeatedly told government representatives that CHTE was the decision-maker. Miller told government negotiators "we are here on behalf of CHTE. We would not be here but for them" and "[w]e're not negotiating separate and apart from the Trust." Tr. 226–28, 678–79 (Miller). "They were consciously aware, just as they had someone to talk to, that we did in the same fashion. And that every—well, it is a simple matter. We couldn't deliver the transaction. We were not the principals. We were working on behalf of the decisionmakers." Tr. 247 (Miller). *See also* Tr. 1760–63 (Boone); Tr. 1244–45 (Herrick) (Crisp had the overall de-

cision-making authority); Tr. 1170, 1189 (Crisp—the SSA negotiators informed him that they had communicated the Trust's required conditions).

As Boone testified, he and his team negotiated on behalf of the Trust:

Q. Did you ever have occasion to tell the Government representatives in these negotiations that your team was negotiating on behalf of the Caroline Hunt Trust Estate?

A. I don't know how we could have made it any clearer. We said from the very beginning that this was a question of what the trust would do or not do. The trust had [sic], again, was a very strong financial entity and had lots of options. And it was not going to necessarily just turn over and do any transaction that the Government proposed.

Regardless of what they might think about their insignificance, and there was always that at the beginning anyway, we thought that that's who they had to go through. That's who I had to go through to get the transaction done from our side, and so—go ahead.

Q. Mr. Boone, did you say these things yourself to the Government representative:

A. Yes, I sure did.

Q. Did you hear anyone else say it?

A. Mr. Miller, several times.

Tr. 1761–62.

Attorney Herrick's testimony was in accord:

Q. Did any of your negotiating team ever tell the Government in the spring of 1988 that your team was negotiating on behalf of the Caroline Hunt Trust Estate?

A. That concept was made clear continually. And it was made clear in many ways, but the principal way it was made clear in almost every meeting was, you know, that there was a discussion of the net worth maintenance stipulation and the fact that that would have to be released in regard to any transaction that was done, so as to limit the liability of the Caroline Hunt Trust Estate.

But it was also discussed in other ways. And, in fact, the Holding Company Act and

regulations, you know, required that the Caroline Hunt Trust Estate as a registered holding company, you know, be a party to this transaction and a party to any such a transaction where there is going to be an acquisition involving Southwest Savings.

Q. Based on your presence at these negotiating sessions, Mr. Herrick, is it possible that the Government didn't hear those things, didn't understand those things?

A. No.

Tr. 1250–51.

Negotiations included percentages of equity, a deal point only the Trust could provide. In an April 19, 1988 Memorandum to the government, outstanding issues included an equity split with 40% of the shares of SSA retained by existing shareholders with 60 % to FSLIC. DX 101 at WSJ026 0768. On April 20, 1988, the split was 63% for the government with 37% to the shareholders, with the latter having the right to reacquire 25% of the government's share depending on SSA's performance.[32] PX 234C and Tr. 286–87(Miller). On May 6, 1988, the proposed equity split was 60% to FSLIC with an agreement to reduce that to 40% if SSA met certain performance standards..

On May 8, 1988, in Washington, DC, Boone thought a deal had been reached. The Trust signed a shareholder's agreement on equity sharing. Tr. 1777–78. On May 9, 1988, government negotiators called the deal off, saying the Bank Board wanted more equity. Chairman Wall wanted to meet directly with Miller. Tr. 235–36 (Miller). Miller and Wall met alone on May 10, 1988.[33] Wall demanded 95%. Tr. 238–45 (Miller), Tr. 1011–12 (Crisp), Tr. 1778–79 (Boone). As he had no authority to further dilute the Trust's interest, Miller and his team returned to Dallas. Tr. 235–36 (Miller), Tr. 1777–78 (Boone).

Crisp was informed of these developments. In a speaker phone conference in Crisp's Dallas office, the government offered flexibility. Crisp then compromised on equity, and a deal was reached shortly thereafter. Tr. 1781.

The court is not persuaded by the government's position that Herrick was only negotiating for SSA because Herrick disclaimed representation of the Trust ("we are not counsel to the Trust") in his February 18, 1988 letter to the FHLBB regarding the release of the Trust's regulatory capital maintenance letters, and his May 4, 1988 letter to ORPOS regarding proposed forbearances. DX 87 at 2; DX 114 at 4. Those same letters present the Trust's position on the release and on the forbearances—content that belies his qualifier. Tr. 1260 (Herrick) (testifying he did not recall why the letters had the disclaimer). Furthermore, attorney Herrick testified that he had previously represented both SSA and the Trust. In these negotiations he took directions from CHTE and then delivered the message to the government. Tr. 1004 (Crisp) (Attorneys Boone and Herrick had both worked for CHTE in connection with prior acquisitions). The court does not find those disclaimers to be either binding on this court, or determinative of the issue of contract liability. Nor is the fact that the negotiators' fees and salaries were paid by SSA decisive on contract status, particularly here where the intent, understanding, and documents of the parties tell a different tale.

That some documents refer to SSA as the acquiring association and others refer to CHTE as the acquirer, majority shareholder or the holding company with control over SSA, does not alter the court's findings either. Fundamentally, that SSA was the subsidiary thrift that CHTE chose to take ownership of the insolvent thrifts, is consistent

---

**32.** *Performance Standards.* The proposal provides that FSLIC's 60% ownership interest may be reduced to a 40% interest if Southwest Savings meets certain performance standards.... These and other performance standards will be set forth in an incentive plan and it is contemplated that the 20% ownership interest available for "earn back" will largely redound to Southwest Savings' management. DX 117 at WSJ026 0895.

**33.** The court concludes that Wall's inability to recall the meeting is of no material consequence. His calendar (DX 531) indicated a meeting on that date and other witnesses testified to the fact that the meeting occurred. Tr. 237–238, 297–301 (Miller); Tr. 1011–12 (Crisp), Tr. 1264–67 (Herrick), Tr. 1778–79 (Boone) (Miller told him the meeting occurred).

(indeed dictated by) the structure of the acquisition under the H-(e)3 Application, negotiations, the FHLBB resolutions and the intent of the parties. While it is not clear from the record when the Trust's H-(e)3 Application was submitted (it is dated in blank May _, 1988), it was in, and the foundation of, the package approved by the FHLBB—the government entity with contracting authority.

The court also rejects the government's argument that because the SSA Board resolution gave Miller full authority to negotiate specific terms to be memorialized in an Assistance Agreement, Miller was negotiating only for SSA.[34] While Miller and the negotiating team had the flexibility to negotiate, all significant terms had to be taken, and were in fact taken, to CHTE for approval, a reality known to, discussed with, and acknowledged by the government.

Documents also confirm CHTE's substantive participation. Miller's notes of a February 1, 1988 meeting with government representatives, including Roger Martin (one of the three members of the FHLBB), Root and Selby and his administrative aide, Alise Pylan, memorialize CHTE's deal points communicated by Miller in the meeting, specifically, release "net worth maintenance," retain debentures (the subdebt) according to their terms, retain control, and share equity with FSLIC in a reasonable percentage with an option to regain control. PX 234B. The release would benefit only CHTE; only CHTE could dilute its ownership of SSA. Miller testified he told the assembled group that these were the deal points SSA's stockholder (the Trust) required. Tr. 280–83 (Miller).

Accordingly, in partial summary, the court concludes that the government was informed that CHTE was a party principal and negotiations, as well as the ultimate agreement, included terms that only CHTE could provide.

### Adverse Inferences

While CHTE's witnesses testified that they identified themselves as negotiating for the Trust from which their decision-making authority came, CHTE requests the court draw an adverse inference from the government's failure to call its negotiators, particularly Duhl or Rogers, as witnesses to rebut CHTE's position. These former government employees were not available to CHTE for trial preparation without a government attorney monitoring the conversation.

An adverse inference is the " 'well settled principle of evidence which provides that, where a party fails to call a witness available to him and who has knowledge of material facts, the court may draw the inference that the testimony of the witness concerning those facts would have been unfavorable to the party.' " *Day & Zimmermann Serv. v. United States,* 38 Fed.Cl. 591, 603 (1997), citing *Barnett v. United States,* 6 Cl.Ct. 631, 671 (1984). This evidentiary precept, established in *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893), provides "that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." The inference, however, is adverse, not conclusive. *JHP & Assoc. v. NLRB,* 360 F.3d 904, 909–10 (8th Cir.2004); *New World Communications v. NLRB,* 232 F.3d 943, 946 (8th Cir.2000). See *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1323 (Fed.Cir.2002) (noting the trial court declined to apply an adverse inference because the witnesses were equally available to both parties); *Aptix Corp. v. Quickturn Design Systems, Inc.,* 269 F.3d 1369, 1374 (Fed.Cir.2001) (approving adverse inference against witness who invoked his Fifth Amendment privilege); *A.B. Dick & Co. v. Burroughs Corp.,* 798 F.2d 1392, 1400 n. 9 (Fed.Cir.1986) (noting propriety of inference and explaining that the likelihood of bias may make witness not equally available to both parties). *Cf. Herbert v. Wal–Mart Stores, Inc.,* 911 F.2d 1044, 1047–49 (5th Cir.1990) (declining to apply rule where witness could have been subpoenaed by either party).

---

34. Miller represented to the regulators that "Southwest Savings has the flexibility to negotiate the specific terms of any FSLIC assisted acquisition of the troubled institutions." DX 73 at HB 005672.

CHTE argues that because the government prohibited contact with former government employees without the permission and participation of Department of Justice attorneys, they were practically unavailable to CHTE.[35] The court finds that insistence on the presence of government counsel, in this instance, made the former government negotiators "unavailable" in a practical sense. *Jones v. Otis Elevator Co.,* 861 F.2d 655, 659 (11th Cir.1988) (affirming adverse inference jury instruction against defendant for not calling witnesses with direct personal knowledge of material facts, in part, because they were employees of defendant and were practically unavailable to plaintiff). That CHTE could have deposed these witnesses, but for the Trust's selection to be in the so-called "first wave" of *Winstar* cases in which depositions were forgone, is neither a defense nor a nullification of this inference.[36]

In contrast to the several witnesses who testified as to CHTE's role in the negotiations and the disclosure of that role to the government negotiators, the government's sole witness as to negotiations was former FHLBB Chairman Danny Wall, who, while making the decisions on behalf of the government, was not directly involved in many of the early meetings. Wall dealt with many transactions and understandably, his recollection of details conveyed to him by government negotiators was not refreshed.[37] Accordingly, CHTE's testimony in this regard in essentially unrebutted. Miller, Crisp, Herrick and Boone testified in this regard. CHTE Trustee Crisp testified that he gave Miller his negotiating parameters; these instructions were confirmed by Miller. Tr. 1000 (Crisp) (he, on behalf of the Trust,

authorized Miller to acquire the troubled thrifts); 1005–09 (Crisp) (he approved the positions Miller took in the proposals he made to the government; Crisp informed Miller that the Trust had to have the net worth maintenance letters released because of uncertainty over the large institutions being acquired; the release of the Trust and a ten-year period for economic improvement were non-negotiable conditions to which Miller reported he had never received any negative reaction from the government); Tr. 200–03, 216, 234–35, 644 (Miller) (Crisp was in the same office building and Miller kept him informed as the transaction evolved; Miller followed Crisp's instructions on equity split and release of the net worth maintenance letters; the Trust signed a shareholder authorization for the equity split; in sum, Miller was authorized to negotiate pursuant to directions received from the Trust.). Testimony of attorneys Herrick and Boone corroborated the forgoing. Tr. 1760–61, 1772–73, 1780–81 (Boone) (CHTE appointed Miller as the lead negotiator—Boone would report to and get instructions from Crisp); Tr. 1245–46, 1249–50 (Herrick) (same).

The court also rejects the government's position that adverse inferences may not be considered in determining whether plaintiff has satisfied its burden of proof that CHTE was a disclosed principal, citing *Bosies v. Benedict,* 27 F.3d 539, 543 (Fed.Cir.1994). CHTE presented a *prima facie* case through testimony of at least four witnesses that government negotiators were told CHTE was the decision-maker in the negotiations. The absence of testimony from numerous government negotiators fully warrants the inference

---

**35.** "To clarify a statement we made during closing argument, Tr. 4599, the Trust could not contact former Government employees without the permission and participation of the Department of Justice attorneys." Gov't Post–Trial Brief filed Sept. 26, 2003, at 60 n. 11.

**36.** The Priority Cases Pretrial Scheduling Order in *Plaintiffs in all Winstar-related Cases at the Court,* Case No. 90–8C *et al.,* dated April 2, 1997, in relevant part, prohibited CHTE, as a Priority Case plaintiff, from discovery from the government except for "core" document exchanges and certain expert discovery.

**37.** Tr. 3090–92 (Wall) (failing to recall his 1998 congressional testimony that the FHLBB had entered into a Southwest Plan deal with "a trust fund owned by a woman"); Tr. 3044–48, 3053 (Wall) (failing to recall a meeting in which he [Wall] changed the terms of the proposed deal); Tr. 3089–90 (Wall) (failing to recall some of his senior staffers referred to this deal as an acquisition by CHTE); Tr. 3008–14, 3020–23 (Wall) (failing to recall FHLBB General Counsel legal opinion [PX 022] that described CHTE as the proposed acquirer, described the waivers and forbearances sought by CHTE and described CHTE's overarching H-(e)3 Application under which the deal was proposed).

that they would have admitted (or at least not denied) that CHTE was a disclosed principal. *Adams v. Dept. of Transp., FAA,* 735 F.2d 488, 492 (Fed.Cir.1984) ("[P]etitioners' silence before the Board, after the agency had established a *prima facie* case, fully warranted the Board's drawing of an adverse inference."). *See also Anderson v. Dept. of Transp., FAA,* 827 F.2d 1564, 1572 (Fed.Cir. 1987) (applying adverse inference to add to agency's *prima facie* case). *Cf. Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 1337, 1341 (Fed.Cir. 2004) (limiting adverse inference on lack of exculpatory legal opinion in patent cases) and *Insituform Technologies, Inc. v. CAT Contracting, Inc.,* 385 F.3d 1360, 1377 (Fed.Cir. 2004) (remanding in light of *Knorr–Bremse* ). Alternatively, based on witness testimony, the court finds that even without the application of an adverse inference, CHTE was a disclosed principal.

### Contract formation

As a result of the foregoing, CHTE contends, and it is found, that the Trust had a contract with the government to acquire up to fifteen insolvent thrifts, including the four involved in this initial transaction. The contract included the $307.5 million capital credit. " 'When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.' " *Winstar,* 518 U.S. at 895, 116 S.Ct. 2432, 135 L.Ed.2d 964 (citation omitted). Accordingly, fundamental contract principles are applied.

The testimony, agreements, resolutions, and implementing documents summarized above, "constitute a contract only if three elements are met: 'mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.' " *La Van v. United States,* 382 F.3d 1340, 1346 (Fed.Cir.2004) ("*La Van III*") (citing *Cal. Fed. Bank v. United States,* 245 F.3d 1342, 1346 (Fed.Cir.2001)) (quoting *Massie v. United States,* 166 F.3d 1184, 1188 (Fed.Cir.

1999)). *See also Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1375 (Fed.Cir. 2004) ("[M]utual intent to contract is required to prove an enforceable agreement .... [T]here must be an offer, an acceptance, consideration, and governmental authority."); *Anderson v. United States,* 344 F.3d 1343, 1353 (Fed.Cir.2003).

The Federal Circuit recently revisited the application of contractual requisites in the *Winstar* context. In *La Van III,* investors, who like CHTE, were defined as acquirers in FHLBB resolutions,[38] infused funds for the government-assisted conversion of a failing state-chartered stock association into a federally-chartered stock association. The Federal Circuit affirmed the finding of a contract between the government and the investors in Board resolutions and internal memorandums that reflected favorable accounting treatment as the epicenter of negotiations. Government participation was contractual not merely regulatory. " '[A]lthough a contract may arise as a result of the confluence of multiple documents, there must still be a clear indication of intent to contract and the other requirements for concluding that a contract was formed.' " *La Van III,* 382 F.3d at 1346 (citing in comparison *D & N Bank v. United States,* 331 F.3d at 1379). There were no negotiations in *D & N Bank.* The documents did not mention favorable accounting for goodwill subsequently eliminated by FIRREA, the basis for the breach alleged; rather the Bank Board simply performed its regulatory function and approved the merger. " '*Something more is necessary.*' " 331 F.3d at 1379 (emphasis in original). *See Fifth Third Bank of Western Ohio,* 402 F.3d at 1231–34 (citing the parties' negotiations, documents, and surrounding circumstances in finding a contract and ascertaining its terms).

### Offer

■ An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Anderson,* 344 F.3d at 1353.

---

**38.** The Federal Circuit concurred with the trial court " 'that Messrs. La Van, Lullo, and Skozek were, as individuals, "the acquirors" who negoti-

ated with the FHLBB to purchase the converted federally-insured institution.' " *La Van III,* 382 F.3d at 1349.

*See also Linear Tech. Corp. v. Micrel, Inc.,* 275 F.3d 1040, 1051 (Fed.Cir.2001) (quoting *Restatement (Second) of Contracts* § 24). While acknowledging there were prior negotiations, plaintiff contends that CHTE's H-(e)3 Application was its "offer." Pl.'s Post-Trial Response Brief at 12. Therein, CHTE is the "applicant" and SSA is the identified subsidiary. The Application references SSA's Proposal dated March 7, 1988 (DX 92), amended from time to time, and requests forbearances and waivers noted to have been filed previously. "By this Application H-(e)3 ('Application'), SWS and the Trust, to the extent required by law, request the approval of the FHLBB, as acting head of the FSLIC, for the merger [pursuant to applicable laws and regulations]." DX 138 at Pl. 000004. The Application is sufficiently definite to constitute a contractual offer to acquire failed thrifts by merging their assets and liabilities into CHTE's subsidiary. *Home Sav. of Am.,* 399 F.3d at 1348–49 ("The Resolutions recognized that the 'offer' that led to the contract was [the holding company's] application for regulatory approval of [the subsidiary's] purchases . . . .").

A capital credit in an amount to be negotiated was requested in each proposal sent to the FHLBB by Miller beginning in October, 1987, including the March 7, 1988 proposal referenced in the H-(e)3 Application and its subsequent derivations.[39] The court finds that in its H-(e)3 Application, CHTE made an offer to the government to acquire troubled thrifts through the vehicle of its subsidiary SSA, and that offer included the $307.5 million capital credit that was subsequently eliminated by FIRREA.

Williams' legal opinion dated May 17, 1988, presented to the Board, describing the structure of the proposals as CHTE's H-(e)3 Application, detailed above, is further evidence the Application was an "offer."

The government acknowledges that CHTE's H-(e)3 Application was required by

regulation, and that SSA's acquisition of the four thrifts could not have been accomplished without it. Gov't Resp. to Pl. Facts No. 133. But, the government points out, the Application contains a qualifying footnote that it was "solely" for the purpose of obtaining approval of the transaction. DX 138. The footnote warned that the Application should not be construed as an admission that the Trust was a savings and loan holding company, a premise that was then, but no longer, in dispute. Jt. Stip. ¶ 3. This recital made no difference to government regulators. (Tr. 2794) (Former FHLBB Deputy General Counsel Williams testified that the disclaimer made no difference in the way CHTE's Application was processed by her office.). The court rejects the government's suggestion that this footnote prevents contractual formation.

In sum, CHTE offered to use its subsidiary thrift to acquire initially four failing thrifts (that the government would otherwise have had to liquidate at great expense), in return for various incentives, including a substantial regulatory capital credit later quantified as $307.5 million dollars.

**Acceptance**

■ "For a contract to be formed once an offer is made, there must be an acceptance, i.e., a 'manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'" *Anderson,* 344 F.3d at 1355 (quoting *Restatement (Second) of Contracts* § 50(1)). In *Winstar* cases, the critical inquiry is whether the "acceptance" or regulatory approval is simply boilerplate—*ergo,* no contract, or "something more" that comports with the negotiated offer—*ergo,* a contract. The foregoing Board resolutions, release of the net worth maintenance letters, extension of the $307.5 million capital credit, and other forbearances negotiated and agreed upon, are clearly the "'something more,' that is, the recognition that the government was engaged in negotiations about the terms of the

---

**39.** The March 7, 1988 proposal did not use the term "capital credit," but requested an additional FSLIC note or other asset or device to bring the resulting SSA's regulatory capital to 4%. DX 92 at WOT131 0285. Indeed the term "capital credit" did not appear in the final documentation. Capital credit is a short-hand term to de-

scribe a positive regulatory accounting entry. As plaintiff notes, although the term was not used in documentation, the Supreme Court referred to a similar promise of a starting accounting credit balance as the "capital credit" granted to Statesman. *United States v. Winstar,* 518 U.S. 839, 866–67, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

[acquisitions] as well as the subsequent manifest assent to abide by the Resolution[s] required under *D & N Bank.*" *La Van III*, 382 F.3d at 1347, citing *Anderson*, 344 F.3d at 1357.

Here, as in *La Van III*, the extensive negotiations summarized above, the Board recommendation packages, resolutions and implementing agreements are that "something more." CHTE, agreed under the auspices of its H-(e)3 Application to acquire troubled thrifts from the government through its subsidiary SSA. Through intense negotiations, and a confluence of documents summarized in Board resolutions and internal memorandums, the offer included use of SSA and its management expertise, The offer also included the right to acquire more than half the equity in the postmerger SSA, the Trust's relinquishment of its subdebt, and the acceptance of an enormous debt load that relieved the government's insurance fund and staved off tremendous costs of liquidating all of the thrifts. In return, for federal assistance including $307.5 million in regulatory capital credit and forbearance from certain adverse regulatory action.

The requisite elements of mutuality and clarity of intent and consideration here are akin with those in *La Van III* where there were negotiations over the push-down accounting and amortization of goodwill subsequently approved by the FHLBB. " '[T]he facts and circumstances surrounding the August 24, 1984 Resolution approving the conversion establish a bargained-for agreement in which the acquirors agreed to infuse capital into the institution, and thus save the bank from immediate liquidation, based on the express understanding that they would in exchange receive the above-specified goodwill.' " *La Van III*, 382 F.3d at 1347, citing *La Van*, 53 Fed.Cl. at 298. The Federal Circuit also affirmed the analogy to *Cal. Fed.* where " 'the government bargained with Cal Fed to assume the net liabilities of the acquired thrifts in exchange for favorable regulatory consideration allowing goodwill to be counted as an asset for regulatory capital purposes and to be amortized over 35 to 40 years.' " *Id.*, citing *Cal. Fed.*, 245 F.3d at 1347. *See also San Juan City College v.*

*United States,* 391 F.3d 1357, 1360 (Fed.Cir. 2004) (Incorporating regulatory requirements into an agreement "does not make [the regulatory requirements] any less contractual obligations or provisions, or constitute a valid reason for not treating them as such.").

Alternatively, the FHLBB resolutions, the Assistance Agreement, and other documents generated from the May 18, 1988 transactions were the FHLBB's counter-offer which CHTE accepted by its performance including the contribution of the subdebt, the use of its subsidiary to acquire the troubled thrifts, and the equity grant.

The government argues (1) the Assistance Agreement cannot be an acceptance because it contains a sole benefit clause which applied only to the signator SSA; (2) the Board resolutions could not be an acceptance because the regulators testified they did not intend to enter contracts by passing the resolutions, and resolutions do not always create contracts. While the latter statement is true, not all resolutions create contracts, here the court has found the "something more" that does. *La Van III*, 382 F.3d at 1346. Furthermore, Board intention as to contractual status is not controlling on the determination of that legal issue.

The Federal Circuit recently rejected the government's position that the sole benefit clause in the Assistance Agreement precluded a holding company contract. In *Home Savings of America v. United States,* 399 F.3d 1341 (Fed.Cir.2005), the holding company did not sign the Assistance Agreement, but was found a "party to the contractual arrangement as a whole." "[T]he 'offer' that led to the contract was [the holding company's] application for regulatory approval [of the subsidiary thrift's acquisition of troubled thrifts]." 399 F.3d at 1348. Reciprocal promises in the FHLBB resolutions were part of an agreement larger than (but encompassing) the Assistance Agreement.

The Assistance Agreements, regardless of their 'sole benefit' clause, do not preclude Ahmanson [the holding company] from having any contractual rights. *See Winstar,* 518 U.S. at 907–09, 116 S.Ct. 2432, 135 L.Ed.2d 964; *Cal. Fed. Bank,*

*FSB v. United States,* 245 F.3d 1342, 1346 (Fed.Cir.2001). Although Ahmanson did not sign the Assistance Agreements, the Court of Federal Claims properly focused on a set of 'larger transactions' involving Ahmanson, FSLIC, FHLBB, and Home [the wholly-owned subsidiary]. *See [Home Sav. of Am., F.S.B. v. United States,] Home II,* 51 Fed.Cl. [487] at 497–99 [(2002)]. In each transaction, the Assistance Agreement is not the entire contract; the Resolutions contain reciprocal promises that were part of the overall bargains between the plaintiffs and the government.... Ahmanson was party to the larger transactions in which those obligations were incurred; the government's promise therefore runs directly to Ahmanson. Accordingly, Ahmanson is in privity of contract and consequently has standing to seek damages in this case.

399 F.3d at 1349.

As in *Home Savings,* the integration clause here incorporates the Board resolutions and forbearance letter, the umbrella under which the acquisitions were approved.[40] *See also Barron Bancshares,* 366 F.3d at 1374 (finding integration clause incorporated Board resolutions and forbearance agreement).[41]

Finally, the subsequent implementation of the agreement mirrored the respective offers by the Trust and the government. *Anderson,* 344 F.3d at 1355.

### Consideration

■ Consideration was clearly exchanged here. Regardless of the analytical construct, as part of a multi-million dollar rescue of five (including SSA) failing thrifts and preservation of the FSLIC insurance fund (as well as the pockets from which any deficit would have been paid and the stability of the national thrift industry), a holding company and the government entered into a complex agreement. The government contributed four thrifts already in federal receivership and CHTE contributed SSA. As the Federal Circuit commented in *Hansen,* "there is no doubt that the merger was desirable from the FSLIC's point of view." 367 F.3d at 1316–17. "By assuming the liabilities [of the failing thrift], the Hansens allowed the FSLIC to avoid the high cost of bailing out another insolvent thrift." *Id.* at 1317. "In a very real sense, what the Government received in exchange for its promise was time—time to deal with other failing S & Ls, time to see what the market would do before having to commit substantial resources to the problem." *Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1382 (Fed.Cir.2001); *Am. Capital Corp. v. United States,* 59 Fed. Cl. 563, 586 (2004)("[The government's] real gain was delaying political accountability for federal regulators' interference with market forces."). The Federal Circuit recently reiterated the mutual consideration exchanged in most *Winstar* cases:

The FHLBB was dealing with the worsening crisis in the savings and loan industry by seeking healthy institutions to merge with or acquire failing thrifts and by offering incentives such as the use of supervisory goodwill. The healthy thrifts sought permission from and agreement with the FHLBB in order to safely undertake the

---

**40.** Section 27(a) of the Assistance Agreement titled *"Entire Agreement, Severability."* provides:

This Agreement and the other agreements entered into by the ACQUIRING ASSOCIATION [defined in the Assistance Agreement as SSA] pursuant hereto, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement, between the parties and supersedes all prior agreements and understandings of the ⸱·⸍ties in connection with it, excepting only ⸱· ⸍Acquisition Agreement and any resolutions ⸦ ·tters concerning the Transaction or this ⸍ ement issued by the Bank Board of the ⸦ PORATION in connection with the approval of the Transaction and this Agreement,

*provided,* however, that in the event of any conflict, variance or inconsistency between this Agreement and the Acquisition Agreements or any other agreement entered into by the ACQUIRING ASSOCIATION in connection with the Transaction, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations and liabilities of the CORPORATION are concerned.

DX 158 at Pl. 000133.

**41.** Even if the Assistance Agreement contained all the terms of the acquisitions, it would have been approved under the umbrella of the H-(e)3 Application.

salvage efforts the Government so eagerly desired.

*Fifth Third Bank,* 402 F.3d at 1231.

### The court's conclusions on contract formation

*Home Savings* is dispositive on contractual privity. CHTE's "offer" was its H-(e)3 Application. The "offer" in *Home Savings* was the holding company's H-(e)3 Application. In both cases the holding company engaged in or was the initiator of negotiations. In *Home Savings,* the holding company agreed to maintain the net worth of the resulting institution. Here, CHTE agreed to and did contribute subdebt and stock warrants in the newly expanded SSA. The overarching contract was implemented as detailed hereinabove.[42] CHTE's expanded subsidiary had $307.5 million in regulatory capital credit, and the parties embarked on an envisioned ten-year business plan, at the end of which CHTE and the government would have weathered an economic storm and emerged as partners in a major financial institution. The Assistance Agreement was part of a larger, umbrella contract between CHTE and the government.

### Governmental authority to contract

■ The government's contention that the FHLBB lacked authority to contract with a holding company was also recently rejected in *Home Savings. Home Savings* held the government had authority to contract with the holding company under 12 U.S.C. § 1725(c). 399 F.3d at 1356–57. Previously, two of the three *Winstar* acquisitions found to be contractual by the Federal Circuit and the Supreme Court were made by holding companies. *Winstar III,* 518 U.S. at 864–65, 866–68, 116 S.Ct. 2432 (discussing acquisition by Winstar corporation and Statesman Savings Holding Company, both of which filed H-(e)3 applications); 12 U.S.C. § 1725(c); 12 U.S.C. § 1729(f)(2) and (f)(3); *Hansen Ban-*corp, *Inc. v. United States,* 367 F.3d 1297, 1303–04 (Fed.Cir.2004) (discussing without reservation on authority, FSLIC promises to plaintiff holding company). Furthermore, contracting authority in *Winstar* cases extends to capital credits. *Cal. Fed. Bank v. United States,* 395 F.3d 1263, 1274–75 (Fed. Cir.2005) (*"Cal.Fed.II"*) (finding government authority to extend forbearances, including capital credits to be well established, citing *Winstar,* 518 U.S. at 890, 116 S.Ct. 2432). Accordingly, the FHLBB had the authority to bind the government to obligations found herein.

Given the existence of a contract, it is necessary to resolve whether there was a breach, whether any breach was material, and if so, what is the appropriate measure and amount of damages.

### The breach alleged—an overview

■ On August 9, 1989, Congress adopted FIRREA which established more stringent capital requirements for thrifts including new measures of mandatory capital—tangible capital, core capital and risk-based capital. 12 U.S.C. § 1464(t)(1)(A) to (D). FIRREA also included new provisions affecting whether and in what amount goodwill, other intangibles and other forms of capital could be used to satisfy these requirements. 12 U.S.C. § 1464(t)(9)(C), 12 U.S.C. § 1464(t)(3)(A). Pl. Facts No. 223 and Gov't Resp. Prior to FIRREA, regulatory capital ("RAP"), essentially consisting of whatever the regulators permitted, sufficed for regulatory purposes and allowed a thrift to remain open. Tr. 2990 (Wall); Tr. 3550–51 (Bradley); Tr. 1864 (Root): Tr. 3807–08 (Smuzynski); Tr. 930–31 (Miller).

FIRREA required the Director of OTS to "prescribe and maintain uniformly applicable capital standards" for thrifts. 12 U.S.C. § 1464(t)(1)(A). Those standards, promulgated in regulations, were effective in December 1989 (12 C.F.R. § 567.2–.9). An OTS

---

42. As concluded in *Home Savings,* an implied-in-fact contract is not involved. *Home Savings* held the holding company was in direct contractual privity with the government. The trial court's finding of an implied-in-fact contract (which was incompatible with the express contract with the subsidiary thrift the government asserted) was described as a "slip in terminology." 399 F.3d at 1349. *Cf. La Van III,* 382 F.3d 1340, 1346, 1347 (Fed.Cir.2004) (finding investors who agreed to infuse funds into a new thrift to have an implied-in-fact contract with the government); *Anderson v. United States,* 344 F.3d 1343, 1351 n. 2 (recognizing privity can be established through an implied-in-fact contract with the government).

Thrift Bulletin issued shortly thereafter made it clear that the new capital standards applied to thrifts that had been operating under capital and/or accounting forbearances. OTS Thrift Bulletin No. 38–2, Jan. 9, 1990. Jt. Stip. ¶ 15; Pl. Facts No. 224 and Gov't Resp. Thereafter, thrifts were required to maintain tangible capital at 1.5% of assets. Goodwill and other intangible assets would not count. Core capital could be no lower than 3% of assets, or the level set for national banks by the Comptroller of the Currency, whichever was higher. Only limited amounts of "qualifying supervisory goodwill" could be included in computing core capital. Risk-based capital was to be in an amount substantially comparable to that required by the· Comptroller of the Currency for national banks. Jt. Stip. No. 16.

The OTS treated capital credits in the same manner as supervisory goodwill, Jt. Stip. No. 17; accordingly, plaintiff's $307.5 million capital credit was eliminated. FIRREA also abolished the FHLBB and FSLIC, distributing their authorities to several other agencies, including the newly created OTS, RTC, and FDIC. Jt. Stip. No. 14.

That FIRREA's enactment and implementation could result in a breach of contract is clear. *See Winstar Corp. v. United States,* 64 F.3d 1531, 1545 (Fed.Cir.1995) (*en banc*) ("We conclude the government failed to perform its contractual obligations. . . .)," *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The Supreme Court remanded for consideration of damages. 518 U.S. at 910, 116 S.Ct. 2432 (affirming Federal Circuit's finding the government liable for breach of contract and remanding for determination of the "appropriate measure or amount of damages"). *See Fifth Third Bank,* 402 F.3d 1221, 1224, 1235 (explaining "subsequent government activity caused [*Winstar* contracts] to be breached;" and "[w]hen the Government changed the regulations, it could no longer make good on its promise and was therefore in breach of the contract"); *Hansen,* 367 F.3d at 1310, n. 11 ("FIRREA had the effect, in part, of preventing thrifts from counting capital credits toward regulatory capital requirements.").

The contract between the government and CHTE included the capital credit. Given that FIRREA and its implementing regulations eliminated that asset, thus breaking the government's contract with CHTE, the next issue is whether the breach was material. CHTE claims FIRREA's elimination of the $307.5 million capital credit was a material, substantial and total breach, and asks to be restored to its pre-contract/pre-reliance position with a damage award of $21,700,000— the asserted value of the subordinated debentures contributed to the "new" SSA—and $2,279,700, the asserted equity value of the "old" SSA that CHTE provided to acquire four insolvent thrifts—CHTE's cost of performance. Pl. Initial Post–Trial Brief at 38. The government contests both materiality and quantum of damages.

### Damages in Winstar cases

In *Winstar* cases, expectancy-lost profits have generally proven impractical and not susceptible to reasonable proof. *Fifth Third Bank,* 402 F.3d at 1236; *Calif. Fed. Bank v. United States,* 395 F.3d 1263, 1270 (Fed.Cir. 2005); *Glendale Fed. Bank v. United States,* 378 F.3d 1308, 1313 (Fed.Cir.2004), *cert. denied,* —— U.S. ——, ——, 125 S.Ct. 1590, 1592, 161 L.Ed.2d 277 (2005) (Nos. 04–626, 04–786). CHTE does not seek lost profits; neither does CHTE request damages for the estimated $400 to $500 million the government would have had to spend to liquidate the troubled thrifts (referred to in some *Winstar* cases as restitution), or the amount of liabilities it assumed. Indeed such recovery would be precluded. *Glendale,* 378 F.3d at 1313, citing *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1376–77 (Fed.Cir.2003).

CHTE seeks the value of the hard assets it contributed to the transaction as the contract required. Under the cost of performance damage model, "the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract" are awarded to the nonbreaching party. *Landmark Land Co., Inc. v. FDIC,* 256 F.3d 1365, 1372 (Fed. Cir.2001), citing *Acme Process Equip. Co. v. United States,* 171 Ct.Cl. 324, 347 F.2d 509, 530 (1965), *rev'd on other grounds,* 385 U.S.

138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). *See also Restatement (First) of Contracts* § 347 *et seq.* (1932).

The *Second Restatement of Contracts* defines restitution as that amount necessary to prevent the unjust enrichment of the breaching party. Damages are the value to the breaching party of the benefits conferred in order to prevent the breaching party's "enrichment" which would be "unjust" given the breach. "Reliance" damages satisfy the non-breaching party's "interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made." *Restatement (Second) of Contracts* § 344(b) (1981), *quoted in Glendale,* 239 F.3d at 1382–83.[43]

Perhaps to clarify whether the focus should be on the value of investor's consideration to the government, the breaching party (unjust enrichment), or the value to the investors (cost of performance), the Federal Circuit recently explained that while the "two approaches to restitution are not necessarily incompatible, we have observed that the 'costs' measurement may sometimes be more properly viewed as a form of reliance damages." *Hansen,* 367 F.3d at 1314 n. 13 (citing *LaSalle,* 317 F.3d at 1376) (citing *Glendale,* 239 F.3d at 1379–80) ("When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract position by returning [to it] as damages the costs incurred in reliance on the contract."). The Federal Circuit noted that the approach of the *Second Restatement of Contracts* § 344 (that restitution prevents unjust enrichment of the breaching party) was not incompatible with the cost of per-

formance measure, because the definition of restitution varies with each particular case. "The amount of recovery ... is not invariably determined by the value of what is received. In some cases the value of what is given is determinative.... The principle of restitution damages is to return the costs incurred in performing the contract, costs sometimes conveniently measured by the benefits conferred on the breaching party." *LaSalle,* 317 F.3d at 1376.

Reliance is, however, the preferred remedial construct. " 'Reliance is an ideal recovery in Winstar cases.' " *Glendale,* 378 F.3d at 1313 (quoting Jon W. Burd, *Where the Rabbit Hole Ends: A Working Model for Measuring Winstar-type damages in the Federal Circuit,* 13 Fed. Cir. B.J. 657, 685 (2004)). "Despite the landscape where alternative forms of recovery are speculative and loss models inherently unreliable, reliance damages can be ascertainable and fixed." *Id.*

Irrespective of theoretical underpinnings, the Federal Circuit counsels against focus on doctrinal damage labels; rather the task is, in appropriate cases, to return nonbreaching parties to their pre-contract position and not quibble about analytical construct. "We remain optimistic that with the additional guidance and support given the trial court ... the remainder of the *Winstar* cases can be disposed of ... based on the particular facts of the case, and without further dispute over the theory on which damages may be calculated." *Id.*

CHTE's Amended Complaint alleges the contribution of its subordinated debentures and authorization of the use of its subsidiary to take on these thrifts was made in reliance on the government's promises concerning capital.[44]

---

**43.** *See Restatement (Second) of Contracts* § 349 (1981), cited in *Glendale,* 239 F.3d at 1383, for a discussion of essential reliance, the outlay of funds essential to plaintiff's performance under the contract, and incidental reliance, costs incurred in preparation for collateral transactions incident to contract performance.

**44.** CHTE's Amended Complaint asserts:

3. As an integral part of the FHLBB and FSLIC's approval of the Southwest Plan Acqui-

sitions, the government expressly conditioned its approval on the contribution of approximately $23.78 million of equity capital into SSA by the CHTE. Thus, in reliance on the government's agreements, the CHTE contributed this amount as permanent capital into SSA to facilitate the Southwest Plan Acquisitions.

. . . .

30. The willingness of the CHTE to enter into this venture and to authorize SSA to take on the operation of not only four, but eleven

The net value of required contractual contributions has been awarded in *Winstar* cases. *Hansen*, 367 F.3d at 1314–15 (explaining restitution may be the net market value of benefits provided); *Glendale*, 378 F.3d at 1313 (sanctioning return or restitution of specific contributions, and recovery or restitution of expenses of nonbreaching party "as a form of reliance damages"). *Landmark* affirmed an award of $21,458,571, the value of real estate and cash contributed under the express terms of the Assistance Agreement. 256 F.3d at 1372–73, 1375.

In *La Van v. United States*, 56 Fed.Cl. 580, 583–84 (2003) the shareholder acquirers were awarded money-back restitution—their hard dollar contributions. The shareholder claims for expectancy or reliance damages were rejected as belonging to the thrift receivership, not the individual shareholders. The government did not appeal the acquirers' award of their initial investment. In *La Van III*, the Federal Circuit reversed and remanded the rejection of the lost profits claim, noting however, that if the shareholders could not prove their lost profits claim, the money-back restitution would still be available "as a fall-back position." *La Van III*, 382 F.3d at 1351 (citing *Glendale*, 239 F.3d at 1380). *See Hansen* 367 F.3d at 1308–09 (explaining that reliance damages are preparation expenditures made by the nonbreaching party in part performance of the contract and other expenses made in reliance on the contract). *See also Far West Federal Bank v. OTS*, 119 F.3d 1358, 1367 (9th Cir.1997) (affirming award of restitution of $26.6 million—the investor's capital contributions to the thrift) and *Resolution Trust Corp. v. Fed. Sav. and Loan Ins. Corp.* 25 F.3d 1493, 1505 (10th Cir.1994) (affirming summary judgment for return of capital contribution).

The government argues that CHTE's contributions were not required by the contract but were merely conditions precedent to the acquisitions. The contributions must have been required. *Castle v. United States*, 301 F.3d 1328, 1340 (Fed.Cir.2002) ("[T]he law is

well settled, however, that in order to be compensable as restitution, the plaintiff's contribution must have been made in performance of its contractual obligations.") (citing *Landmark*, 256 F.3d at 1375). One issue in *Hansen* was whether a requirement that plaintiff transfer stock as part of the agreement was a true "condition" of the Assistance Agreement. In other words, was it required? The Federal Circuit held that it was, and return of that consideration would be appropriate assuming FIRREA was a material breach. 367 F.3d at 1317; *See also La Van III*, 382 F.3d at 1349. In that there would not have been a deal if the subdebt had not been contributed, that contribution was required here. CHTE's contribution of SSA as the vehicle to form its partnership with the government was the lynchpin of the deal, and thus required. Accordingly, the court finds that the contractual arrangement required CHTE's contribution of its subdebt and SSA.

### Materiality

"The impact of FIRREA ... was swift and severe, and many thrifts quickly fell out of compliance with regulatory capital requirements, making them subject to seizure by thrift regulators." *Fifth Third*, 402 F.3d at 1224. Was the FIRREA breach here "material?" Recently, the Federal Circuit addressed this issue in the context of restitution of $1 million, the value of the capital contribution made by a holding company to effectuate the acquisition of a troubled thrift. The Federal Circuit explained that remedy would be " 'available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach.' " *Hansen Bancorp*, 367 F.3d at 1309 (citing *Restatement (Second) of Contracts* § 373). Damages from a breach must be definitely established. *See generally, Cal. Fed. II*, 395 F.3d at 1267–68 (rejecting "substantial factor" causation test, stating that while damages must be "definitely established," the breach need not be the sole cause; the existence of other factors operating in confluence with the breach will not

additional failed thrifts was expressly conditioned on the willingness of the FHLBB and FSLIC to grant to SSA the above-described

capital treatment, forbearances and authorities.

preclude recovery). *Cf. Centex v. United States*, 395 F.3d 1283, 1304–1311 (Fed.Cir. 2005) (FIRREA deprived acquirers of a "substantial part" of the benefit of their bargain in breach of the implied covenant of good faith and fair dealing).

*Hansen* defined a total breach as one that "'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.'" "[T]he breach 'must be of a relatively high degree of importance.'" 367 F.3d at 1309, 1312, citing *Restatement (Second) of Contract* § 243(4) and George E. Palmer, *The Law of Restitution* § 4.5 (1978). While this standard "is necessarily imprecise and flexible," *Restatement (Second) of Contracts* § 241 cmt. a., cited at 367 F.3d at 1312, the focus is (1) on the value of the contribution to the nonbreaching contributing party—(2) as of the time of the breach. The five factors of Restatement Section 241 were cited as significant in this determination:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.* While noting circumstance (c) would rarely apply to the government where, as here, the government is the breaching party, circumstance (a) (the extent to which the injured party will be deprived of the benefit which he reasonably expected) "will always be a pertinent consideration." *Id.* "'In deciding whether the breach is essential enough to justify restitution, a court should be concerned primarily with the objective of the plaintiff in seeking the performance promised by the defendant.'" *Id.*, citing Palmer, *The Law of Restitution* § 4.5. To "significantly narrow" "a gateway to ... the enjoyment of all other rights ... violated material conditions in the contract[ ] ... [and] was 'substantial,' depriving the companies of the benefit of their bargain." *Id.*, citing *Mobil Oil*, 530 U.S. at 621, 120 S.Ct. 2423, citing *Restatement (Second) of Contracts* § 243. "[T]he determination of whether a breach was material 'depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties.'" 367 F.3d at 1312, citing *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1551 (Fed.Cir.1992).

Here, having considered the facts and circumstances surrounding the contract and the breach, the court finds the loss of the $307.5 million capital credit was an essential, substantial, material and total breach.

**Capital credits**

The capital credits here must be understood in the context of the agreements and the breach. Capital credit was described by the Supreme Court in *Winstar*: "[s]ome transactions included yet a further inducement, described as a 'capital credit' ... [which] permitted the acquiring institution to count the FSLIC contribution as a permanent credit to regulatory capital." *United States v. Winstar Corp.*, 518 U.S. 839, 853, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). "[T]he capital credits portion of the agreement contains an express commitment to include those credits in the calculation of regulatory capital." *Winstar*, 518 U.S. at 867, 116 S.Ct. 2432. *See also Hansen Bancorp.*, 367 F.3d at 1310 n. 11.

Regulatory capital was a thrift's lifeblood. Capital credits "counted" toward meeting minimum regulatory capital ratios for a financial institution to remain open. Regulatory capital was an asset against which a thrift could expand or leverage loans. *Am. Capital v. United States*, 63 Fed.Cl. 637, 640 (2005); *Old Stone Corp. v. United States*, 63 Fed.Cl. 65, 67 (2004).

## Capital credit was negotiated

The amount of capital (or capital credit) to be provided by the government to counter the negative burdens of the troubled thrifts to be acquired was heavily negotiated. A capital credit, note or a total forbearance from any regulatory capital requirements was part of the negotiations from the beginning.[45] The proposals in October of 1987 included a capital note equal to 4% of the liabilities of the acquired thrifts, the full amount of their net worth deficiencies, and a ten-year forbearance from regulatory capital requirements. DX 65 at HB024231 and HB 024234 (Oct. 16, 1987 proposal) and FX 17 at HB024249 and HB 024254 (October 29, 1987 proposal). November 24, 1987 and January 15, 1988 proposals included a FSLIC Note for the negative net worth of the acquired thrifts and an additional capital contribution note in an amount to be negotiated. DX 73 at FCR446 0714–16 (November 24, 1987 proposal) and DX 81 at HB005725–57 (January 15, 1988 proposal). A ten-year forbearance from regulatory capital requirements was repeated. DX 73 at CFR446 0718 and DX 81 at HB005729. The February 11, 1988 proposal was for a FSLIC Regulatory Capital Note (or transfer of assets) for 4% of the target thrifts' liabilities plus the full amount of their net worth deficiency and certain net operating losses. DX 84 at HB 005984–86. Also, for a ten-year period "... FSLIC would forbear from any supervisory or enforcement action against [SSA] for failure to meet the Regulatory Capital requirements of 12 C.F.R. ¶ [sic] 561.13 or any similar regulation." DX 84 at HB 005988 (February 11, 1988 proposal). The March 7, 1988 proposal referenced in CHTE's H-(e)3 Application included a Net Worth Note and a Regulatory Capital Note as well as a ten-year forbearance from supervisory action for failure to meet regulatory capital. DX 92 at WOT131 0284 and WOT131 0305. Clearly, CHTE was concerned about regulatory capital. A capital credit was a cornerstone of the negotiations.

## A ten-year plan

In analyzing the materiality of breach and the issue of whether the breach harmed CHTE, it must be noted that a ten-year plan was envisioned, and the capital credit would be a credit for the full ten years. Ten years was provided to transform the consolidated failed thrifts into a profitable financial institution. The forbearance letter granted several ten-year restraints. DX 163. The government estimated ten years was necessary for the economy to improve and real estate values to recover. Tr. 1873–76 (Root); Tr 3557–58 (Bradley). Proposed acquirers in the Southwest Plan were offered ten-year notes in the amount of the tangible negative net worth of the acquired thrifts. DX 88 at FCR043 0009. The Assistance Agreement had a ten-year term. DX 158. The FSLIC recommendation memorandum described a ten-year FSLIC note, a ten-year yield maintenance rate, and a ten-year term on the preferred stock. DX 140 at Pl. 000332–334. Stock options granted to FSLIC were exercisable in ten years. *Id.* The ORPOS recommendation memorandum referred to the ten-year term of the Assistance Agreement and the ten-year qualified thrift lender status to be granted to CHTE. DX 139 at WOB023 0504–06.

This ten-year term was important to CHTE. Tr. 1001, 1007, 1033–34, 1008–09 (Crisp); Tr. 1768, 1782, 1786–87 (Boone). In his February 11, 1988 detailed proposal to Root (Executive Director of FSLIC) and Martin (FHLBB member), Miller wrote: "[w]e do not believe that it would be prudent for Southwest Savings to expose its present net worth and going concern value to these undefinable risks without adequate indemnities, yield maintenance and other protections

---

45. Miller testified as to early negotiations:
   A. In addition to, you know, adequate yield maintenance and loss coverage, capital loss coverage, we also provided and requested a 6 percent regulatory capital.
   Q. And how did the FSLIC note fit into that?
   A. Well, it was a capital note that was given for the deficit net worth and we were given a capital credit for the amount of that note applicable to regulatory capital to bring what eventually became the negotiated capital of the institution to 5 percent instead of 6.
   Q. Did you ask for 6?
   A. Yes, we did.
   Q. And what happened?
   A. It was negotiated and finally agreed upon to be 5.
   Tr. 230 (Miller).

from FSLIC for a period of ten years." DX 84 at HB 005992–93. *See also* Tr. 1767–70 and 1784 (attorney Boone) (the ten-year term of the acquisitions in general and the capital note in particular, were important to CHTE). Boone's trial testimony captured not only CHTE's essential role in the acquisitions but also CHTE's reliance on the government's promises:

> [t]he value of the enterprise increases by being a successful business, increases, inures to the benefit of the shareholders. And so they have the savings and loan, they control it, they own it. They have a lot of latitude to do a lot of things because of their financial wherewithal to make it successful.
>
> And now to bring in a partner, okay, the question is going to be is how you share that equity. And they all—this is clear at the time we were doing it—in fact, that's why we had a fight over the equity. The Government wanted more equity because everybody believed, with the assistance and the ten years and the turnaround of the real estate market, that this was going to be a very valuable enterprise long—you know, over the ten-year period, by the end of '98.
>
> And so that was a factor that inured to the benefit of the shareholders. That's why they were—that's what they were negotiating, is how they shared that enterprise value with the Government. But it was in reliance upon the Government's doing their part of the bargaining and that's

doing the federal assistance over the ten years, the capital note, et cetera.

Tr. 1769–70.

**The contract included the capital credit**

As finally negotiated, the regulatory capital credit was granted in the FHLBB Board resolutions,[46] the Assistance Agreement,[47] and the forbearance letter:

> It is the intention of the FSLIC that the promissory note(s) issued to and made to the order of SWS, pursuant to an Assistance Agreement to be entered into between the FSLIC and SWS, will be a credit to SWS' regulatory capital to the extent that such credit increases SWS' ratio of regulatory capital to total liabilities to 5.0% at the Effective Date, for purposes of determining compliance with Section 563.13 of the Insurance Regulations, or any successor regulation.

DX 163 at WSJ0690524.

As computed, the capital credit was $307.5 million, more than ten times SSA's pre-deal regulatory capital—a significant, substantial, and material aspect of the transaction.

Crisp testified that the decision to acquire $5 billion in troubled assets was based on the government's commitment to provide significant regulatory capital. Initially cash, notes or other tangible capital was requested, but to save money FSLIC agreed to provide "a contractual provision which would allow the new Southwest to meet its regulatory capital requirements. CHTE relied upon those contractual commitments when it allowed South-

---

46. *Accounting*

RESOLVED FURTHER, That for regulatory accounting purposes, the promissory note(s) issued to and made to the order of the Assuming Association pursuant to the Assistance Agreement will be a credit to the Assuming Association's regulatory capital to the extent that such credit increases the Assuming Associations' ratio of regulatory capital to liabilities to five percent (5%) at the Effective Date of the Acquisition, for purposes of determining compliance with § 563.13 of the Insurance Regulations, 12 C.F.R. § 563.13 (1987), or any successor rule or regulation;

DX 152 at Pl. 000503–04. The same language is in Board Resolutions for the other acquired thrifts. Id. at 000536–37, at 000570–01, and at 000603–04.

47.

> (C) For purposes of reports to the Bank Board, other than reports or financial statements that are required to be governed by generally accepted accounting principles, that portion of the principal amount of the Promissory Notes delivered by the CORPORATION under this [section] which is necessary to increase the ACQUIRING ASSOCIATION'S regulatory capital to an amount equal to 5% of the aggregate liabilities of the ACQUIRING ASSOCIATION immediately after giving effect to the acquisition of the ACQUIRED ASSOCIATIONS shall be credited to the ACQUIRING ASSOCIATION'S regulatory capital account and shall constitute regulatory capital.

DX 158 at Pl. 000076.

west to enter into the transaction." PX 128. at 1–2; Tr. 1065–66 (Crisp).

A May 6, 1988, FSLIC memorandum encapsulates the materiality of the regulatory capital credit (the amount of which was still being negotiated), to the transactions, and ironically, foretold of the consequences of its elimination:

> [T]he acquisition ... [without capital assistance will] result in a $8.9 billion association with $30 million of regulatory capital,—a level of capital which evidences the continued financial weakness of the resulting institution. While expected future earnings resulting from FSLIC's financial assistance should rebuild capital over a 10 year period, during the interim, and particularly in the early years of the agreement, the institution will have the appearance of being severely undercapitalized. The solution proposed for this transaction is to treat $450 million of FSLIC's negative capital note as regulatory capital. This approach produces 6% regulatory capital for the resulting institution, but does so without any tangible capital infusion. Whether this accounting treatment provides sufficient financial strength to engender public confidence and lower Southwest Savings' cost of funds is difficult to evaluate, but the alternative of operating in a near-insolvent status is no more attractive. As a matter of policy, the Board may conclude that the 6% regulatory capital resulting from the transaction will not be well received publically and that the assistance will be considered to be inadequate and the resulting institution weak and undercapitalized.

DX 117 at 054943–44. While the final negotiated capital credit was 5% rather than 6%, the government recognized before the transaction closed that without it, SSA would appear to be "severely undercapitalized." Indeed, it soon was.

Although CHTE does not claim that the subsequent seizure and liquidation of the "new" SSA was a breach, SSA's post-FIRREA disintegration is outlined as background on breach and materiality, and the importance of the capital credit at or about the time of breach, and the government's defense that SSA would have failed anyway,

therefore FIRREA caused no harm, the latter addressed hereinafter.

Congress recognized that FIRREA would have a substantial effect on government contracts. *Winstar*, 518 U.S. at 900, 116 S.Ct. 2432 ("The statute not only had the purpose of eliminating the very accounting gimmicks that acquiring thrifts had been promised, but the specific object of abrogating enough of the acquisition contracts as to make that consequence of the legislation a focal point of the congressional debate.") (citing congressional testimony). Thrifts failed as a result of FIRREA's elimination of favorable accounting treatment.

> Despite the superficial appeal of supervisory mergers, these arrangements could not rescue the industry and the FSLIC from a worsening crisis. In 1989, Congress intervened by enacting FIRREA. As part of an extensive reformation of the savings and loan industry, FIRREA mandated minimum capital requirements and prohibited the use of supervisory goodwill. No longer able to rely on supervisory goodwill, many thrifts could not comply with FIRREA's capital requirements and were seized by regulators.

*Hansen*, 367 F.3d at 1303 (citations omitted). The elimination of capital credits had the same effect.

Following the May 18, 1988 closing on the acquisitions, SSA's regulatory capital continued to plummet. By March 31, 1989, SSA's regulatory capital, including the $307.5 million capital credit, was 3.91%. DX 209 at FCR349 0512. As of June 30, 1989, it was 3.05%. Tr. 3254–55 (Jardieu). By September of 1989, it was 2.41%. Tr. 922–23 (Miller); DX 291; DX 499–W; Tr. 3379 (Robert Brick). SSA was, however, regulatory capital deficient prior to the acquisitions. Pre-merger SSA was regulatory capital deficient by almost $22 million as of September 30, 1987 (only 69% of its required minimum), almost $43 million as of December 31, 1987 (only 47% of its required minimum), and over $61 million as of March 31, 1998 (only 33% of its required minimum). DX 629A. Clearly, substantial pre-merger, pre-FIRREA regulatory deficiencies were not a bright-line trigger for receivership.

Witnesses testified that prior to FIRREA, with regulatory capital of 2.41%, SSA would not necessarily have been immediately placed into receivership; the percentage would have to have been closer to zero. Tr. 3424–25 (Brick); Tr. 3534 (Bradley); Tr. 3808–09 (Smuzynski). The common practice pre-FIRREA was to work with an institution, placing it into receivership when it was much closer to actual insolvency (liabilities in excess of assets). Tr. 3424–25 (Brick), Tr. 3534 (Bradley); Tr. 3808–09 (Smuzynski). Less drastic measures would have been taken, particularly where management was strong. Tr. 3425–26 (Brick); Tr. 3533–34 (Bradley). SSA did not have management problems that would lead to seizure. Tr. 3809–10 (Smuzynski).

Within months after the May 18, 1988 deal closing, SSA was looking for additional capital from outside investors, retaining the investment firm of Merrill Lynch. DX 185. Merrill Lynch presented a potential investor interested in providing capital for SSA, provided SSA could obtain federal assistance on its uncovered assets. DX 250, Tr. 857, 861 (Miller). The government suggests that SSA's engagement of Merrill Lynch in late 1988 indicates CHTE was willing to further dilute its equity interest in the thrift and that the investment firm's concern about lack of government coverage on SSA's pre-merger assets suggests that SSA had no value.

FHLB–Dallas' supervisory letter to SSA of June 22, 1989, criticized numerous instances of loan reserves that did not adequately reflect declining real estate values, identified an additional $54 million in loan loss reserves and directed SSA to increase reserves accordingly. These were not actual losses, as the security had not been foreclosed. These were accounting cushions to absorb possible future losses. As a result of this accounting adjustment, SSA was very close to failing the 3% capital provision of its forbearance letter. DX 223 at Pl. 011228. A long-term capital plan acceptable to the regulators was demanded by October 1, 1989, or FHLB–Dallas would, request and expect to receive authorization from the shareholders and the Board to negotiate a reorganization or acquisition to infuse capital. *Id.*

In the June 30, 1989 regulatory plan for SSA generated by the regulators, CHTE is noted as the holding company and controlling entity. Management reportedly complied with the terms of the FSLIC agreement in consolidation and cost savings efforts, and had generally operated SSA in a prudent manner. Capital infusion was pressed. DX 524 at FCR226 0792, 0799–000. SSA was required to submit a business plan by September 1, with an October 1, 1989 deadline for negotiations with potential investors. Progress on consolidation and costs savings would be monitored monthly, with quarterly monitoring for compliance with the forbearances. *Id.* at FCR226 0803–05. A safety and soundness examination was scheduled for July 10, 1989. *Id.* at FCR226 0804.

A Report of Examination from July 11, 1989 to August 25, 1989 of Anthony Jardieu, OTS examiner-in-charge, questioned SSA's long-term viability due to the lack of earnings retention, poor quality of uncovered assets, and inadequate monitoring of interest rate risk. DX 291 at FCR164 2894.

FIRREA was enacted on August 9, 1989, and implementing regulations became effective in December of 1989. Jt. Stip. ¶ 13; Pl. Facts No. 224. Robert Brick, OTS Caseload Manager took over the supervision of SSA in November of 1989. Tr. 3365 (Brick).

On October 30, 1989, Chip Kiesewetter, OTS Principal Supervisory Agent, wrote to SSA's Board of Directors, expressing "significant concern" about the level and composition of SSA's capital. "The association will be required to meet the tangible and core capital tests imposed by the Financial Institutions Reform, Recovery and Enforcement Act ('FIRREA')." DX 260 at Pl. 00496. SSA's deadline for submitting a capital plan was extended to October 31, 1989, with a warning that if significant progress toward infusing new capital was not made by November 15, 1989, appointment of a conservator would be considered. *Id.* SSA's MACRO rating was downgraded to a 5 due to lack of earnings retention, deteriorating asset quality and lack of GAAP (capital measured under general accounting principles) and tangible capital. A macro rating of 5 was reserved for thrifts "with an extremely high immedi-

ate or near-term probability of failure. The volume and character of weaknesses are such as to require urgent aid from the shareholders or other (sources such as merger partners or acquirors)." *Id.* at Pl. 00497.

SSA's response dated November 30, 1989, first addressed the issue of capital, disagreeing with the regulator's assessment that it had negative regulatory capital. "As we have stated many times, Southwest was contractually provided regulatory capital by the Government and is not insolvent." DX 270 at p. 1. Continuing efforts to find an investor were noted as was frustration with finding someone in the government with authority to negotiate. *Id.*

A November 3, 1989 government report (again noting CHTE as the holding company), stated SSA had a regulatory capital ratio of 2.41% for fiscal year end September 30, 1989. DX 266 at FCR349 1179. Management was reportedly satisfactorily operating the thrift in a "prudent manner given the circumstances." *Id.* at FCR349 1184. Additional loan loss reserves of $193.5 million since the merger were attributed to the Texas economy and required reporting changes. *Id.* at FCR349 1188. Success in the disposition of foreclosed properties was noted, but pending contracts requiring financing were stopped because FIRREA prohibited SSA from making loans in excess of $500,000. This loan limitation impacted approximately $200 million in pending sales. *Id.* The report concluded that SSA had over $148 million in regulatory capital vice negative $208,928,000 "modified equity capital," and negative $215,781,000 GAAP capital. *Id.* at FCR349 1192. In summary, the number one supervisory concern was the amount and composition of SSA's GAAP capital deficit of $215,781,000. *Id.* at FCR349 1195. The deadline for submission of a business plan was extended to December 31, 1989. Continued viability was questionable; receivership was likely. Planned followup included an examination of CHTE.[48] *Id.* at FCR349 1197.

Citing the impact of FIRREA, Peat Marwick Main & Co., SSA's Independent Auditor, reported as of September 30, 1989, that it could not express an opinion on the financial statements of SSA and its subsidiaries. DX 272 at 2.

SSA's Alternative Solutions Report dated December 12, 1989 (DX 275), estimated that the government benefited some $157 million from postmerger cost savings. FIRREA's limitation in the loan-to-one-borrower (the $500,000 cap) resulted in $110 million in potential lost sales. The report also stated that a primary, material and substantial provision of the 1988 acquisition was the ten-year term, and the regulatory capital credit. The report noted: "[t]o Southwest's dismay, FIRREA appears to conflict with this contractual understanding by requiring that all insured institutions have by December 7, 1989 minimum tangible capital of 1.5% of assets while at the same time apparently giving no effect to Southwest's contractual regulatory capital. Obviously, the intent of the 1988 transaction is negated if FIRREA is deemed to override Southwest's regulatory capital position." DX 275 at Pl. 005339–40.

An internal OTS memo discussing an SSA investor proposal, referenced an impression from FDIC and RTC that the management of SSA had performed well in achieving the goals of the Southwest Plan. SSA had operated conservatively, and "the only problem was its capital level." DX 276 at 2.

Any doubt whether regulatory capital credit was eliminated was put to rest by the January 19, 1990 Supervisory Notice from OTS District Director Billy C. Wood enclosing Thrift Bulletin 38–2 which stated succinctly "FIRREA has eliminated capital and accounting forbearances previously granted. All institutions that have been operating with such forbearances must eliminate them in determining compliance with the new minimum regulatory capital requirements. Capital plans may not include continuation of such forbearances." DX 282. The post-FIRREA January 1990 OTS examination of SSA was also unequivocal, reporting that the $307.5 million capital credit could no longer be counted toward capital compliance. "The

---

48. In a December 1, 1989 letter, OTS informed Crisp, on behalf of CHTE, was informed that an offsite examination of CHTE was being conducted. Several questionnaires were tendered requesting salaries, debts, cash flow and stock ownership. DX 271.

$307 million in intangible assets, which was provided for by the Southwest Plan Agreement, could no longer be counted toward capital compliance with the inception of FIRREA." DX 294 at Pl. 004963. This report was sent to SSA's Board of Directors on April 16, 1990. DX 310.

On January 16, 1990, Brick, on behalf of the District Director of OTS, wrote to Crisp to share his concern about the new capital standards imposed by FIRREA and to extend every opportunity to the Trust to infuse capital into SSA. He wrote "[t]his office can not stress strongly enough the importance of a capital infusion to ensure the viability of Southwest Savings Association." PX 129. On January 30, 1990, CHTE responded to Brick's concern. DX 291 at FCR164 2954–55. In addition to informing of the retention of Merrill Lynch and meeting with NCNB, a potential investor, Crisp wrote of the difficulty in finding investment capital due to uncertainty surrounding the savings and loan industry. Investor uncertainty "will be heightened by recent Government announcements regarding treatment of its obligations to existing investors (a veiled reference to FIRREA's elimination of the capital credit.) It is imperative that there be predictability of performance by the Government in its contracts and other assistance programs if investors are to make capital infusions." *Id.* at FCR164 2954. Crisp warned that FIRREA's elimination of $307.5 million in capital eliminated the "cornerstone" condition of SSA's agreement to acquire $5 billion dollars of troubled assets. Tangible capital in the form of cash or notes had been requested initially, but, in order to save FSLIC money, the government gave a contractual provision to allow SSA to meet its regulatory capital commitments. "The Trust Estate relied upon those contractual commitments when it allowed Southwest to enter into the transaction." *Id.* at FCR164 2955. Crisp's contemporaneous, pre-litigation words shortly after the breach, provide strong evidence on materiality, and particularly, given the opportunity to witness his testimony, are accorded much credence, not for their legal conclusions but for the facts conveyed. Crisp characterized FIRREA's actions as a breach and a material breach:

The enactment of FIRREA which has eliminated the capital committed to Southwest by the Government has adversely affected the on-going economic viability of the institution. In May, 1988, the cornerstone condition of Southwest acquiring $5 billion of troubled assets was the Government's commitment that it would provide $307 million of capital. At the time, Southwest requested cash or notes which constituted tangible capital but was told by the Government's officials that in order to save the FSLIC money they would provide capital by a *contractual* provision which would allow the new Southwest to meet its regulatory capital requirements. The Trust Estate relied upon those contractual commitments when it allowed Southwest to enter into the transaction.

*Id.* at FCR164 2954–55.

Consistent with its espoused opinion that the regulatory capital credit was a material part of CHTE's contract with the government, CHTE requested a legal opinion (as to FIRREA's effect on regulatory capital commitments) from the law firm of Haynes and Boone. A draft opinion is dated February 9, 1990. DX 287.

OTS examiners in February 1990 found that the elimination of the $307 million capital credit adversely affected SSA's capital compliance. DX 294 at Pl. 004963. Pl. Facts No. 228 and Gov't Resp.

A February 9, 1990, OTS Inter–Office Memorandum reported that SSA failed all three of FIRREA's capital standards. DX 288 at OCR002–0578. A February 16, 1990 letter from OTS Director Billy Wood to SSA's Board of Directors rejected SSA's capital plan and stated that because SSA did not have an approved capital plan, pursuant to 12 C.F.R. § 567.10(a)(4), SSA was not allowed to increase its assets, make any new loans or investments, make any capital distributions, add to the Board of Directors or employ any senior executive in either SSA or CHTE without prior written approval. DX 290.

On February 16, 1990, Wood recommended to Alvin Smuzynski, OTS Deputy Director of Supervision Operations, and Ronald Brown, Associate Chief Counsel, that a receiver be

appointed for SSA. DX 291. This "S–Memorandum" (which noted at that time SSA had sixty-nine full-service branch offices in Texas and forty-one subsidiaries) concluded that SSA failed to meet the new capital standards of FIRREA which superceded the forbearance letter. The memorandum also noted that SSA's regulatory capital ratio fell to 2.41%,[49] below the 3% required in the forbearance letter. SSA's capital plan and its proposed sale to NCNB were rejected because they required additional federal assistance. DX 291 at FCR164 2887. The Memo specifically noted that removal of management was not recommended. Therein the government acknowledged the importance of the capital credit to CHTE's subsidiary, FIRREA's elimination of that credit, and the government's awareness that CHTE was asserting contractual rights:

> On May 18, 1988, FSLIC granted to [SSA] as part of the assisted acquisitions of four insolvent institutions an accounting forbearance, whereby the institution was allowed to credit regulatory capital in an amount of the FSLIC note that would bring regulatory capital up to 5 percent of total liabilities. This amount equaled $307,496,000 on that date. [SSA] and [CHTE] contend that the cornerstone condition of [SSA] acquiring $5 billion of troubled assets was the Government's commitment that it would provide the $307 million of capital. According to [SSA], [SSA] requested cash or notes which constituted tangible capital but was told by the Government's officials that in order to save the FSLIC money they would provide capital by a contractual provision which would allow the new [SSA] to meet its regulatory capital requirements. [CHTE] has stated that they relied upon those contractual commitments when it allowed [SSA] to enter into the transaction. The dispute arises due to the association no longer being allowed to include the $307,496,000 as capital (except for 1.5 percent of assets included in the calculation of core capital).

DX 291 at FCR164 2885–86.

An April 16, 1990 letter to SSA Board of Directors, including the January 1990 OTS exam, warned that SSA was near failure and immediate corrective action was necessary. A detailed response to the report of examination was demanded. DX 310.

Although SSA was drafting a response to the demand (DX 321—dated May 15, 1990), it was not finalized because on May 18, 1990, OTS appointed a conservator for SSA. Jt. Stip. 9118; DX 325; DX 322. The appointment order referred to a May 16, 1990 legal memorandum and an executive summary that cited unsafe and unsound conditions, including "substantially insufficient capital" as the statutory grounds for the appointment. Even if the $307.5 million was counted, SSA had only $4 million in regulatory capital which was far short of its requirement of $79.447 million. *Id.* at Pl. 006733. OTS Chief Counsel, in a Legal Memorandum to the Director of OTS, responding to possible litigation over the appointment of a conservator, stated "[a]s a result of FIRREA, the Association's capital position has been affected adversely, due to its inability to calculate its capital requirements using these forbearances." *Id.* at p. 9. On June 15, 1990, the OTS appointed the RTC as receiver. Jt. Stip. ¶ 18; DX 325.

In post-trial briefing the government raised an issue whether the capital credit could have been phased-out over a five-year period rather than immediately which would have mitigated its impact and the materiality of the breach. It appears that SSA did use the permitted portion of its capital credit in 1989–90 to calculate its core and risk-based capital until placed into receivership in May 1990. It did not, however, apply as a credit to tangible capital which was of most importance post-FIRREA. The court notes that there was confusion concerning phase-out of intangible assets. *See* Plaintiff's Response to Defendant's Motion for Leave to File Supplemental Authority and Correct the Official Transcript, Exhibit B. In *Commercial Federal Bank v. United States,* 59 Fed.Cl. 338, 346–47 (2004), the court did "not believe ... that plaintiff was unreasonable in understanding that FIRREA regulations, as implemented in its case, required the complete elimination of supervisory goodwill in the

---

49. The S–Memorandum gives the percentage as 2.14, a transposition error.

first year." Accordingly, the court need not decide whether, or to what extent, the $307.5 million dollar capital credit could have been phased out over a five-year period. SSA's regulators thought the capital credit was eliminated, and its elimination even under the government's proposed five-year phase out, would have been a material breach.[50]

In finding a material breach, the court is mindful that "... it is not a requirement of 'total breach' that the defendant have failed to render *any part* of the promised contractual performance; such a misinterpretation of the expression 'total breach' would seriously distort the meaning of the present Section." *Restatement (Third) of Restitution and Unjust Enrichment* § 37 (Tentative Draft No. 3, 2004).[51]

### Defenses

FIRREA resulted in a material and total breach of CHTE's contract. The government asserts several defenses: CHTE breached the agreement when it failed to deliver a thrift with a conservative lending portfolio as had been represented; and a breach occurred when SSA's regulatory capital fell below the 3% floor of the forbearance letter. The court concludes these defenses were waived. Even if not waived, it is concluded that the defenses are not available to the government and, in any event, they would not serve to prevent or annul the government's breach resulting from the elimination of the $307.5 million capital credit.

### The government's claims of pre-FIRREA breach were waived

■ In contrast to CHTE's immediate and vociferous objection to the elimination of the $307.5 million in capital credit, the foundation of its contract with the government, the government's complaints about serious loan portfolio deficiencies are of new cloth. Regulators contracted despite awareness of SSA's own precarious economic situation, and then continued to make assistance payments despite awareness (and indeed concerns expressed on more than one occasion) of the

financial condition of both "old" and "new" SSA. *Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1382 (Fed.Cir.2004) ("[T]he government['s] 'continued performance under the contract despite perceived material breaches,' ... [failed] to reserve any claim of prior breach.") (quoting *Barron Bancshares, Inc. v. United States,* 53 Fed.Cl. 310, 321 (2002)) (quoting *Coast–to–Coast Fin. Corp. v. United States,* 52 Fed.Cl. 352, 363 (2002)). As in *Barron Bancshares,* here the government accepted the deal, and then continued to make assistance payments to SSA despite continuing negative financial reports. The facts in *Barron Bancshares* are so similar to the government's knowledge and actions (as well as inactions) with respect to SSA, as to make *Barron's* finding of waiver determinative here. In *Barron Bancshares,* in addition to an initial capital contribution of $6.675 million, the Assistance Agreement obligated FSLIC to provide capital credits, additional cash and capital loss coverage (the government would pay the thrift, or "cover," certain losses on the sale of thrift assets). Here, in addition to the initial capital contribution of a promissory note of $483.7 million, and the $307.5 million capital credit, FSLIC provided loss coverage, yield maintenance on certain acquired assets (the government would pay the thrift if certain assets did not generate a certain percentage yield), interest on its promissory note, and an agreement to indemnify SSA from certain claims. In *Barron Bancshares,* the thrift was placed in receivership in July 1991, yet assistance payments continued until December 1991. Here, the government acknowledged that assistance continued for several months at least, until SSA was placed into receivership. More importantly, FHLBB entered into the acquisition transaction in spite of a wealth of negative financial information, audits and reports. No fraud is claimed; there is no claim that financial information was withheld. Whether called misrepresentation or breach, any claim of inadequate loan documentation,

---

50. Even with a five-year, equal reduction, over $60 million of capital credit would disappear each year, a substantial and material amount.

51. Tentative Draft No. 3 of the *Restatement (Third) of Restitution and Unjust Enrichment* was approved at the 2004 Annual Meeting of the American Law Institute. *www.ali.org/ali/R2701 03–ActionsTaken.htm* (March 28, 2005).

risky loans, outdated appraisals or other-than-conservative loans was waived.

The government argues there is no evidence it was fully aware of SSA's pre-merger loan portfolio and lending practices until after a conservator was appointed. Absent knowledge, there can be no waiver, the government states. After hearing testimony in this regard, the court finds that from the regulators' extensive reviews, audits, and particularly their interest in establishing additional loan loss reserves, both pre– and post-merger, as well as their comments about SSA's loan process and portfolios, that they knew or should have known of the financial conditions of which the government now complains.

Proposals, correspondence and recommendations acknowledged SSA's financial problems pre-merger.[52] SSA's financial straits and concerns were not sufficient to warrant objection to the acquisitions. DX 139 at WOB023 0498. Regulators noted that SSA's "problems with substandard assets and its interest margin GAP are attributable mostly to prevailing economic conditions of the region." *Id.* at WOB023 0494–95. Regional economic conditions were acknowledged; the ten-year bail-out was in part to weather this cycle.

While concerns about both pre– and post-acquisition SSA had long been expressed by the government, no prior material breach by CHTE or SSA was asserted until after this litigation commenced. Accordingly, the court finds "...that through its continued performance of the contract, the government waived any claim for prior material breach or material misrepresentation giving rise to the right to terminate the contract." *Barron,* 366 F.3d at 1383.

**There were no prior material breaches**

**Claimed representation that SSA had a conservative loan portfolio**

Even if not waived, CHTE did not materially breach its agreement by misrepresenting the nature of SSA's loan portfolio. In April of 1988, regulator Thomas Fontanna voiced concerns that SSA had understated its loan losses. DX 139 at WOB023 1069–71. William Robertson, ORPOS Managing Director for Supervision also noted a number of areas of possible supervisory concern in a May 4, 1988 letter to Miller that asked: "[h]ow does Southwest intend to reverse this trend and prevent further increases in problem assets?" DX 115. Miller's May 10, 1988 response is characterized by the government as a "guarantee" that CHTE would deliver SSA with a conservatively-managed loan portfolio—later found (post-takeover) to be unfounded and a material breach according to the govern-

---

52. It is undisputed that SSA had a regulatory capital deficit of over $21 million as of September 30, 1987; $43 million as of December 31, 1987; and $60 million as of March 31, 1988. DX 629A; Jt. Stip. ¶ 20. The record contains numerous pre-May 1988 closing references to financial difficulties. Audited financial statements for fiscal year ending September 30, 1987 were included in the ORPOS recommendation package, DX 139 at WOB023 1095–1120; PX 142, as was SSA's thrift financial report (TFR) for March 1988. DX 139 at WOB023 1072–1094; PX 499Q. SSA was predicted to be insolvent within a year before the acquisitions:

> The association has not been able to stem the trend towards increasing levels of nonperforming assets. Consequently, gross operating income from [sic] is insufficient to cover operational expenses and cost of funds of the association. The long-term outlook of the association is not promising.
>
>     . . . .
>
> As indicated earlier, the prospects for this association's survival are bleak. Barring a sudden turnaround in the local real estate mar-

ket, losses from operations will render the institution insolvent in approximately one year. At that time, we believe that FSLIC assistance will be necessary to resolve this case and that the eventual costs will exceed $100 million. DX 139 at WOB023 1071.

Just weeks prior to the deal, on April 29, 1988, FHLBB Supervisory Agent wrote to SSA's Board of Directors with areas of supervisory concern (including the amount of general loan loss reserves) and requests for corrective action. DX 139 at WOB023 1238–39. On May 4, 1988, ORPOS wrote to SSA with a number of concerns and requested an expeditious response in light of the pending evaluation of SSA as an acquirer in the Southwest Plan. DX 139 at WOB023 1240–1241. Both these letters were in the ORPOS package. The regulators still recommended SSA as an acquirer in a May 5, 1988 memo (DX 139 at WOB023–1059–1065) even though SSA's response to the examination and supervisory letter had not been received. *Id.* at WOB023 1065; DX 116. Miller responded to the ORPOS concerns on May 10, 1988. DX 139 at WOB023 1238–1246; DX 122.

ment. Miller's response to Robertson's concern in its entirety was:

Our Association has been fortunate in that its underwriting requirements have been conservative, great attention has been given to the fundamentals of sound lending practice, and every attempt has been made to insure the collateral value of our loans.

DX122 at WOB023 1242. As a result of this statement, the government's position is that CHTE promised to contribute a thrift that (1) had a conservative loan portfolio, and (2) had sound lending practices, and (3) had made "every attempt" to "insure the collateral value of [its] loans."

What the government complains of are mostly accounting or paper losses that SSA should have taken, and if they had been, the deal would not have transpired. While discussing whether or not CHTE made these representations and whether or not any such representations were breached, however, the court is mindful that the government did not establish that either SSA, its conservator, or receiver suffered actual losses on the sale of any of these properties or any other tangible loss because (1) SSA should have "booked" additional loan loss reserves for future contingent losses should the asset be sold; or (2) SSA's appraisals did not comply with applicable regulations; or (3) some of SSA's commercial loans were made to high risk borrowers—the breaches alleged.

Statements made during negotiations about delivering a thrift with a "conservatively managed portfolio," particularly in this heavily regulated and audited industry, was not a firm objective representation, but more of a subjective description, subject to change with the economic tides, particularly given the thrift's real estate-laden portfolios. Moreover, even if the claims were not waived, the court finds that the government failed to establish this "representation" was either inaccurate, or if inaccurate, was a material breach, such as to excuse or rise to the level of the government's subsequent elimination of $307.5 million in capital credit. *Stone Forest Indus. Inc. v. United States,* 973 F.2d 1548, 1550–51 (Fed.Cir.1992); *Malone v. United States,* 849 F.2d 1441, 1445 (Fed.Cir.1988).

To support its claim of other than conservative loans and sloppy documentation, the government relies on its expert, Harry Potter, who testified he examined nine of SSA's loans as of September 30, 1987. Based on his review, Potter concluded that SSA should have obtained new appraisals or performed discounted cash flow analyses due to the declining and depressed local real estate market. Potter also found loan files without a narrative appraisal. Other appraisals did not comply with applicable regulations. He identified instances of high-risk commercial loans made to borrowers with unverified financial resources. In sum, Potter opined that SSA had not made every attempt to insure the collateral value of the loans, and SSA's audited financial statements contained a material misstatement in that an additional $41 million in specific loan loss reserves should have been taken. According to the government, SSA's understatement of loan losses was material to the FHLBB's decision concerning SSA's acquisition of troubled thrifts, and Chairman Wall was upset, angered and disappointed when soon after the transaction he learned of the "true" nature of SSA. If he had known, he would not have voted as he did.

The parties quarreled about accountant Potter's qualifications to criticize real estate appraisals. The viability of SSA's appraisals is foundational to Potter's criticism that resulting loan loss reserves were inadequate. Likewise, the viability of SSA's appraisals is foundational to SSA's pre-merger federal and state audits and examinations. SSA's financial condition was not hidden. There were no material misrepresentations established and no material breaches.

**The forbearance letter's 3% percent provision**

The government also argues SSA failed to maintain its capital at 3% as stated in the forbearance letter, which was a prior material breach and evidence that the thrift was going to (and did) fail anyway, therefore FIRREA was not a material breach. SSA's regulatory capital fell to 2.41% even with the capital credit, after FIRREA was enacted, but prior to implementing regulations. Unlike its complaints about SSA's loan portfolio,

the government points to evidence that in response to a precipitous drop in capital, regulators immediately expressed grave concern and demanded a long term capital plan to return postmerger SSA to capital compliance. SSA provided a capital plan with five different options, each of which required more government assistance, additional government forbearances, or both.

SSA acknowledged it was going to fall below 3% just two weeks before the passage of FIRREA due to booking of additional loan losses. In a letter dated July 26, 1989, SSA warned that "[a]s indicated in our Capital Plan after giving effect to the loan loss reserves referred to above and assuming no additional infusion of capital, [SSA's] regulatory net worth ratio is likely to decline below 3% during the next fifteen months, but it is expected, given reasonable economic assumptions, to remain above 2% at all times during that period." DX 231, p. 2.

The court concludes that this decrease does not rise to the level of a prior material breach or a material misrepresentation, nor does it allow the government to declare a breach and denigrate CHTE's contractual right to the $307.5 million capital credit. In this regard, the court is mindful that much of the pre-FIRREA reduction in capital was paper accounting entries—booking of additional loan loss reserves to hedge against possible future losses due to perceived reduction in value of real estate collateral for certain loans. These reductions were not due to any action (or inaction) on SSA's part, but were regulator-driven accounting adjustments that could have been made at any time, particularly since adequacy of reserves was an issue with pre-merger SSA.

The consequence of falling below 3% was not the loss of all contractual commitments by the government. Under the forbearance letter, FSLIC agreed it would not take certain actions against SSA under 12 C.F.R. § 563.13 for ten years provided that SSA's regulatory capital did not fall below 3% of total liabilities.

> [T]he FSLIC will forbear, for a period not to exceed ten years . . . from exercising its authority to take action under Section 563.13 (Regulatory capital requirement) of the Rules and Regulations for the Federal Savings and Loan Insurance Corporation ("Insurance Regulations"), for any failure of SWS to meet the regulatory capital requirements of Section 563.13 of the Insurance Regulations, *provided that,* SWS's regulatory capital does not fall below 3.0% of total liabilities.

DX 163 at WSJ069 0522.

The 3% provision would trigger the regulators' option to take specific supervisory or enforcement action. If SSA's regulatory capital fell below 3%, FSLIC had the discretion to require SSA take one or more of enumerated corrective actions: (1) increase regulatory capital; (2) convene a meeting between the Board of Directors and the Directors of the Office of Examinations and Supervision; (3) reduce the earnings rate paid on savings accounts; (4) limit deposits; (5) cease or limit new accounts; (6) cease or limit lending; (7) cease or limit the purchase of loans or other investments; (8) limit operational expenses; (9) increase and maintain liquid assets; or (10) take such other action as may be necessary for the protection of FSLIC, the insured institution, or the depositors. 12 C.F.R. § 563.13(d) (1988). The appointment of a receiver or conservator is not one of the enumerated corrective actions. The grounds for the appointment of a conservator or receiver are in 12 C.F.R. § 547.1(a) (1988).[53]

---

53. The following are grounds for appointing a conservator or receiver for a Federal association:

(1) The association's assets are less than its obligations to others, including its members;

(2) Its assets or earnings are substantially dissipated due to violations(s) of law, rules, or regulations or to unsafe or unsound practice(s);

(3) It is in an unsafe or unsound condition to transact business;

(4) It willfully violates a "cease-and-desist order which has become final," as defined in section 5(d) of the Act; or

(5) It conceals its records or assets or refuses to submit its records or affairs for inspection to an examiner or lawful agent of the Board.

12 C.F.R. § 547.1 (1988).

FHLBank–Dallas Regional Counsel concluded that a drop in SSA's regulatory capital below 3% could trigger regulatory restrictions, but the $307.5 million capital credit would remain. FX 200 at 1. Furthermore, pre-FIRREA, FHLBB did not close a thrift or cancel other forbearance if a thrift's regulatory capital level was 2.41%. Tr. 3424–25 (Brick)(testifying he did not recall any institution placed in receivership that had 2.4% regulatory capital pre-FIRREA); Tr. 3534 (Bradley) (same); Tr. 3809 (Smuzynksi) (same); Tr. 1427–28 (plaintiff's expert Leibold) (opining that normally there would be negotiations not immediate receivership).

### Post–FIRREA assistance to SSA did not waive CHTE's claim of breach

The few months of continuing (but unquantified) assistance payments to SSA in the form of yield maintenance and capital loss coverage[54] did not relieve the government of FIRREA's breach or its liability for damages. The details of such are unclear. The assistance was not material. There was no "significant post repudiation performance" requisite to possible waiver. *Mobil Oil*, 530 U.S. at 623, 120 S.Ct. 2423.

More significantly, there simply was no waiver. CHTE immediately complained bitterly to the government of FIRREA's breach. In *Barron Bancshares*, the Federal Circuit upheld a finding of waiver of prior material breach where, despite government awareness of claimed reckless lending practices by the thrift, the government assistance payments continued for five years. "In order to preserve its claim of a prior material breach giving rise to the right to terminate the contract, the government had to treat Barron as if it had breached the contract." 366 F.3d at 1381–82 *citing* 14 *Williston on Contracts* § 43:15 (4th ed.2000). CHTE responded to the breach appropriately and timely and did not waive its claim for breach of contract.

### Windfall

Related to the foregoing defenses, the government also complains that the transactions

cannot be unwound; therefore CHTE would receive a windfall if awarded damages without having to return the millions in assistance the government paid to its subsidiary. In many *Winstar* cases, the transaction simply cannot be unwound. *Restatement (Third) of Restitution and Unjust Enrichment* § 37 cmt. e (Tentative Draft No. 3, 2004) discusses mutuality of rescission generally: "a plaintiff seeking to be restored to the status quo ante must likewise restore to the defendant whatever the plaintiff has received in the transaction." *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1372 (Fed.Cir.2001) (stating that the value of benefits received by the nonbreaching party are an offset to the value of benefits received by the government). *See Am. Sav. Bank*, 62 Fed.Cl. at 19. However, when defendant's performance cannot be unwound due to no fault of the plaintiff:

> [t]o preserve the availability of the remedy in a proper case, and to avoid hardship to the plaintiff, the requirement of counter-restitution by the plaintiff may be relaxed. *See* § 51, Comment ___. The result in the context of breach of contract is usually that a plaintiff may be entitled to recover a prepaid price without deduction for incidental and nonreturnable benefits. *See* Illustrations 11 and 12.

*Id.* cmt. e.

Here the government benefited by avoiding liquidation costs and depletion of the overburdened FSLIC fund. On the other hand, the benefits conferred by the government, assistance payments, yield maintenance and loss coverage, did not result in any tangible payment or delivery of assets to CHTE. SSA was benefited, but it is no more. In short, there is nothing for CHTE to give back. The consideration exchanged at the onset, the release of the regulatory net worth maintenance letters, is discussed hereinafter as a proposed offset to damages. CHTE does not receive a windfall.

---

**54.** Other than in general argument, this defense, specifically the nature, timing or amount of the post-FIRREA assistance payments, was not developed at trial. In any event, any assistance would have been paid during the short time from the passage of FIRREA in August of 1989 and the appointment of a receiver in May of 1990.

**Would have failed anyway defense—or expectancy damages are not in doubt**

SSA was going to fail anyway, the government argues, therefore FIRREA did not harm CHTE. In *Admiral Financial Corp. v. United States,* 57 Fed.Cl. 418 (2003), the court concluded that by the time of the passage of FIRREA, or certainly its implementing regulations, "the thrift had failed, the investors had abandoned all hope of recovery with the existing resources and indeed of providing additional capital, and that operating control had passed from the owners to the FSLIC." 57 Fed.Cl. at 419. This prior material breach by Admiral, the holding company, trumped FIRREA's subsequent breach. Alternatively, FIRREA's breach did not harm Admiral. It is the latter conclusion that was affirmed by the Federal Circuit. *Admiral Fin. Corp. v. United States,* 378 F.3d 1336, 1345 (Fed.Cir.2004).

*Admiral* is distinguishable. There, the holding company was in default of, and repeatedly disavowed any intention of honoring, its Regulatory Capital Maintenance Dividend Agreement ("RCMA") in which it agreed to maintain the thrift's capital at a certain level. It was also in default of its agreement with the government to liquidate certain properties and contribute the proceeds to the thrift, and the professed value of its contributed properties were considerably less than represented. Under these circumstances, the passage of FIRREA was held not to harm the holding company. Restitution would have been an impermissible windfall. The Federal Circuit explained that "the trial court had ample evidence to conclude that Admiral's expectancy damages attributable to the government's breach were zero." 378 F.3d at 1344.

Moreover, the breach was not material. After affirming the trial court's conclusion that *Admiral's* expectancy damages were zero, therefore restitution was not available, the Federal Circuit discussed another, independent ground for awarding restitution regardless of whether expectancy damages are difficult to ascertain or nonexistent:

> Courts have also recognized the availability of restitution when a party injured by a contract breach is allowed to treat the contract as rescinded and to return to the status quo ante instead of relying on the terms of the contract to obtain damages .... However, an injured party is entitled to rescission only if the defendant repudiated the contract or committed a total breach

*Id.* (citing *Mobil Oil,* 530 U.S. 604, 608, 120 S.Ct. 2423 (2000); and *Hansen Bancorp,* 367 F.3d at 1309 & n. 10).

Accordingly, restitution is appropriate for a "total" breach. A total breach is one that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstance to allow him to recover damages based on all his remaining rights to performance [regardless of] whether the contract 'would or would not, ultimately, have proved financially beneficial.'" *Mobil Oil,* 530 U.S. at 608, 120 S.Ct. 2423.

In the instant case the government's breach was material. Therefore, *Admiral* is not dispositive. In contrast to the findings in *Admiral* that the thrift had failed and the investors had given up prior to FIRREA, SSA was certainly not viewed as a lost cause. Plaintiff presented testimony from a well-qualified real estate and finance expert, Dr. George W. Gau, Dean of the McCombs School of Business, University of Texas. From his extensive experience in real estate financing and investment, Dr. Gau testified that in the mid–1980s the Texas real estate market was depressed due in part to the Tax Reform Act of 1986 and falling oil prices. As a result, residential and commercial real estate demand and prices fell. Tr.1978–88. Beginning in the first quarter of 1988, the Texas economy began to recover as economic indices, including employment and personal income, correspondingly bolstered real estate prices. Tr.1989–2002. In May, 1988, SSA had a total of $1.4 billion in assets, the majority secured by residential or commercial real estate. Tr.2003–04. Dr. Gau demonstrated that there was dramatic recovery in the Dallas/Ft. Worth real estate markets from 1988 until 1998 (the anticipated ten-year duration of the plan) which would have presented an opportunity for the postmerger SSA to become profitable. By 1998, the Dallas real

estate market (which had accounted for most of SSA's losses prior to its 1990 receivership due to the regional recession that had gripped the area) had fully regained its value. Stuart Root, former Executive Director of FSLIC testified that the ten-year contract period "turned out to be ... pretty much right on the money." Tr. 1875 (Root). Dr. Gau's opinion as to the investment attractiveness of a thrift also lends support for the conclusions reached on the value of the pre-merger SSA and the value of the subdebt, discussed hereafter. As a result, it cannot be found that future profitability was out of the question.

Unlike in *Admiral* where the elimination of goodwill did not substantially impair the value of the contract, here the loss of the $307.5 million credit "'substantially impair[ed] the value of the contract.'" 378 F.3d at 1344, citing *Mobil Oil*, 530 U.S. at 608, 120 S.Ct. 2423, *quoting Restatement (Second) of Contracts* § 243 (1979). FIRREA's elimination of SSA's capital credit was, if not the most prominent reason given for the appointment of a conservator, certainly not an insubstantial factor in that decision. Furthermore, in considering the complexity of the pre-deal status of all parties, including the government's thrift crisis predicament, the negotiations and the deals struck—all considered in light of the testimony presented, the $307.5 million capital credit was a substantial component of SSA's and CHTE's contract with the government both, at the time of inception, and at the time of the breach. Without the capital credit there would have not have been a deal, and this leads to the conclusions that "the Government must give the companies their money back." *Mobil Oil*, 530 U.S. at 624, 120 S.Ct. 2423.[55]

Upon consideration of all the evidence and testimony, the court finds the government's breach was material in that it eliminated a substantial part of CHTE's benefit from the bargain reached. The elimination of the $307.5 million capital credit was a substantial

and total breach entitling CHTE to a return of its net required contributions.

### *Valuations of CHTE's contributions*

▇ As damages, plaintiff seeks the value of its contribution of SSA, plaintiff's subsidiary, and the subdebt. These contributions, required by the contract with the government, were lost and are capable of valuation.

### Burden of proof on damages

While plaintiff has the burden of proving its damages, the government has the burden of proving any setoffs, here the value of any benefits conferred on plaintiff. *Glendale*, 378 F.3d at 1311–12. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 769 (Fed.Cir.1987) ("The burden was on the government to prove the amount [of the claimed offset]"); *Trans Ocean Van Serv. v. United States*, 426 F.2d 329, 345 n. 2, 192 Ct.Cl. 75, 105 n. 2 (1970). Any offset must be established with reasonable certainty. *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 729 (2nd Cir.1992) (citing *Restatement (Second) of Contracts* § 349 (1979)); *Am. Capital Corp.*, 59 Fed.Cl. at 584.

Generally, any doubt as to the amount of damages is resolved against the breaching party, in this case the government. *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983). *Restatement (Second) of Contracts* § 352 cmt. a (1981) guides the court's analysis:

> Doubts are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred. A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts. Damages need not be calculable with mathematical accuracy and are often at best approximate. This is especially true for items such as loss of good will as to which great precision cannot be expected.

---

**55.** In so concluding, the court is mindful of the Supreme Court's direction that materiality is determined regardless of whether or not the venture would have been profitable. *Mobil Oil* is definitive on this point. 530 U.S. 604, 623–24, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000).

Furthermore, increasing receptiveness on the part of courts to proof by sophisticated economic and financial data and by expert opinion has made it easier to meet the requirement of certainty.

*Id.* (citations omitted).

### Value of subdebt contribution

The government argues that CHTE's relinquishment and contribution of its subdebt was not an affirmative grant of new capital, not a hard asset, but merely an accounting adjustment. As for CHTE's position that it relinquished future payments on the subordinated notes, the government responds that the prospect of continued payments was bleak, so CHTE really did not contribute anything of value. The government also argues that CHTE traded its subdebt for the release of the net worth maintenance letters, such that the trade was even and the net contribution was zero.

SSA had not missed any previous payments on this subdebt despite prior regulatory capital deficits. To the extent that SSA did not have to pay some $24 million dollars in the future, substantial value was conferred on the thrift, particularly given the anticipated ten-year duration of the partnership, and the contemplated turnaround in the Texas economy from which both the government and CHTE would benefit. Indeed, former FSLIC Director Stuart Root testified the government wanted CHTE to contribute its subdebt so that SSA would not use governmental financial assistance for payments on it. (Tr. 1887–88); Gov't Resp. to PPF 393. The infusion or contribution of the subdebt made economic sense at the time by eliminating debt. The hope and anticipation of all involved was that this ten-year venture would be successful. The contribution of the subdebt by CHTE was valuable.

The question as to the amount of value was addressed by plaintiff's expert, Dr. John McConnell. Dr. McConnell, the Emanuel T. Weiler University Distinguished Professor of Management, Purdue University, taught for twenty-five years, and has several publications on bond valuation. He previously qualified as a trial expert on thirteen occasions, five of which involved valuation of debt securities, and three, corporate valuation. Dr. McConnell was accepted without objection as an expert in financial markets, valuation of corporate debt and valuation of equity. Tr. 2063, 2069–70.

Using comparable securities in publicly traded companies and a discounted cash flow analysis, Dr. McConnell opined as to the market value of CHTE's privately-held subordinated debentures. He defined market value as a price agreed-upon by a willing buyer and a willing seller, neither under an obligation nor compulsion to transact, a standard generally accepted and recently approved by the Federal Circuit, albeit under a gift tax analysis. *See Okerlund v. United States,* 365 F.3d 1044, 1050 (Fed.Cir.2004) (noting the market approach to valuation identifies comparable companies). He computed remaining payments due on the subordinated notes,[56] adjusted by a risk factor, and discounted to March 31, 1988—the end of the quarter prior May 18, 1988 when the notes were contributed by CHTE. Dr. McConnell assumed the bonds were fully performing, that is, no payments had been missed, and the government does not assert to the contrary. Accounting for admitted volatility of corporate debt in nonpublicly traded corporations, he chose as comparables the lowest rated performing publicly traded bonds,[57] also subordinated, meaning they would be paid second to the last in the event of liquidation, ahead only of stockholders.[58] From a

---

**56.** Dr. McConnell calculated remaining principal and interest payments of $267,027 due on March 23, 1989 and 1990 on Subordinated Note 1; $1,085,187 due on August 30, 1989, 1990 and 1991 on Subordinated Note 2; $3,081,082 due on June 29, 1990, 1991, 1992, 1993, 1994 and 1995 (with a payment of $1.5 million on June 29, 1988) on Subordinated Note 3; and $1,027,027 due on July 25, 1989, 1990, 1991, 1992, 1993, 1994 and 1995 (with a payment of $500,000 due

on July 25, 1988) on Subordinated Note No. 4. PX 219A, 220A, 221A, 222A.

**57.** Use of publicly traded companies was necessary because privately traded corporate debt sales are not published.

**58.** Applicable Standard and Poor ratings range include BB, B, CCC, CC and C:
Debt rated BB, B, CCC, CC and C is regarded, on balance, as predominantly speculative with

list of all "C" graded subordinated debt ratings as of December 31, 1987 and March 31, 1988 (PX 223 [Revised] and PX 224A), he calculated the average yield. From that analysis, Dr. McConnell opined that the reasonable value of the subdebt was $21.1 million as of December 31, 1987, and $21.7 million as of March 31, 1988. Tr. 2075–84.

The government objects to Dr. McConnell's valuation, asserting that his comparables were not truly "comparable" because they were not limited to thrifts, but included a steel company, an airline, a sporting goods company and a furniture business. Dr. McConnell however explained that there was no "C" rated savings and loan debt to compare; all thrift debt was rated higher which would have resulted in a higher valuation. For economic analysis, the type of investment does not matter so long as the grade or investment criteria is level. The comparables used, however, included an airline and a cellular telephone company, both regulated industries.

Dr. McConnell applied objective factors and used classic non-industry specific economic methodology. His comparables were Moody's Caa[59] and Standard and Poor's CCC, CC and C bonds. There had been no defaults on CHTE's subdebt; and "C" is the lowest rating given a performing bond (meaning no missed payments). Nonperforming bonds would be rated "D." Tr.2075–78. The ratings are based not only on objective, quantitative analysis, but also on qualitative analysis, including discussions with management about future business projections. *Id.* Accordingly, the use of "C" rated comparables was not unreasonable.

The government avers that Dr. McConnell should have used an even lower quality bond because a hypothetical buyer would investigate SSA's financial future in the volatile thrift industry and, as Dr. McConnell admitted, a bond will trade flat if future payments

were questionable. He also admitted that a potential investor would take into consideration the fact that SSA had lost money in each of the quarters prior to his March, 1988 valuation, and had been out of capital compliance for nine months. However, the underlying poor credit risk of Dr. McConnell's comparables was an equalizer. All his comparables were rated at the lowest category for a performing bond.

Error is also alleged because Dr. McConnell did not consider whether regulators would have allowed SSA to make payments on the subdebt given SSA's capital inadequacies. David Bradley, one of SSA's regulators, testified that a thrift with deficient capital might have been prevented from making payments on holding company subdebt. Having heard the testimony and reviewed the exhibits in this regard, the court does not reject Dr. McConnell's expert opinion on this ground. This criticism was first raised by the government at trial and was not mentioned in the expert reports of defendant's experts, Dr. Cox or Mr. Bankhead. Moreover, Mr. Bradley could recall only two thrifts in the Dallas District that had been directed not to make payments under these circumstances. Also, SSA fell below its regulatory capital requirement several times prior to May of 1988, when the deal closed, and there is no evidence that SSA regulators ever instructed SSA not to make payments on the subdebt. Indeed all payments had been made despite SSA's history of regulatory capital deficiencies.

Moreover, Dr. McConnell's valuations are relatively close to, but less than $27 million, the approximate valuation of the subordinated debt advanced in the ORPOS summary presented to the FHLBB in May of 1988 when the transactions closed.

[T]he Trust has agreed to substitute permanent regulatory capital in the form of common stock in exchange for subordinat-

---

respect to capacity to pay interest and repay principal in accordance with the terms of the obligation. BB indicates the lowest degree of speculation and C the highest degree of speculation. While such debt will likely have some quality and protective characteristics, these are outweighed by large uncertainties or major risk exposures to adverse conditions.

PX 302, p. 2. A plus or minus indicates relative standing within the category. *Id.*

59. Moody's Caa rating is for bonds of "poor standing. Such issues may be in default or there may be present elements of danger with respect to principal or interest." PX 302.

ed debentures currently on the books of SWS. This, in essence, will result in an increase in permanent capital of approximately $27 million, which in the opinion of this Office adequately compensates for the loss of the net worth maintenance agreement as a source of capital, considering that all other alternatives suggested by this Office were rejected.

DX 139 at WOB023 0500. The FSLIC recommendation package referred to conversion of $25 million of subordinated debt to equity. "Existing net worth maintenance agreement to be released in return for conversion of $25 million of subordinated debt to permanent equity." DX 140 at Pl. 000333. A May 6, 1988 FSLIC memorandum from Lykos and Rogers to Root stated the pre-merger SSA had $23 million of subordinated debt. DX 117 at 054943. The government accepted, or at least did not question, these values then. Tr. 329–31, 502 (Miller); Tr. 1018 (Crisp). The court concludes that CHTE has proven with reasonable certainty, that the value of its May 19, 1988 contribution of the subdebt was $21,700,000, Dr. McConnell's valuation as of March 31, 1988, the calendar quarter immediately prior to CHTE's required contribution.

### Even exchange subdebt for release

The government asserts that CHTE and the government agreed that in return for the contribution of the subdebt to the transaction, the government would release CHTE from any obligations under the net worth maintenance letters. The issue is whether the government established that the value of the subdebt contribution was offset totally by the release.

In 1988, there were divergent views as to whether the unilateral net worth·maintenance letters were enforceable.[60] FHLBB staff members had reservations about their enforceability. Tr. 1445–48. Indeed, days before the closing, in a May 6, 1988 draft

memo prepared by Lykos and Rogers to Root, enforceability was questioned. DX 117 at 054942. Similarly, the ORPOS memorandum to the Board, while warning that a release would be a major policy decision for the Board, stated that "[the Trust] did not at the time of the acquisition of [SSA] contemplate an increase in future exposure of the magnitude which will ensue from this transaction.... [T]he position of the Trust on this matter is not without merit." DX 139 at WOB023 0500. Because the number and identity of the proposed targeted thrifts evolved over time, and the acquisitions were negotiated and consummated in a relatively short time, CHTE did not have an opportunity to conduct due diligence. Tr. 204, 253, 680.

SSA's corporate counsel Boone testified that Duhl, FHLBB's chief negotiator, expressed doubt about enforceability. Tr. 1764–65; Tr. 1254–57(attorney Herrick). Stuart Root, attorney and former FSLIC Director, testified there were differences of opinion within the FHLBB and its staff, in his opinion they were of dubious enforceability. Tr. 1857–58, 1860–61, 1954–57. ("I have a very distinct recollection of somebody advising me that, for whatever reason, that the net worth maintenance agreement in this particular case was a[sic] dubious enforceability.... I got a verbal briefing on the subject of this net worth maintenance agreement and it may have spilled over into others as well, but as to this one, my recollection is that I was advised that the Caroline Hunt one was of a genre, for example, that was of dubious enforceability."). While former SSA President Miller, also an attorney, believed on advice of counsel, the letters were not enforceable, he negotiated for their release in 1987–1988 at the direction of CHTE. Tr. 686, 935–36. There was testimony to the contrary, much of it was tempered upon cross-examination.[61]

---

**60.** In contrast to CHTE's unilateral letters, other acquisitions included formal bilateral agreements. *See* PX 109, PX 500.

**61.** Government witnesses Wall, Williams, and Hom (all government officials during relevant times) testified concerning the general enforceability of these agreements. Hom, a lawyer and

former Deputy Director in the FHLBB Office of Enforcement, and the most knowledgeable about enforceability of this genre of net worth maintenance obligations in the Office, sent FHLBB memorandums on this issue to Jordan Luke, General Counsel for the FHLBB dated March 18, 1988 and April 8, 1988. DX 94 and 97. In part, the memorandums concluded that whether em-

The government criticizes plaintiff's expert Arthur Leibold, an attorney, for his opinion that there were serious questions about enforceability of letters such as those submitted by CHTE. It was Leibold's opinion that the letters had some value to SSA, but the value could not be quantified.[62] Leibold had some thirty years of experience in this area including extensive study of net worth agreements. He also had litigation experience in this regard. Leibold kept current on agency pronouncements, policy statements, regulations and court decisions. (Tr. 1367–75). Leibold was accepted as an expert in savings and loan association law, regulations, policy and regulatory customs and usages applicable to savings and loans in the 1980s, and in particular in net worth maintenance provisions applicable to shareholders of thrifts during this time. Tr. 1389 (the court accepts Leibold as an expert in this area).

That the government required a second net worth maintenance agreement with the second merger in 1986 is some evidence that the initial letter covered only the prior acquisition. Another letter was required for additional acquisitions. This indicates that the two existing letters, even if left in place, might well have not carried over to apply to the substantially increased risk SSA undertook by merger with four insolvent thrifts.

As the government points out, events subsequent to May 1988 are not directly probative on the value to CHTE of a release of its letter obligations. Subsequent events do, however, have background relevance and confirm that questions raised by regulators and the industry were not unfounded.

The government does not dispute that subsequent to the May, 1988 acquisitions, there was at least a prospective change in the government's policy toward net worth maintenance obligations. In an August 19, 1988 policy statement, FSLIC discontinued open-ended regulatory capital maintenance obligations in thrift acquisitions, acknowledging they deterred qualified investors. PX 301; *Regulatory Capital Maintenance Obligations of Acquirors of Insured Institutions,* 53 Fed.Reg. 31761 (August 19, 1988) (noting that the "treatment of acquirors' regulatory capital maintenance obligations will be applied prospectively, in connection with applications approved after this policy goes into effect. With regard to holding companies and other acquirors that are subject to other forms of obligations, such obligations shall remain in full force and effect except to the extent that the Board agrees in writing to the modification of any such obligation."). *See also Acquisition of Control of Insured*

---

bodied in a written agreement, a condition in a Board resolution, or imposed by regulation, they were enforceable. Tr. 2840–45. This conclusion was summarized in a memorandum to the FHLBB on April 26, 1988. DX 107. At that time, the Board considered and approved the filing of a lawsuit against Arthur Mason based on a net worth maintenance obligation. Hom also testified that consideration was given to bringing enforcement action against Gary Akin based on a net worth maintenance agreement. PX 109. Regulatory action in Texas was later brought against Akin to enforce that agreement. Tr. 2848. Both the Mason litigation and the Akin administrative cease and desist proceedings had to be approved either by the Enforcement Review Committee or the FHLBB itself. Tr. 2850. As of April, 1990, OTS had procedures for the enforcement of net worth maintenance obligations in cases of net worth deficiency, which Hom testified was consistent with his opinion at that time that these obligations were enforceable. DX 500; Tr. 2853. Multimillion dollar settlements were reached in the Security Capital Corporation and Pinnacle West net worth obligations in which he was involved. Tr. 2854. The lack of the government's signature on

CHTE's letters did not affect his opinion on enforceability. Tr. 2860. In contrast to CHTE's unilateral letter, the Akin agreement was bilateral, recited that it was entered in order to avoid a cease and desist proceeding, would terminate when the underlying association met its net worth requirements for two years, and contained language affirming that it was a binding agreement. PX 109. The Mason agreement, PX 500, also contained specific language acknowledging that it was a binding agreement and terminated in five years. Tr. 2865–68. Hom admitted that such bilateral agreements would have fewer defenses (Tr. 2869); open ended obligations were more "troublesome" (Tr. 2876). Hom concluded, however, that it was more likely than not that the net worth maintenance obligations were enforceable as of the 1988 time frame. Tr. 2913–14.

62. Q. "So you are not taking the position that it (the net worth maintenance letters) didn't have any value. You are just saying you can't quantify the value?"

A. "That's a fair way of saying it." Tr. 1696–97 (Leibold).

*Institutions Technical Amendments,* 53 Fed. Reg. 47941 (November 29, 1988) (deleting requirement in holding company applications that the applicant agree to an open-ended net worth maintenance obligation as "no longer reflective of the Board's policies in this area"). The FHLBB concluded that "other approaches," such as a monetary cap and a time limit, would be less discouraging to potential investors.

After FIRREA, generally, the OTS required a limited net worth maintenance agreement or a "prenuptial agreement" only when the thrift being acquired failed to meet fully phased-in capital requirements. OTS Thrift Bulletin 5a (April 12, 1990). In a limited capital maintenance agreement, the acquirer would agree to infuse additional equity capital if the insured institution failed to meet its regulatory capital requirement, or fell below a predetermined amount during a five-year period. In a pre-nuptial agreement, the government had the right to vote the securities of the acquiring institution and replace its Board of Directors if the thrift's assets declined below a certain level.

Enforcement of net worth maintenance obligations was sought both in contract and administrative actions with mixed results. Most courts rejected regulators' arguments they were enforceable. *Wachtel v. Office of Thrift Supervision,* 982 F.2d 581, 582–83 (D.C.Cir.1993) (holding OTS could not administratively compel holding company to pay bank's deficit based on net worth maintenance agreement absent reckless disregard of legal obligations or unjust enrichment); *Rapaport v. United States Dept. of Treasury,* 59 F.3d 212, 216 (D.C.Cir.1995) (applying *Wachtel* to shareholder guarantee); *Fed. Sav. and Loan Ins. Corp. v. Savers, Inc.,* 1989 WL 248120 at *3–4 (E.D.Ark. Dec.13, 1989) (finding no contract); *Resolution Trust Corp. v. Tetco, Inc.,* 758 F.Supp. 1159, 1162–63 (W.D.Tex.1990) (declining to find net worth maintenance promise was a contract where the terms were not negotiated but

preordained by regulation), *judgment vacated due to settlement,* 1992 WL 437650 (5th Cir.1992); *In re Conner Corp.,* 1990 WL 124052 (Bankr.E.D.N.C. June 20, 1990), *aff'd sub nom., FDIC v. Butler,* 127 B.R. 775 (E.D.N.C.1991) (finding a holding company's promise to maintain a thrift's net worth was not a contract); *United Liberty Life Ins. Co. v. Ryan,* 772 F.Supp. 366, 372–74 (S.D.Ohio 1991), *aff'd in part, rev'd in part on other grounds,* 985 F.2d 1320 (6th Cir.1993) (not a contract). *Cf. In re Firstcorp., Inc.,* 973 F.2d 243, 250 n. 6 (1992) ("[A] capital maintenance obligation imposed as a condition of FHLBB's approval of an acquisition, however, is clearly enforceable by OTS under settled law.") (citing *Kaneb Servs., Inc. v. Fed. Sav. & Loan Ins. Corp.,* 650 F.2d 78 (5th Cir.1981)); *In re Overland Park Fin. Corp.,* 232 B.R. 215, 228 (D.Kan.1999), *aff'd in part, rev'd in part,* 236 F.3d 1246 (10th Cir.2001) (holding that under the Bankruptcy Code,[63] a net worth stipulation, while not a contract, was a commitment and under Chapter 11 must be cured by the bankruptcy trustee).

The court finds that in May, 1988, there was uncertainty as to whether these CHTE letters were enforceable, and more specifically, whether any such commitment would continue to bind CHTE postmerger absent additional consideration.[64] The government did not establish enforceability nor the value of the release of any obligation to infuse capital into the pre-merger SSA given that SSA's liabilities expanded exponentially in the merger. It is not found that the net worth maintenance letters lacked any value to SSA because of questionable enforceability. Release of the letters did have some value to CHTE despite the uncertainty as to enforceability. The government's argument is that the parties agreed the release of the net worth maintenance agreements was an even exchange for the contribution of the subordinated notes so that the value of the subdebt for damages purposes is zero.

---

**63.** The Crime Control Act of 1990 granted net worth maintenance stipulations priority in bankruptcy and directed bankruptcy trustees to "assume" the obligations and "cure" deficits. 11 U.S.C. §§ 507(a)(8) and 365(*o*).

**64.** Under the government's theory that CHTE was not a party to any contract with the government, there would be no consideration either for an extension or a new net worth letter.

There is support for the government's position. On May 11, 1988, Duhl and Root called Miller in Dallas inviting resumption of negotiations on the equity split. Miller's notes of that meeting indicate that the subdebt would be swapped for the release: "[e]xchange debentures for maintenance agreement, convert to equity." DX 162 at Pl. 012957; Tr. 738–39. *See also* DX 153 at Pl.000463 (transcript of Board meeting approving these transactions, stating that the subdebt contribution adequately compensated for the loss of the net worth maintenance "agreement").

Regulatory rationale for the release was the subdebt contribution. Former FHLBB Chairman Danny Wall testified:

> Q. Do you recall why that [the subdebt contribution] was required of Caroline Hunt Trust Estate?
>
> A. In order to justify for the agency its willingness to remove the maintenance agreement.

Tr. 3058 (Wall).

CHTE indicated that if the May 1988 acquisitions were not approved, it would proceed to cure SSA's then existing regulatory capital deficiency. However, it is one thing voluntarily to abide by an existing commitment, and quite another to extend that commitment through mergers and acquisitions from which a new and vastly enhanced SSA emerged. Indeed, the Board characterized this scenario as creating "[i]nteresting issues." [65] *See also Restatement (Third) of Suretyship & Guaranty* § 41 (1996).

In context, it is concluded that the "exchange" of the subdebt for the release of the net worth maintenance letters in this complex transaction was more banter and semantics than *quid pro quo*. The acquisition was and is simply not meaningfully divisible. Consideration of the principles of severability of contract promises is appropriate. To carry its burden of proving an equal offset, the government must overcome the "presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated." *First Nationwide Bank v. United States*, 51 Fed.Cl. 762, 766 (2002), citing *Stone Forest*, 973 F.2d at 1552; *Am. Sav. Bank v. United States*, 62 Fed.Cl. 6, 17 (2004) (also citing *Stone Forest*). The "exchange" of deal points, even if agreed to at the same time, does not necessarily establish the values exchanged are equal. In determining whether a contract is divisible "the general rule is that a contract is divisible when the performance by one party consists of several distinct and separate items, and the price to be paid by the other party is apportioned to each item." 15 *Williston on Contracts* § 45:7 (4th ed.2000). Here, the agreement was not so neatly parsed. Crisp testified that CHTE would not have contributed the subdebt solely in exchange for a release of the net worth letters. Tr. 1023–24 & 1192 (Crisp) (testifying that the subdebt would not have been contributed unless all the rest of the agreement had been carried out).

Even if severable, and the parties bargained for CHTE's contribution of the subdebt as an even exchange for the release of the net worth maintenance letters (a point recognized as a deal-killer if not obtained from the very beginning), for purposes of restoring the parties to their pre-contract positions, it is the reasonable value of both the contributions provided, and the offsetting benefit, and not the "contract price" that governs.

> Because the doctrine of restitution looks to the reasonable value of any benefit conferred upon the defendant by the plaintiff, and is not governed by the terms of the

---

65. "Where holding companies and other acquirors are subject to older versions of regulatory capital maintenance agreements, or other types of prenuptial agreements, the Policy Statement indicated that acquirors' obligations under such agreements remain in full force and effect, except to the extent that the FHLBB agrees in writing to modify the agreement. Interesting issues may be presented in this regard in the case of acquirors that already own savings institutions and seek to acquire additional institutions, either through merger into their existing subsidiary institution, or as another, separate subsidiary. The Guidelines do note, however, that the FHLBB would consider modifying (upon application) open-ended net worth maintenance agreements entered into between the date the Policy Statement was issued, and the date the Guidelines were implemented." PX 507 at SMO 135864 n. 7.

parties' agreement, restitution is available even if the plaintiff would have lost money on the contract if it had been fully performed.

*Am. Capital,* 59 Fed.Cl. at 576–77 (citing *Bausch & Lomb Inc. v. Bressler,* 977 F.2d 720, 730 (2nd Cir.1992)).

### Value of release from letters

Because it is concluded that the value to CHTE of obtaining a release of its net worth maintenance letters cannot be measured by the value of its contribution of the subdebt, it is necessary to examine the evidence relating to the value of the release. Dr. Charles Cox was proffered as an expert by the government in financial economics, specifically financial markets and valuation of securities. Although his opinion was not offered in his expert witness report, and while he did not place a specific value on the release (indeed no witness placed a dollar value on the release), Dr. Cox opined that the value of the release of the net worth maintenance letters (which he had not seen) dwarfed the value of CHTE's subdebt. Tr. 3602, 3683–84. Dr. Cox testified that shortly before these transactions closed, SSA had a $60.9 million regulatory capital deficiency. Tr. 3610–11(Cox); DX 629A. SSA's insolvency (debt in excess of assets) in May of 1988 was somewhere between $59.2 million and $204 million with $110 million being the mid-range. With a 50% chance of enforceability, the release would be worth $55 million he thought (50% of $110 million average insolvency of pre-merger SSA). If the probability of enforcement was 24%, the value would be $26 million. (Tr. 3635–37). As these amounts exceed the value of CHTE's contributions, the government suggests, CHTE should recover nothing.

The efficacy of these calculations of SSA's insolvency (assets over debt) is questionable, in that it was "net worth ... [as] required by [12 C.F.R.] Section 563.13(b),"—regulatory capital deficiency—that would have triggered any obligations on behalf of CHTE to infuse regulatory capital into SSA. DX 24. At the time of the May 1988 acquisitions, SSA had regulatory capital—just not enough. Its reg-

ulatory capital deficiency was $60,884,000 as of March 31, 1988, the quarter preceding the acquisitions. Accordingly, CHTE's maximum exposure in May of 1988, assuming enforceability and further assuming the Trust infused cash or equivalent rather than other methods, was approximately $60 million.

To reiterate, while the release of the net worth maintenance obligation had value to CHTE, the government has the burden of establishing the amount of any offset this value represented. *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 769 (Fed.Cir. 1987). *See Glendale,* 378 F.3d at 1312 (noting without comment Glendale's position that the government had the burden of proving offset, and affirming the trial court's denial of offset). Offsetting benefits must be proven with "reasonable certainty." *Westfed Holdings, Inc. v. United States,* 55 Fed.Cl. 544, 560 (2003) (finding that the government did not establish alleged offsets with reasonable certainty, thus there was no deduction from the holding company's damages) (citing *Restatement (Second) of Contracts* § 371 cmt. a); *Granite Mgmt. Corp. v. United States,* 58 Fed.Cl. 766, 771 (2003).[66]

Plaintiffs in *Winstar* cases have been held to a "reasonable certainty" standard of proof which has resulted in the denial of recovery under several of the damage theories put forth despite definite, yet undefinable or unquantifiable loss. *La Van III,* 382 F.3d at 1351(stating that there must be a "sufficient basis [ ] for estimating the amount of lost profits with reasonable certainty") (citing *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002)).

In *Bluebonnet II,* the Federal Circuit suggested the "jury-verdict" method of estimating the cost of complex financing for post-FIRREA required cash infusions into the acquired thrift. "We have also allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages—but only where the evidence adduced was sufficient to

**66.** The court is mindful of the government's criticism that CHTE did not ask Dr. McConnell, its economic expert witness to value the releases, despite his acknowledged expertise in valuing contingent liabilities. (Tr. 2182–83). Plaintiff did not, however, have the burden of proof.

enable a court or jury to make a fair and reasonable approximation.'" 266 F.3d at 1357, citations omitted. In *Bluebonnet,* the value of the equity contributed was memorialized, but the incremental costs of the breach "must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." *Bluebonnet Sav. Bank v. United States,* 339 F.3d 1341, 1345 (Fed.Cir. 2003) (*"Bluebonnet III"*). In other words, damages must be reduced by costs that would have been incurred in the absence of a breach to obtain the net financial effect. Acknowledging that "that issue may be difficult to resolve," *Id.,* "at a minimum, jury verdict damages would be appropriate." *Id.* at 1346. *See also Hi–Shear Tech. Corp. v. United States,* 356 F.3d 1372, 1381–82 (Fed.Cir. 2004). Here, a similar task is involved in resolving the amount of offsetting benefit to apply in determining the value of CHTE's net reliance contributions. *See also Hansen Bancorp, Inc.,* 367 F.3d at 1316 ("To the extent that the benefit may reasonably be measured in different ways, *the choice is within the discretion of the court.*")(emphasis in original, citing *Restatement (Second) of Contracts* § 371 cmt. a).

After careful review of the record, including the testimony of the numerous witnesses considered in light of the totality of circumstances presented, the court concludes that CHTE definitely benefited from the release of its pre-merger obligation to bring the pre-merger SSA into regulatory capital compliance. From the beginning, CHTE viewed the absence of a release as a "deal-killer." However, post-merger enforceability would have been questionable. CHTE's prior counsel testified that the release avoided, at minimum, nuisance value litigation costs. CHTE's maximum contingent exposure as of March 31, 1988, the quarter preceding the acquisition, was $60,884,000. DX 629A. CHTE could have brought pre-merger SSA into regulatory compliance by methods other than by writing a check although these options were not fully developed. Pl. Facts 423, 425–427. Whether or not a formal request was made by the FHLBB on the Trust, the letters were a contingent liability for CHTE and their release had value to and was a benefit for CHTE. As to how much the release benefited CHTE, the range is between nuisance litigation costs and $60,884,000. Weighing the enforceability issues, the ability CHTE had to satisfy any regulatory capital obligation by noncash means and the other factors discussed, it is concluded that the monetary risk to CHTE of honoring its letter commitment to SSA approached no more than 15% of its then exposure, or $9,132,600. *F.D.I.C. v. Bell,* 106 F.3d 258, 263–64 (8th Cir.1997) (explaining that a contingent liability is discounted by the probability that the contingency will or will not materialize); *In re Chase & Sanborn Corp.,* 904 F.2d 588, 594 (11th Cir.1990)("[A] contingent liability cannot be valued at its potential face amount; rather, 'it is necessary to discount it by the probability that the contingency will occur and the probability will become real.'"). The release portion benefited CHTE by this amount and its recovery is offset by this sum.

### CHTE's ownership interest in SSA

The value of CHTE's SSA contribution presents a more difficult inquiry. CHTE seeks recovery of its equity in SSA, the value of its "ownership interest" in SSA at the time of the contribution. CHTE claims that the value of its equity, according to plaintiff's expert Dr. McConnell, was $4.754 million as of December 31, 1987, and $2.533 million as of March 31, 1988 (less than 1% of the "old" SSA's $1.3 billion in assets). PX 211A; Tr. 2110–14. The government contests both the valuation and the methodology used by Dr. McConnell. It is also asserted that CHTE's stock ownership in SSA was not diluted, therefore nothing was contributed.

CHTE did not give up its 90% interest in SSA—that percentage remained constant. The loss of its shares came not by grant of or exercise of the government's stock warrants, or by CHTE allowing SSA to acquire the four troubled thrifts, but by the receivership and liquidation of SSA. This was not a front-end contribution to the deal *per se,* except that CHTE "gave" stock warrants to FSLIC, exercisable in ten years. As a result, CHTE's equity share in the "old" SSA was diluted to accommodate FSLIC's future contingent interest in 90% of the "new" SSA.

There is no evidence of the value of that dilution.

CHTE granted or consented to its subsidiary granting stock warrants to the government. CHTE's consent was necessary to dilute its ownership in SSA. While the government never exercised those warrants, they were nevertheless a then present corporate encumbrance. *See generally* 19 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations,* § 2.60 (2004 Cum. Supp.) ("A warrant or option relating to securities to be issued by an issuer in the future by its very nature constitutes a continuing contractual obligation on the part of an issuer and, therefore, a continuing offer to sell securities."). There is no evidence of the consequent value (or diminution in value) to CHTE because of those warrants.

Furthermore, CHTE contributed the management expertise of SSA valued and cited throughout government documents as the driving force behind the optimism that fueled these acquisitions. The use of SSA, troubled but not insolvent, and particularly its well-regarded management, to acquire insolvent thrifts, was a vital part of the consideration for the transactions, the underlying premise of the foundational H-(e)3 Application. However, there is no specific evidence of the value of management per se. Accordingly, there is no alternative way to view or value this contribution other than as a contribution of stock.

In *Hansen Bancorp Inc. v. United States,* 367 F.3d 1297, 1316–17 (Fed.Cir.2004) ("*Hansen II*"), the Federal Circuit recently instructed that in returning the shareholders to their pre-contract/pre-breach condition, recovery should include not only cash or equivalent contributions, but also the value of the thrift used as the acquisition vehicle, because such was required by the contract with the government and benefited the government in facilitating the assisted transaction. In *Hansen Bancorp. v. United States,* 53 Fed.Cl. 92 (2002) ("*Hansen I*") the plaintiffs were awarded their $1 million capital contribution as restitution for the government's breach, but their request for the value of their stock was rejected in part because the holding company retained its stock in the subsidiary throughout the resulting government-assisted merger, and the "exchange fairly cannot be characterized as a cost to the individual plaintiffs, [therefore] recovery under either a theory of restitution or reliance is inappropriate." 53 Fed.Cl. at 106. The Federal Circuit disagreed, finding that stock contribution should be included as damages:

> Stock is an asset with a monetary value, just like cash. If it is proper as the Court of Federal Claims held and we agree, to reimburse the Hansens via restitution for their cash contribution, it would seem appropriate to do the same as far as the value of their stock is concerned. In short, we fail to see a compelling distinction between these two assets that would counsel us to allow restitution of the cash, but prohibit restitution of the stock.

367 F.3d at 1317 n. 14. There is no substantive distinction between the contributions in *Hansen* and the contribution by CHTE here. In *Hansen,* the Federal Circuit remanded for a determination of the value of that stock. Here, of course, that valuation was vented at trial.

In response to the court's post-trial inquiry concerning the *Hansen II* ruling, the government asserted that neither the subdebt nor the contribution of the "old" SSA were "required" under the Assistance Agreement, as opposed to the facts in *Hansen II* where the FHLBB Resolution required the stockholders to exchange their stock in preparation for the merger. In *Hansen,* both the stockholders and the holding company signed the Assistance Agreement just days after SSA signed the Assistance Agreement at bar, suggesting a substantive difference in contractual rights and responsibilities between the two cases. The government also points out that the stock exchanged in *Hansen* was in Raritan, a healthy thrift. Here, the stock contributed was in "old" SSA, a troubled thrift. Also, in *Hansen II,* cash contributions were also required. CHTE did not make a cash contribution. Finally, the shareholders in *Hansen II* exchanged their shares for shares in a new venture. In contrast, CHTE's ownership in SSA remained constant—except for the stock warrants, its percentage ownership in SSA was not reduced.

In *Hansen II,* the Federal Circuit made it clear that benefits conferred on the breaching party are compensable and benefits "should be broadly construed to include money, services, and property of all types." 367 F.3d at 1316. *See Farnsworth on Contracts* § 12.9 ("The party in breach is required to account for a benefit that has been conferred by the injured party. Sometimes this is accomplished by requiring the party in breach to return the very benefit received and sometimes by requiring that party instead to pay a sum of money that represents the value of the benefits."). As the Federal Circuit in *Hansen II* found: (1) the stock transfer was "an essential component of the merger;" and (2) the stock transfer assisted the government and was "... desirable from the FSLIC's point of view" in order to avoid the high cost of liquidating another insolvent thrift. 367 F.3d at 1317. Rather than focusing on the microcosm of the various written agreements or the government's argument that shareholders retained their ownership of the acquisition vehicle, *Hansen II* focused the essence of the government's and assurances. "The centrality of the government's promise to the success of Hansen Savings suggests that the merger should be viewed as a *contribution* of stock to a joint and risky venture, rather than as an *exchange* of shares between two entities owned by the Hansens." 367 F.3d at 317 n. 14 (emphasis in original). Likewise, the "centrality" and essence of the transaction here is that SSA and its attendant management were used and "contributed" to a "joint and risky venture" with the government for an estimated ten years until the anticipated upswing in the Texas economy materialized at which time both the government and CHTE would share in the post-survival profits. The government would avoid the cost of liquidation; CHTE's subsidiary would take on the Sisypheon debt load with massive government assistance including the capital credit. Clearly SSA was put at risk by those shackles.

In *American Capital Corp. v. United States,* 59 Fed.Cl. 563, 581–82 (2004), damages included the value of equity in the thrift where the thrift's sole shareholder " 'put on the table' " its equity in the thrift (valued at $126,479,000) to acquire two failed thrifts in return for government assistance to the resulting thrift. The restoration of that amount would "... put [the holding company] in as good a position as the party would have been in had the contract not been made." *Id.* at 572, citing *Restatement (Second) of Contracts* § 344.[67]

The court concludes that CHTE put its subsidiary on the table as an essential component of a dicey venture with the government which advanced the government's interests. *Hansen II,* 367 F.3d at 1316–17. The court likewise sees no compelling distinction between *Hansen II* and this case. CHTE should be reimbursed for the value of its stock.

Plaintiff's expert, Dr. McConnell offered his opinion on the value of the stock of "old" SSA using what he referred to as a comparable company's multiple approach.[68] He computed the ratios of the net worth of comparable publicly traded thrifts to their market value[69] and then applied the average (median) of those ratios to SSA to determine a stock value. Dr. McConnell has published several articles using this approach.[70] He

---

**67.** The court in *American Capital* rejected essentially the same argument the government makes here—that the use of the acquiring thrift was not "required" by the Assistance Agreement. The court found that the corporation was "put on the table" as the condition to the benefits in the Assistance Agreement. 59 Fed.Cl. at 581.

**68.** Dr. McConnell rejected using a discounted cash flow analysis to value the stock of the privately-held SSA because it would have required projections into SSA's future which would have been speculative. Tr. 2096–97.

**69.** Market value was the product of the number of common shares outstanding times the average share price for the ten trading days prior to and including the valuation date.

**70.** Peer-reviewed publications using this matching procedure during the time targeted in his expert opinion in this case were *"Earnings Signals in Fixed–Price and Dutch Auction Self–Tender Offers,"* Journal of Financial Economics, August 1998, Vol. 49, No. 2, pp. 161–186 (with C. Lie); *"To Live or Let Die? An Empirical Analysis of Piecemeal Voluntary Corporate Liquidations,"* Journal of Corporate Finance, December 1997, Vol. 3, No. 4, pp. 325–254 (With G.R. Erwin). Tr. 2110–11.

first identified comparable publicly traded thrifts. From the roughly 3,200 thrifts nationally, he selected thrifts in Federal Home Loan Bank's Districts 9 and 10, the two Districts encompassing Texas and the surrounding area. From those, only 24 were publicly traded. Privately traded thrifts' financial information was not publicly available. Because many publicly traded thrifts file on a consolidated basis with their parent holding company, Dr. McConnell sifted out a holding company if its thrift did not constitute at least 95% of its holdings. This filter reduced the comparables to twenty.[71] Pl. Facts No. 397; PX 214. As all thrifts, both publicly and privately owned are required to file TFR's (which are publicly available), Dr. McConnell culled from the twenty selected thrifts what he determined to be key financial data—total assets, net mortgage loans, foreclosed real estate, and deposits. He then calculated "GAAP net worth" for each of the selected thrifts (total assets less ten specific TFR line items,[72] referred to hereinafter as "McConnell GAAP" in recognition of the government's objection that this product is not "true" GAAP). He made these calculations as of September 30, 1987 and December 30, 1987. PX 215, 217. He then excluded one thrift from his September 30, 1987 list and three from his December 30, 1987 group that had negative McConnell GAAP.[73]

Dr. McConnell then narrowed the list to those with mortgage loans and "pass-through securities" at least 50% of assets and foreclosed real estate at least 2% of assets. He compiled average market values for ten trading days prior to, but including December 31, 1987 and, separately, March 31, 1988 [74] and computed the ratio of market value (common shares outstanding times average price per share) to McConnell GAAP. PX 209A and PX 210A. The ratios ranged from 5.3% to 60.4% with a median of 36.6% for December 31, 1987. The ratios ranged from 9.9% to 451.9% [75] for March 31, 1988, with a median of 52.5%. He then took the same TFR financial data for SSA, applied the median ratios and concluded SSA's stock was valued at $4.754 million as of December 31, 1987, and $2.533 million as of March 31, 1988, values less than 1% of SSA's pre-merger $1.3 billion in assets. Tr. 2110–2114; PX 211A. As CHTE owned approximately 90% of the stock, that percentage would apply to those valuations. Tr. 2113.

The government assails the comparables used by Dr. McConnell, arguing that the ratio of net worth to publicly traded stock price does not *ipso facto* apply with like force to SSA, a privately held thrift. Secondly, SSA was not in capital compliance; the comparables were. Also Dr. McConnell did not factor individual risk characteristics such as loan delinquencies and non-accrual levels. Dr. Cox, the government's expert, criticized the comparables, asserting they all were all in better financial shape than SSA, and ob-

---

71. Dr. McConnell wanted to insure that the market value of a holding company reflected the value of the subsidiary thrift, not any other assets, thus he required that a thrift(s) constitute at least 95% of the holding company's assets. Tr. 2100.

72. From total assets, the following were subtracted from both the comparables and SSA: Redeemable Preferred Stock, Qualifying Mutual Capital Certificates, Qualifying Subordinated Debentures, Appraised Equity Capital, Net Worth Certificates, Accrued Net Worth Certificates, Income Capital Certificates, Deferred Net Losses (Gains) on Loans Sold, Deferred Net Losses (Gains) on Other Assets Sold, and Accounts Receivable Secured by Pledged Deposits. DX 356, p. 2.

73. Any ratio applied to a negative number produces a negative number. A ratio applied to negative GAAP would result in a negative share price—a negative market value for the thrift, which is most often not the case in the real

world. Tr. 2106–08 (McConnell). As even government expert Dr. Cox admitted, a thrift with a negative net worth will nevertheless have a positive market value as a going concern. Tr. 2269–70 (McConnell); Tr. 3676–77(Cox). Accordingly, Dr. McConnell did not apply his formula to negative numbers.

74. Dr. McConnell used TFR data from the preceding quarter for his December 31, 1987 and March 31, 1988 valuations. Tr. 2104–05. He testified that an investor on December 31, 1987 and March 31, 1988 would use the financial information from the TFR from the prior quarters. Accordingly, an investor's valuation as of March 31, 1988 would be based on the TFR from December 31, 1987.

75. Dr. McConnell's use of the median rather than the average ratio lessens the impact of extremes such as the 451.9% ratio. Tr. 2110.

jected to Dr. McConnell's extrapolation of GAAP net worth from TFRs. By way of illustration, the government asserts that Dr. McConnell's estimate of SSA's GAAP net worth for the quarter ending September 30, 1987 was three times the amount given by SSA and its auditors. While Dr. McConnell responded to this criticism by explaining that his computation of McConnell GAAP was dictated by an OTS directive, the government replies that the "directive" was not mandatory, and the document itself cautioned that GAAP capital prior to 1989 could not be accurately calculated. The government also notes that Dr. McConnell could have used annual or quarterly reports for actual GAAP numbers and make comparisons from there. As a result, Dr. McConnell's numbers are assertedly pure speculation. However, when pressed on this point at trial, Dr. McConnell insisted that as long as his methodology was applied consistently to both SSA and the comparables, his conclusions remained scientifically valid. The government did not offer a counter-opinion on the value of the stock.

The government is correct in that McConnell's GAAP differs from generally-accepted accounting principles. There are differences between RAP, GAAP and McConnell GAAP. For example, CHTE's contribution of States General Life Insurance Company under GAAP would be reported at its 1930 value while under RAP, it would be booked at its current fair market value, a difference of six million dollars. Tr. 2267. Dr. McConnell took the same economic data reported on the same lines of the same TFR publicly available forms as the denominator in his ratio calculation, market value being the numerator. He used the same TFR components from SSA, and using the median ratio obtained in the first calculation, solved for "X"

to reach his valuation. That the "GAAP" label for the constituent components is not the same as the accounting definition of that label is of no consequence. The economic data used in both reaching the ratio and applying it to SSA was the same. Dr. McConnell explained:

> Well, GAAP accounting follows a set of rules. There is no question about that. That's a set of rules. RAP accounting is a different set of rules. As long as, in my view, as long as one is consistent in following those set of rules, then comparing two institutions on the basis of that set of rules is a completely legitimate undertaking. So to me or from my perspective, one is not true and the other false, they are calculations each of which is done according to a prescribed procedure. One is as relevant as the other, in my opinion.

Tr. 2264–65.

In response to the government's criticism, Dr. McConnell looked at the three publicly traded thrifts with negative McConnell GAAP. He computed the ratio of both total assets and deposits (both positive numbers) to market value. Tr. 2134–36. The results of those computations are greater than his opinion of the value of SSA's stock—$4.754 million as of December 31, 1987 and $2.533 million as of March 31, 1988. This testimony, given in response to criticism, was offered by proffer as it was not contained in Dr. McConnell's original opinion.[76] The court concludes, as it stated preliminarily at trial, because the constituents of equations are otherwise in the record, the expert (as well as the court) can do the math. Computing the ratio of market value to total assets and separately to total deposits for the thrifts with negative McConnell GAAP results in the following:

---

76. The government objected to Dr. McConnell's response to this criticism as it was beyond his expert witness report. Plaintiff responded that under the unique case-management in the *Winstar* cases, supplemental reports to expert reports prepared in 1998 were inappropriate and were met with motions to quash in other cases. Tr. 2117. In any event, the court allowed Dr. McConnell to testify as to his mathematical calculations from numbers already in the record. Tr. 2121–22.

Sept. 30, 1987—TFR
Dec. 31, 1987—Market Value
Ratios of Market Value to Assets and to Deposits

| Thrift and McConnell GAAP Net Worth | Market Value | Total Assets | Ratio to Market Value | Deposits | Ratio to Market Value |
|---|---|---|---|---|---|
| First Federal of Ark. $(35,520,000) | $2,760,000 | $1,775,435,000 | 0.0016 | $1,227,994,000 | 0.0022 |

Applying these ratios to SSA's total assets and total deposits from SSA's September 30, 1987 TFR results in a market value for SSA of $2,141,091 (.0016 times $1,338,182,000 [Total assets]) and $2,012,296 (.0022 times $914,680,000 [Deposits]). PX 214, PX 215.

Dec. 31, 1987—TFR
March 31, 1988—Market Value
Ratios of Market Value to Assets and to Deposits

| Thrift and McConnell GAAP Net Worth | Market Value | Total Assets | Ratio to Market Value | Deposits | Ratio to Market Value |
|---|---|---|---|---|---|
| Columbia Savings $(56,711,000) | $9,327,000 | $2,807,319,000 | 0.0033 | $1,764,079,000 | 0.0053 |
| First Federal of Ark. $(44,510,000) | $3,358,000 | $1,785,408,000 | 0.0019 | $1,201,836,000 | 0.0028 |
| Occidental/Nebraska $(643,000) | $2,803,000 | $ 715,580,000 | 0.0039 | $ 506,459,000 | 0.0055 |

Applying the lowest (most conservative) ratio separately to SSA's total assets and total deposits from SSA's December 31, 1987 TFR results in market values for SSA of $2,679,893 (.0019 applied to SSA's total assets of $1,410,470,000) and $2,668,809 (.0028 applied to SSA's total deposits of $953,146,000). These extrapolations are close to, and provide support for Dr. McConnell's opinion of $2.533 million as of March 31, 1988. PX 217. Using valuation as of March 31, 1988 (closest to the May 1988 contribution), the court concludes the value of SSA's stock was $2.533 million. CHTE's 90% share is $2,279,700.

The court does not reject McConnell's opinion on the grounds that his methodology does not apply to negative numbers, particularly his GAAP calculations. SSA's value was inherent to the May, 1988 transactions despite its regulatory capital deficiencies. The market value of comparable publicly traded thrifts did not decrease significantly as a result of a reported negative McConnell GAAP. For example, Columbia Savings had a market value of $9,978,000 as of December 31, 1987 and a market value of $9,327,000 as of March 31, 1988. PX 214. During the corresponding prior quarter TFR reports, Columbia Savings' McConnell GAAP plummeted from $20,825,000 to a negative $56,-711,000—a drop of over $70 million. PX 215, 217. First Federal of Arkansas had a market value of $2,760,000 as of December 31, 1987 and a market value of $3,358,000 as of March 31, 1988. PX 214. During the corresponding prior quarter TFR reports, First Federal's McConnell GAAP fell from negative $35,520,000 to a negative $44,510,000. PX 215, PX 217. Occidental Nebraska had a market value of $1,813,000 as of December 31, 1987 and a market value of $2,803,000 (PX 214) as of March 31, 1988 with a corresponding drop in McConnell GAAP of $3,068,000 as of September 30, 1987 and negative $643,000 as of December 30, 1987. PX 215, PX 217. Mindful of the recognition (or at least hope) that the thrift industry was in crisis but that recovery or government bailout was in the future, thrifts even with

McConnell-defined negative GAAP had value.[77]

The government also argues that Dr. McConnell's conclusions are flawed because they are not based on the most up-to-date financial data. The government posits that an investor eyeing this equity asset as of May 18, 1988, the date of closing, would have had SSA's March 31, 1988 TFR audit report that SSA lost an additional $9 million dollars in the preceding quarter. DX 499Q. SSA was losing money every quarter from September 30, 1987 through September 30, 1989. Tr. 2218. Accordingly, the government asserts, the McConnell GAAP value of SSA would be much lower resulting in a lower stock value upon application of the ratio Dr. McConnell developed. Dr. McConnell did not know if the March 31, 1988 TFR would have been publicly available to a potential investor on May 18, 1988. Tr. 2221–22. There is conflicting evidence on this point. The FSLIC liquidation analysis presented to the Board, dated May 4, 1988 prepared at least in part by Carrie Wagner was based on December 31, 1987 reports. FX 68. As Wagner explained, TFR's were available six to eight weeks after the close of a quarter. Tr. 3149. If regulators did not use March 31, 1988 financial data for liquidation analysis to the FHLBB on May 4, 1988, that March data probably would not have been publicly available to a hypothetical investor for purposes of valuing CHTE's stock in May of 1988. FX 68, PX 24 at 00429, 00431, 00435, 00438. On the other hand, a former government examiner of SSA testified that the March report would have been available by mid-May at or about the time of this acquisition. Tr. 3205. The ORPOS package dated May 18, 1988 used assets, liabilities, and regulatory capital of pre-merger SSA from March 31, 1988. DX 139. The court need not however, reconstruct the public forum because applying the lowest ratios discussed above (to obtain the lowest and most conservative results) does not result in valuations

that differ dramatically from those of Dr. McConnell:

.0016 (ratio of market value of thrifts with negative McConnell GAAP to total assets) times $1,524,131,000 (SSA's March 31, 1988 TFR gross assets—line SUB0280 [DX 499Q])[78] equals $2,438,609; .0027 (ratio of market value of thrifts with negative McConnell GAAP to total deposits) times $997,982,000 (SSA's TFR total deposits— line SC710 [DX 499Q]) equals $2,694,551.

In a sensitivity analysis to cross-check his opinion, Dr. McConnell also computed the median ratio adding back in 4 thrifts he had previously excluded because of percentage of net mortgage loans, contract and pass-through securities lower than SSA's. PX 237G. He also analyzed only thrifts in Texas. None of his sensitivity checks altered his opinion on the value of CHTE's stock. Tr. 2127.

Moreover, pre-merger government valuations of SSA are not substantially different from Dr. McConnell's valuations. DX 117 at 054943 (FSLIC memorandum reporting SSA had 27.6 million of goodwill); FX 68 (Wagner's liquidation analysis of SSA included net worth of $36,765,000); DX 38 (SSA stock valued at between $18 and $20 million as of June 30, 1987 according to investment banking firm.).

In this regard the court values Dr. McConnell's testimony over that of Dr. Cox or Mr. Bankhead, the government experts. These experts did not offer a counter opinion; they merely criticized Dr. McConnell's testimony and calculations. *See Westfed Holdings, Inc. v. United States,* 55 Fed.Cl. 544, 558, 574–75 (2003) (finding Bankhead's testimony and that of another government expert who did not develop an analytical model but only commented on trial evidence and testimony, to be of "limited usefulness"). Bankhead criticized Dr. McConnell's use of TFR data

---

77. The government also points out that Dr. McConnell's opinions are inconsistent in that during a three-month period, SSA's equity value dropped 50% but the value of SSA's subdebt increased during that same time. He explained this apparent anomaly resulted from his use of a more conservative subdebt rating. Tr. 2262–63 (Dr. McConnell).

78. The TFR numbers are not exactly the same as noted on McConnell's exhibits, but are not substantially different *Cf.* DX 499O, DX 499P with DX 215, 217.

and asserted SEC GAAP capital figures would have been more predictive of market value. However, he then acknowledged that equity analysts often adjust GAAP accounting figures in assessing a company's economic value. Also, government expert Dr. Cox did not disagree with Dr. McConnell's calculation of McConnell GAAP based on TFR data (Tr. 3682), and government regulators relied on TFR data rather than GAAP financial reports.

It is neither unjust to award CHTE its money back, nor does the award constitute a windfall. The government's breach was material and substantial. CHTE's required contributions made in reliance on the government's promises were "real" and their value "reasonably ascertainable." *Glendale*, 378 F.3d at 1310. Return of the value of CHTE's required contributions due to the government's material breach fits squarely within the parameters of *Hansen II.* "We have noted that if a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery, and the court's duty is to make a fair and reasonable approximation of damages." 378 F.3d at 1313 (citations and internal quotation marks omitted). Reasonable approximation was recently reaffirmed in *California Federal Bank v. United States*, 395 F.3d 1263, 1267 (Fed.Cir.2005). As noted, doubts as to the amount of damages are resolved in favor of the nonbreaching party. *Restatement (Second) of Contracts* § 351 cmt. A ("Doubts are generally resolved against the party in breach.").

Finally, there is sufficient evidence to make a fair and reasonable approximation of damages and offsetting benefit. Accordingly, as an alternative to the foregoing, the court applies the so-called "jury-verdict" approach to damages as "the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation [of damages]." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1357 (2001) (citations omitted). Accordingly, the court finds in that alternative, that upon careful consideration of all the evidence and testimony, based on "the exercise of the court's best judgment," that the value of CHTE's contri-

bution of the subdebt was $21.7 million and the value of the equity in SSA was $2,279,700—the value of the Trust's approximately 90% share of SSA's stock as of March 31, 1988 (the reporting period closest to the acquisitions) for a total of $23,979,700 which, separately and in combination is "a fair and reasonable approximation" of the value of CHTE's contributions. Deducting $9,132,600, the value of the release, net damages are $14,847,100.

## Conclusion

Accordingly, based on the foregoing:

1. The Clerk of Court shall enter judgment for the plaintiff in the sum of $14,847,100;

2. Plaintiff's Motion for Leave to File Supplemental Argument about New Authority, filed March 11, 2005, to which the government filed a Response on March 28, 2005; plaintiff's Motion for Leave to File a Reply, filed April 8, 2005, and plaintiff's Motion for Leave to File supplemental Argument, filed April 8, 2005, are **GRANTED**. All other pending motions are **MOOT**.

3. No costs.